ELLEN F. ROSENBLUM
Attorney General
CHRISTINA L. BEATTY-WALTERS #981634
SCOTT J. KAPLAN #913350
Senior Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Tina.BeattyWalters@doj.state.or.us
         Scott.Kaplan@doj.state.or.us

*Additional counsel listed on signature page*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| STATE OF OREGON; STATE OF NEW YORK; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; and STATE OF WISCONSIN, | Case No.<br><br>COMPLAINT |
| Plaintiffs, | |
| v. | |
| ALEX M. AZAR II, in his official capacity as Secretary of Health and Human Services; | |

Page 1 -   COMPLAINT

TBW/j8b/9283940-v17

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
DIANE FOLEY, in her official capacity as the
Deputy Assistant Secretary, Office of
Population Affairs; and the OFFICE OF
POPULATION AFFAIRS,

                    Defendants.

## I.    INTRODUCTION

1.      This lawsuit challenges a U.S. Department of Health and Human Services

("HHS") final rule ("Final Rule") that would fundamentally alter the Title X family planning

program – a federal grant program that currently provides over $286 million annually in vital

family planning and preventive health services to low-income individuals.  The Final Rule would

impose burdensome and unnecessary restrictions that would reduce access to care, interfere with

the patient-provider relationship, and undermine Congress's intent in enacting Title X of the

Public Health Service Act nearly five decades ago.

2.      The Title X family planning program plays "a critical role in ensuring access to a

broad range of family planning and related preventive health services for millions of low-income

or uninsured individuals and others," and is "the only federal grant program dedicated solely to

providing individuals with comprehensive family planning and related preventive health

services."  *About Title X Grants*, U.S. Dep't of Health & Human Servs.[1]

3.      Title X funds have for decades ensured access to high-quality family planning and

related preventive services for underserved families across the country.  These services have

---

[1] *Available at* https://www.hhs.gov/opa/title-x-family-planning/about-title-x-grants/index.html.

Page 2 -    COMPLAINT

TBW/j8b/9283940-v17

allowed millions of low-income women[2] to control their own reproductive destinies and, by extension, achieve greater control over their social and economic futures. The purpose of the Title X program is to ensure equitable access to high-quality family planning services in the United States, regardless of a person's economic condition – to ensure that the highest quality family planning services should be available to all, not just to those who are economically privileged. Access to these vital services is threatened by the Final Rule that is the subject of this suit.

4.    On March 4, 2019, HHS published the Final Rule in the Federal Register amending the regulations developed to administer Title X. *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7,714 (Mar. 4, 2019). In this suit, the states of Oregon, New York, Colorado, Connecticut, Delaware, District of Columbia, Hawai'i, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Pennsylvania, Rhode Island, Vermont, Virginia, and Wisconsin (collectively "States")[3] seek an order vacating the Final Rule as contrary to the U.S. Constitution, contrary to the governing statutes, and arbitrary and capricious. The States also seek an injunction against the implementation of the Final Rule to prevent irreparable injury to the States and their residents. The States and their residents are harmed by the Final Rule, because it is contrary to their laws, policies, and sovereign and quasi-sovereign interests, and would cause them financial injury

---

[2] While this Complaint addresses the Final Rule's impact on women, its allegations are inclusive of individuals who do not identify as women, including but not limited to some transgender men.

[3] As used herein, "States" includes the District of Columbia.

Page 3 -    COMPLAINT

TBW/j8b/9283940-v17

from increased health care costs as a result of an increase in unintended pregnancies, cancers not

detected in early stages, and the spread of sexually transmitted infections ("STIs"). These costs

– and significant public health impacts – will be caused by the Final Rule's restriction of access

to the high-quality family planning and related preventive services for low-income individuals

that Title X has funded for decades.

5.      The Final Rule restricts access to high-quality health care in numerous ways.

First, the Final Rule imposes a gag rule on Title X providers by prohibiting them from offering

pregnant patients "nondirective counseling" on *all* legal options relating to pregnancy.

Nondirective counseling includes the provision of neutral, factual, accurate, and complete

information about prenatal care and delivery, infant care, foster care, adoption, and abortion (as

well as any referrals requested by the patient). Title X programs have provided nondirective

counseling, including referrals for pregnancy services upon request of a patient, in accordance

with not only the controlling statutory and regulatory provisions, but also standards of care and

ethics in the medical professions.

6.      Moreover, although the Final Rule appears to allow what it calls "nondirective

counseling" by some medical professionals (physicians or providers with advanced degrees

("advanced practice providers")), 84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. §

59.14(b)(1)(i)), the Final Rule also specifically restricts counseling "as an indirect means of

encouraging or promoting abortion as a method of family planning." 84 Fed. Reg. at 7,789 (to

be codified at 42 C.F.R. § 59.14(c)(1)). The Final Rule is, in this way, internally inconsistent

and will result in high-quality providers being unwilling to participate in a program that

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

compromises their medical and ethical standards, eroding the high standard of care that has long applied to pregnancy counseling under Title X.

7.      Further, the Final Rule prohibits abortion referrals – and would do so regardless of the professional opinions of the health care providers or the needs or desires of the patient. Yet, as HHS acknowledges in the Final Rule, nondirective counseling includes referrals upon request.  84 Fed. Reg. at 7,734.  Under the Final Rule, a Title X provider could decline to provide any information about abortion providers to a pregnant patient even if that is the only information the patient requests.  The most a Title X provider would be permitted to do is to provide a list of comprehensive primary health care providers, fewer than half of whom provide abortion, without identifying in any way the providers who provide abortion.  Moreover, in contrast to the limits placed on providers' ability to provide neutral, factual, and nondirective information about abortion services, the Final Rule affirmatively requires all providers to refer pregnant patients for prenatal care, whether the patient wants such a referral or not.  These changes will violate current statutory requirements and force health care providers to violate their codes of ethics and professional standards, or to decline Title X funds.  Either way, access to high-quality family planning services will plummet.

8.      Second, the Final Rule requires strict, unnecessary, and arbitrary financial and physical separation of any Title-X-funded provider from all facilities and entities that have virtually anything to do with abortion.  This change would require providers who provide abortions or who offer truly nondirective pregnancy counseling, including abortion referrals, to dramatically restructure their activities to continue offering these services regardless of their

Page 5 -    COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

financial ability to restructure or the needs of their patients.  These irrational and arbitrary new requirements are likely to discourage current Title X providers from participating in Title X.  The Final Rule would, if implemented, force clinics to close or reduce their services to the detriment of their patients, because many clinics could or would not restructure as required but could no longer remain open or maintain service levels without Title X funds.

9.      These arbitrary and irrational requirements are also contrary to the express direction of Congress, which in 2010 prohibited HHS from adopting any regulation that, among other things, "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care," "interferes with communications regarding a full range of treatment options between the patient and the provider," "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions," or "violates the principles of informed consent and the ethical standards of health care professionals."  42 U.S.C. § 18114.  The Final Rule is contrary to all of these congressional limitations on HHS's authority.

10.      Because compliance with the Final Rule would require providers to compromise their professional responsibilities to their patients, the Final Rule's changes would cause a dramatic nationwide reduction of the number of high-quality providers who remain in the Title X program.  And those providers who do remain would be prohibited from providing the same high-quality medical advice and care that they have always provided.  The Final Rule will strip providers of their ability to provide factual, neutral, nondirective medical counseling and referrals on all pregnancy options. That is, they will be unable to provide nondirective counseling

Page 6 -    COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

and referrals that are required by statute and that providers as medical professionals have concluded are required, while at the same time providers will be required to refer pregnant patients for prenatal care even if not desired by the patient.

11.     The Final Rule will necessarily shrink access to high-quality care at Title X clinics for underserved individuals in the States and around the country, to the detriment of the public health.  The States will thus be placed in the untenable position of (a) having their ability to compete for Title X funds severely disadvantaged by the Final Rule; (b) accepting any Title X funds on the condition that they comply with unlawful and unconstitutional restrictions, (c) rejecting Title X funds to preserve providers' ability to deliver necessary medical advice and instead apply scarce state funds to continue to provide for their residents all the services that Title X has for decades funded, or (d) where and if state law allows, simply abandoning their residents who require high-quality family planning services and who might then do without or resort to other, less safe and less medically-appropriate options.

## II.     JURISDICTION AND VENUE

12.     The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).  Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

13.     Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706 and as authorized in 28 U.S.C. §§ 2201 and 2202.

14.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1).  Defendants are United States agencies or officers sued in their official capacities.  Plaintiff the

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

State of Oregon is a resident of this judicial district, and the other Plaintiffs consent to adjudication of these issues in this district.  Divisional venue is proper pursuant to Local Rule 3-2(b) because a substantial part of the events or omissions giving rise to the claim occurred in this division. The capital of the State of Oregon is located in Marion County, which is located in this division.

### III.    PARTIES

15.    Plaintiff the State of Oregon, acting by and through its Governor, Kate Brown, and the Oregon Health Authority, a state agency, brings this action. Governor Brown is the state's chief executive officer and responsible for overseeing the state's operations and ensuring its laws are faithfully executed.  The Attorney General of Oregon, Ellen Rosenblum, is the chief law officer of Oregon and is empowered to bring this action on behalf of the State of Oregon, the Governor, and the affected state agencies under ORS 180.060, ORS 180.210, and ORS 180.220.

16.    Plaintiff the State of New York, represented by and through its Attorney General, Letitia James, is a sovereign state of the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

17.    Plaintiff the State of Colorado is a sovereign state of the United States of America. The State of Colorado brings this action by and through its Attorney General, Philip J. Weiser. The Attorney General has authority to represent the state, its departments, and its agencies and "shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party." Colo. Rev. Stat. § 24-31-101.

Page 8 -    COMPLAINT

TBW/j8b/9283940-v17

18.     Plaintiff the State of Connecticut, acting by and through its Attorney General, William Tong, brings this action as the chief civil legal officer of the state, and at the request of Governor Ned Lamont.  Attorney General Tong is empowered to bring this action on behalf of the State of Connecticut and the Governor under Conn. Gen. Stat. § 3-124 *et. seq.*

19.     Plaintiff the State of Delaware, by and through its Attorney General Kathleen Jennings, brings this action.  The Attorney General is the chief law enforcement officer of the State of Delaware, Del. Const., art. III, and has the authority to file civil actions in order to protect public rights and interests.  29 Del. C. § 2504.

20.     Plaintiff the District of Columbia ("District") is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government.  The District brings this case through the Attorney General for the District of Columbia, Karl A. Racine, who is the chief legal officer for the District and possesses all powers afforded the Attorney General by the common and statutory law of the District.  The Attorney General is responsible for upholding the public interest and has the authority to file civil actions in order to protect the public interest.  D.C. Code § 1-301.81.

21.     Plaintiff the State of Hawaiʻi represented by and through its Attorney General, Clare E. Connors, brings this action.  The Attorney General is Hawaiʻi's chief law enforcement officer, and is authorized to pursue this action pursuant to Hawaiʻi Revised Statutes §28-1.

22.     Plaintiff the State of Illinois, by and through its Attorney General, Kwame Raoul, brings this action. Illinois is a sovereign state in the United States of America. The Attorney

Page 9 -    COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

General is Illinois's chief law enforcement officer and is authorized to advance the state's interest in protecting access to critical health care services for women and men.

23.     Plaintiff the State of Maryland is a sovereign state of the United States of America.  Maryland is represented by and through its chief legal officer, Attorney General Brian E. Frosh.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

24.     Plaintiff the Commonwealth of Massachusetts, represented by and through its Attorney General, Maura Healey, is a sovereign state in the United States of America and a direct Title X grantee.  The Attorney General is the commonwealth's "chief law officer" and has both statutory and common-law authority to represent in litigation the commonwealth and its agencies and officials, as well as the public interest of the people of Massachusetts. *Feeney v. Commonwealth*, 366 N.E.2d 1262, 1266-67 (Mass. 1977); see also Mass. Gen. Laws ch. 12, § 3.

25.     Plaintiff the State of Michigan, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General, Dana Nessel, is Michigan's chief law enforcement officer and is authorized to pursue this action pursuant to Mich. Comp. Laws § 14.28.

26.     Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Keith Ellison is the chief

Page 10 -  COMPLAINT

TBW/j8b/9283940-v17

legal officer of the State of Minnesota and his powers and duties include filing lawsuits in federal court on behalf of the State of Minnesota.  Minn. Stat. § 8.01.

27.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign state within the United States of America.  The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

28.     Plaintiff the State of New Jersey is a sovereign state of the United States of America. This action is being brought on behalf of the state by Attorney General Gurbir S. Grewal, the state's chief legal officer. *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

29.     Plaintiff the State of New Mexico, represented by and through its Attorney General, Hector Balderas, is a sovereign state in the United States of America.  The Attorney General is New Mexico's chief law enforcement officer, and is authorized to pursue this action pursuant to NMSA 1978, Section 8-5-2 (1975).

30.     Plaintiff the State of North Carolina, represented by Attorney General Joshua H. Stein, is a sovereign state of the United States of America.  The Attorney General is the state's chief law enforcement officer and is authorized to pursue this action under his constitutional, common law, and statutory powers pursuant to Chapter 114 of the North Carolina General Statutes.

31.     Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America. This action is brought on behalf of the commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1. Attorney

Page 11 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

General Shapiro brings this action on behalf of the commonwealth pursuant to his statutory authority under 71 P.S. § 732-204.

32.    Plaintiff the State of Rhode Island has the authority to initiate this action by and through its Attorney General, Peter F. Neronha. The Attorney General is a constitutional officer of the state, is vested with all of its common-law powers, and has broad discretion to bring actions for the benefit of the state. *See* R.I. Const. art. 9, sec. 12; Rhode Island Gen. Laws § 42-9-6. *See also State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 470-474 (R.I. 2008).

33.    Plaintiff the State of Vermont, represented by and through its Attorney General, Thomas J. Donovan, is a sovereign state in the United States of America. The Attorney General is the state's chief law enforcement officer and is authorized to pursue this action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 & 157.

34.    Plaintiff the Commonwealth of Virginia, acting on behalf of the Virginia Department of Health, a direct Title X grantee, brings this action by and through its Attorney General, Mark Herring.  The Attorney General has authority to represent the commonwealth, its departments, and its agencies in "all civil litigation in which any of them are interested."  Va. Code Ann. § 2.2-507(A).

35.    Plaintiff the State of Wisconsin, represented by and through its Attorney General, Joshua L. Kaul, is a sovereign state of the United States of America. The Attorney General appears in this action at the request of the Governor to represent the interests of the State of Wisconsin pursuant to Wis. Stat. sec. 165.25(1m).

Page 12 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

36.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the decision to issue the Final Rule has damaged their sovereign, quasi-sovereign, and proprietary interests, and will continue to cause injury unless and until the Final Rule is vacated.

37.     Defendant Alex M. Azar II is the United States Secretary of Health and Human Services and the administrator of HHS, and is named in his official capacity.  The Secretary is authorized by Title X to make grants to and enter into contracts with the States and other public entities to establish and operate voluntary family planning projects.  42 U.S.C. § 300(a).

38.     Defendant HHS is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

39.     Defendant the Office of Population Affairs ("OPA") is an agency within HHS, and under its jurisdiction.  OPA is the agency responsible for administering the Title X program.

40.     Defendant Diane Foley is the Deputy Assistant Secretary for OPA.  She is sued in her official capacity.

### IV.     HISTORY OF THE TITLE X STATUTE AND REGULATIONS

41.     Congress enacted Title X of the Public Health Service Act ("Title X") in 1970 – nearly 50 years ago.  Since its enactment, Title X has been critically important in helping low-income people around the country meet their reproductive and family planning health care needs.  As noted, it is the only federal grant program that is focused exclusively on providing comprehensive family planning and related preventive health services.

Page 13 -  COMPLAINT

TBW/j8b/9283940-v17

42.     The Title X statute authorizes the HHS Secretary to make grants to public or private nonprofit entities "to assist in the establishment and operation of voluntary family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)."  42 U.S.C. § 300(a); *see generally* Pub. L. No. 91-571, 84 Stat. 1504, 1506 (1970).  In Section 1008 of Title X, Congress specified that no Title X funds "shall be used in programs where abortion is a method of family planning."  42 U.S.C § 300a-6.

43.     HHS first issued regulations implementing Section 1008 in 1971 and 1980, stating simply that Title X projects "will not provide abortion as a method of family planning."  36 Fed. Reg. 18,465, 18,466 (Sept. 15, 1971); 45 Fed. Reg. 37,433, 37,437 (June 3, 1980).

44.     Early in the history of Title X, HHS developed interpretations and legal opinions about Title X's abortion-funding prohibition.  Specifically, during the mid-1970s, HHS distinguished between directive counseling, which it prohibited, and nondirective counseling, which it allowed.  HHS viewed directive counseling as that which "encourage[ed] or promot[ed]" abortion, and nondirective counseling as "neutral" counseling that would include all pregnancy options including childbirth, adoption and abortion.  *See Nat'l Family Planning v. Sullivan*, 979 F.2d 227, 229 (D.C. Cir. 1992).

45.     In 1981 HHS issued a formal guidance document ("1981 Guidelines").  The 1981 Guidelines required Title X programs to offer all pregnant patients nondirective counseling and referrals about their pregnancies.  U.S. Dep't of HHS, Bureau of Community Health Services, Program Guidelines for Project Grants for Family Planning Services 13 (1981).  As HHS specified in the 1981 Guidelines, all pregnant patients "requesting information on options for the

Page 14 -  COMPLAINT

TBW/j8b/9283940-v17

management of an unintended pregnancy are to be given non-directive counseling" on three

"alternative courses of action," namely: (a) prenatal care and delivery; (b) infant care, foster care,

or adoption; and (c) pregnancy termination. *Id.* The 1981 Guidelines further required that such

patients receive a "referral upon request" for obtaining services. *Id.*

46.     As HHS has explained, these requirements for nondirective counseling and

referrals were consistent with Title X's abortion-funding prohibition because "the provision of

neutral and factual information" about all pregnancy options, including abortion, does "not have

the effect of promoting or encouraging abortion." 65 Fed. Reg. 41,270-01, 41,271 (July 3,

2000).

47.     In 1988 HHS entirely reversed its own long-standing interpretations and

positions, and issued regulations prohibiting Title X projects from providing any counseling or

referrals for abortion, even if such counseling or referrals provided nondirective, factual, and

neutral information about pregnancy options. 53 Fed. Reg. 2,922, 2,954 (Feb. 2. 1988). The

1988 regulations further required that grantees physically and financially separate their Title X

programs from any abortion-related activities. *Id.* at 2,945. The regulations also prohibited

activities "that encourage, promote or advocate abortion, such as lobbying or disseminating

informational materials concerning abortion as a method of family planning." *Id.* at 2,945-46.

48.     In promulgating the 1988 regulations, HHS primarily relied on reports from the

United States General Accounting Office (now renamed the Government Accountability Office)

and HHS's Office of Inspector General, which HHS claimed expressed concerns about a lack of

Page 15 -  COMPLAINT

TBW/j8b/9283940-v17

guidance regarding Title X's abortion-funding restriction and, as a result, possible non-compliance by existing grantees.

49.    The Supreme Court rejected challenges to the 1988 regulations in *Rust v. Sullivan*, 500 U.S. 173 (1991), based on the record before it and the case law then existing, but the regulations never fully went into effect.

50.    In 1993 HHS suspended the 1988 regulations based on its determination that those regulations amounted to "an inappropriate implementation of the Title X statute" that "unduly restrict[ed] the information and other services provided to individuals under [the Title X] program." 58 Fed. Reg. 7,464-01, 7,464 (Feb. 5, 1993).

51.    In 1996 Congress's annual HHS appropriation statute required that "all pregnancy counseling" in Title X programs "shall be nondirective." Omnibus Consolidated Rescissions and Appropriations Act, 1996, Pub. L. No. 104-134, Title II, 110 Stat. 1321, 1321-221 (1996). This nondirective-counseling mandate has appeared in every subsequent appropriations statute for Title X, including the most recent appropriations statute. *See, e.g.*, Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019 ("2019 Health and Human Servs. Appropriations Act"), Pub. Law. No. 115-245, Title II, 132 Stat. 2981, 3070-71 (September 28, 2018).

52.    In 2000 HHS issued final regulations ("2000 regulations") to govern Title X, which officially revoked the 1988 regulations and reinstated the long-standing HHS interpretations and positions set forth in the 1981 Guidelines. 65 Fed. Reg. 41,270 at 41,270-72 (July 3, 2000). In particular, HHS eliminated the restrictions on nondirective counseling and

Page 16 -  COMPLAINT

TBW/j8b/9283940-v17

abortion referrals and also the onerous physical and financial separation requirements.  HHS

affirmatively required that all Title X programs offer to provide nondirective pregnancy

counseling and referrals on request – a requirement that is consistent with Congress's statutory

nondirective-counseling mandate, the prior 1981 Guidelines, and public comments explaining

that such counseling is "a necessary component of quality reproductive health care services."  65

Fed. Reg. at 41,273.

53.     HHS supported its revocation of the 1988 regulations and reinstatement of its

prior policies based on the extensive history and experience of Title X grantees, which had

successfully participated in Title X and complied with the program requirements.  As HHS

determined, "Title X program grantees have operated on the basis of the policies of the 1981

Guidelines . . . for virtually the entire history of the [Title X] program and in general compliance

with" those rules.  65 Fed. Reg. at 41,272; *see id.* at 41,271 ("Both the program managers and the

Title X grantee community are well-versed in these policies and interpretations, and the grantees

have in the past generally been able to operate in compliance with them.").  Accordingly, the

rules set forth in the 1981 Guidelines and formally adopted in the 2000 regulations provided

adequate guidance "for program operation and for compliance with the statutory prohibition" on

the use of Title X funds.  *Id.* at 41,272.

54.     By contrast, HHS explained, the 1988 regulations lacked any evidentiary or

experiential support.  *Id.* at 41,271.  Because the 1988 regulations had never gone fully into

effect, no evidence or experience suggested that such rules could "work operationally on a

national basis in the Title X program."  *Id.*  Moreover, HHS concluded that the audits relied on in

Page 17 -  COMPLAINT

TBW/j8b/9283940-v17

the 1988 regulations had "showed only minor compliance problems" that did not justify "new interpretations of the law." *Id.* at 41,272.

55.    With respect to nondirective counseling and referrals, HHS found that the restriction on counseling and referrals (often referred to as the "Gag Rule") set forth in the 1988 regulations "endangers women's lives and health by preventing them from receiving complete and accurate medical information and interferes with the doctor-patient relationship by prohibiting information that medical professionals are otherwise ethically and legally required to provide to their patients." *Id.* at 41,270.  HHS also determined that "requiring a referral for prenatal care and delivery or adoption where the client rejected those options would seem coercive and inconsistent with" Congress's nondirective counseling requirement. *Id.* at 41,275.

56.    Accordingly, the 2000 regulations formally adopted the 1981 Guidelines' requirement that Title X projects offer pregnant patients the opportunity to receive neutral, factual, and nondirective information and counseling about prenatal care, foster care or adoption, and pregnancy termination, and referrals on request. *Id.* at 41,279.  HHS specified that nondirective counseling means the provision of "as much factual neutral information about any option, including abortion, as [the provider] consider[s] warranted by the circumstances," without steering or directing patients toward selecting a particular option. *Id.* at 41,273.

57.    With respect to the separation of Title X-funded activities and abortion services, HHS found that the 1988 regulations' physical and financial separation requirements lacked any evidentiary or experiential support. *Id.* at 41,275-76.  As HHS explained, the physical and financial separation requirements, including the "facts and circumstances" test for determining

Page 18 -  COMPLAINT

TBW/j8b/9283940-v17

such separation, were "ambiguous," had caused "practical difficulties," and had "little relevance

or applicability in the Title X program." *Id.* HHS further determined that such requirements

were "not likely ever to result in an enforceable compliance policy that is consistent with the

efficient and cost-effective delivery of family planning services." *Id.* at 41,276.

      58.     The 2000 regulations are still in effect today. It is the 2000 regulations that HHS

seeks to drastically change in the Final Rule that is the subject of this lawsuit.

      59.     Since the 2000 regulations were promulgated Congress has spoken. In addition to

requiring annually, in Title X appropriations statutes, that all pregnancy counseling be

nondirective, Congress has cemented into law the right of health care providers to provide full

information to their patients. In 2010 as part of the Affordable Care Act, Congress emphasized

the core principles underlying the statutory requirement for nondirective counseling and

uninhibited patient access to all information that health care professionals determine is ethically

and medically necessary for informed consent. Specifically, Congress expressly prohibited HHS

from

> Promulgat[ing] any regulation that – (1) creates any unreasonable barriers to the ability of
> individuals to obtain appropriate medical care; (2) impedes timely access to health care
> services; (3) interferes with communications regarding a full range of treatment options
> between the patient and the provider; (4) restricts the ability of health care providers to
> provide full disclosure of all relevant information to patients making health care
> decisions; (5) violates the principles of informed consent and the ethical standards of
> health care professionals; or (6) limits the availability of health care treatment for the full
> duration of a patient's medical needs.

42 U.S.C. § 18114.

Page 19 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## V.    SUCCESS OF THE TITLE X PROGRAM NATIONALLY

60.    Nationwide, in fiscal year 2017 the Title X program received approximately

$286.5 million in federal funding.  U.S. Dep't of Health & Human Servs., Family Planning

Annual Report: 2017 National Summary ("Title X Annual Report 2017").[4]  Funds are distributed

through competitive grants.  The 89 grantees in 2017 included states, local public health

authorities, and family planning or community health nonprofit entities.

61.    As of 2016, Title X funding helped support 3,898 service sites across the country

in providing family planning and related health services to populations that are vulnerable and

often lack access to such services.  U.S. Dept. of Health & Human Servs., Title X Family

Planning Annual Report: 2016 National Summary (August, 2017) ("Title X Annual Report

2016").[5]  Title X projects served over four million family planning clients in 2016, 64% of whom

had incomes at or below the federal poverty level ("FPL"), and 89% of whom were female.[6]

62.    Funding from Title X is often only one of several sources of funding that Title X

clinics receive for family-planning services.  Medicaid, other third-party insurance, and state or

other local funding make up the balance of the funding for the reproductive and family planning

and related services provided to clients at Title X clinics.  Nevertheless, Title X funding is

---

[4] *Available at* https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2017-national-summary.pdf.

[5] *Available at* https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf; *see also* Title X Family Planning Annual Summary Infographic *available at* https://www.hhs.gov/opa/sites/default/files/OPA-FPAR-Infographic.pdf.

[6] *Id.*

Page 20 -  COMPLAINT

critical in ensuring access to high quality family planning services for low-income individuals around the country.

## VI.    HHS GUIDANCE AND OVERSIGHT OF TITLE X GRANTEES

63.    HHS provides grantees with numerous guidance documents to facilitate compliance, and its oversight and monitoring of grantees has long been rigorous and searching. However, in contrast to reports that formed the basis for the promulgation of the 1988 regulations, HHS has not set forth evidence of any violations in support of the issuance of the Final Rule – only that HHS "believes that the [existing] regulations fostered an environment of ambiguity surrounding appropriate Title X activities."  84 Fed. Reg. at 7,721.

64.    HHS has long provided guidelines on program compliance.  In 2014 OPA released updated Title X guidelines that provide detailed guidance on program compliance.[7] HHS has provided other oversight activities in the decades since Title X has been enacted.  For example, HHS also developed a "Program Review Tool" intended for use by OPA to assess grantee and sub-grantee compliance with key aspects of Title X and the newly-released guidelines, as well as by Title X grantees for self-assessment and monitoring of sub-grantees.[8]

---

[7] Office of Population Affairs, Program Requirements for Title X Funded Family Planning Projects (April 2014) (*available at* https://www.hhs.gov/opa/sites/default/files/Title-X-2014-Program-Requirements.pdf).

[8] Office of Population Affairs, Grantee Q&A (July 14, 2016) (*available at* https://www.hhs.gov/opa/sites/default/files/program-review-tool-grantee-qa-vupdated-remediated.pdf).

Page 21 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

65.     OPA administers this tool every three years, contacts grantees with findings, and

monitors any required corrective action plans.  This review tool specifically assesses compliance

with Section 1008, with the 2017 review tool providing:

> 8.2: Prohibition of Abortion.
> Title X grantees and sub-recipients must be in full compliance with Section 1008 of the
> Title X statute and 42 CFR 59.5 (a)(5), which prohibit abortion as a method of family
> planning. Systems must be in place to assure adequate separation of any non-Title X
> activities from the Title X project. Grantee has documented processes to ensure that they
> and their sub-recipients are in compliance with Section 1008. Grantees should include
> language in sub-recipient contracts addressing this requirement.[9]

66.     The HHS reviewer administering the tool must specifically assess compliance

with these requirements, including that "[f]inancial documentation at service sites demonstrates

that Title X funds are not being used for abortion services and adequate separation exists

between Title X and non-Title X activities."

67.     Indeed, OPA has itself reported to the Congressional Research Service ("CRS")

on the robustness of its oversight to ensure compliance with the statutory prohibition on the use

of Title X funds in programs where abortions are available.  In 2017 and 2018 CRS released

reports on Title X, both of which stated that "[a]ccording to OPA, family planning projects that

receive Title X funds are closely monitored to ensure that federal funds are used appropriately

and that funds are not used for prohibited activities such as abortion."[10]  Both reports describe

---

[9] Implementing the Title X Program Guidelines: Program Review Tool (February 2017),
*available at* https://www.fpntc.org/resources/title-x-program-review-tool.com.

[10] Angela Napili, Congressional Research Service, *Title X (Public Health Service Act) Family
Planning Program*, ("2017 CRS Report") at 22 (Aug. 31, 2017), *available at*
https://fas.org/sgp/crs/misc/RL33644.pdf; Angela Napili, Congressional Research Service, *Title*

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

HHS's "safeguards" for keeping abortion activities "separate and distinct" from Title X project activities, relying specifically on a May 1, 2017, email from HHS's Office of the Assistant Secretary for Legislation.  HHS's "safeguards" that have been successful and that obviate any alleged need for the Final Rule include:

> (1) careful review of grant applications to ensure that the applicant understands the requirements and has the capacity to comply with all requirements; (2) independent financial audits to examine whether there is a system to account for program-funded activities and nonallowable program activities; (3) yearly comprehensive reviews of the grantees' financial status and budget report; and (4) periodic and comprehensive program reviews and site visits by OPA regional offices.[11]

## VII.    TITLE X IN THE STATES

### Oregon

68.    The State of Oregon has been an umbrella grantee for Title X services in Oregon since 1970.  Title X is administered in Oregon by the Oregon Health Authority's Reproductive Health Program.  Title X funding provides direct support to a network of 37 agencies in Oregon with over 100 clinic sites.  Title X clinics are located in nearly every county in Oregon.  Clinic sites include local public health authorities such as those in Josephine, Curry and Coos Counties, federally qualified health centers ("FQHCs")[12] such as the Tillamook County Community Health Center, two Planned Parenthood affiliates (through their 12 health centers in Oregon), rural

---

*X (Public Health Service Act) Family Planning Program* ("2018 CRS Report") at 16 (Apr. 27, 2018), *available at* https://fas.org/sgp/crs/misc/R45181.pdf.

[11] *Id.*

[12] "FQHCs" as used throughout this Complaint refers to community-based primary care providers that receive funding under the Consolidated Health Center Program, pursuant to Section 1905(l)(2)(B) of the Social Security Act.

Page 23 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

health centers such as the Grant County Health Department, and other community health centers. In Oregon, significant portions of the state, primarily the rural and frontier areas that include 10 of Oregon's counties, are designated as Medically Underserved Areas because they have a shortage of primary health care providers and facilities coupled with high levels of need. Many of Oregon's Title X clinics serve Medically Underserved Areas.

69.    Title X clinics provide vitally important high-quality care to thousands of low-income Oregon residents.  In 2017 Oregon's Title X clinics served 37,012 patients.  Two-thirds of these patients were at or below 100% of the FPL and 95% were at or below 250% of the FPL. Title X clinic patients received services such as well-woman exams, Pap tests, STI screenings and treatment, pregnancy tests, FDA-approved methods of contraception, and contraceptive management, client counseling, and education.  A 2018 patient survey demonstrates that Oregon's Title X clinics provide high-quality care: 95.6% of patients indicated that they received the care they needed at their clinic visit, and 94.9% of clients indicated that they would recommend the clinic to friends or family.

70.    Oregon's Title X program is also cost-effective.  Of the 37,012 patients Oregon Title X clinics served in 2017, about 35% of these patients were seen at clinics located in rural counties which are also Medically Underserved Areas.  To serve patients in its Title X clinics in fiscal year 2017, Oregon received $2,716,000 in Title X funds, and in fiscal year 2018 Oregon received just over $3 million.  Oregon's Title X grant award has remained at approximately this level for the past 10 years.  In 2017 over 6,000 unintended pregnancies were avoided as a result of the provision of high-quality counseling and effective contraceptive methods by Oregon's

Page 24 -  COMPLAINT

Title X clinics.  Even if only half of those unintended pregnancies had resulted in births, Oregon estimates that the first year of infant health care under Oregon's Medicaid program would have cost Oregon more than $40 million in state taxpayer funds.

71.    Title X does not fund and has never funded abortions in Oregon.

72.    Prior to 2018 Oregon issued Title X funds as direct support grants to health care providers.  Oregon changed its approach just this year as a result of the Oregon Legislative Assembly's adoption of a new law.

73.    In 2017 the Oregon Legislative Assembly passed the Reproductive Health Equity Act, also known as House Bill 3391 ("RHEA"), requiring health benefit plans to cover, among other things, well-woman care consistent with guidelines published by the U.S. Health Resources and Services Administration, certain reproductive health care screenings, pregnancy screening, contraceptive drugs, devices and products, and abortion.  ORS 743A.067.  RHEA also requires the Oregon Health Authority to cover these same costs for individuals who can become pregnant and who would be eligible for medical assistance if not for their immigration status.  ORS 414.432.  Finally, RHEA prohibits a public body, including any state or local government agency or employee of the agency from interfering with or restricting benefits, facilities, services or information regarding a women's right to choose to terminate a pregnancy.  ORS 659.880.  RHEA, passed by the Oregon Legislature after support from numerous state officials, including the Attorney General, and signed by Governor Kate Brown, reflects the clear policy of the State of Oregon to protect its residents' freedom of reproductive choice.

Page 25 -  COMPLAINT

TBW/j8b/9283940-v17

74.     In 2018, to better meet the requirements of RHEA, the Oregon Health Authority's Reproductive Health Program restructured the way in which clinics are reimbursed for clinical services.  The Reproductive Health Program has three sources of funding: Title X, RHEA, and Oregon's family-planning Medicaid waiver called Oregon ContraceptiveCare.  The Program adopted a braided funding approach under which agencies receive funding on a fee-for-service basis for core family planning services from multiple sources.  The Reproductive Health Program is currently able to leverage each of the three funding streams to cover the cost for most services for most clients.  This approach results in a streamlined model where there is no "wrong door" for clients.

75.     If the Final Rule goes into effect, the State of Oregon, as well as other local governmental entities in Oregon, would face conflicting legal requirements under state and federal law.  This is because Oregon and local governmental entities in Oregon cannot restrict health care services provided to residents in the manner required by the Final Rule.

76.     HHS last audited Oregon's Title X program in 2014. HHS did not then notify the Oregon Health Authority or any subrecipient that they have improperly used Title X funds for abortion-related services or otherwise misused Title X funds. Similarly, Oregon Health Authority has found no indication that its subrecipients used Title X funds for abortion services.

## New York

77.     Title X is a critical source of family planning funds in New York State. OPA provides Title X funding to four New York grantees including the New York State Department of Health ("DOH") and Public Health Solutions ("PHS"), a not-for-profit organization dedicated

Page 26 -  COMPLAINT

TBW/j8b/9283940-v17

to advancing public health in New York City. The Floating Hospital, Inc., and Beacon Christian

Community Health Centers are recent Title X grantees.[13]  For Fiscal Year 2017, OPA provided

over $14 million in Title X funding to the State of New York, of which $9,912,000 was allocated

to DOH and $4,617,000 was allocated to PHS.[14]

78.    DOH and PHS in turn provide funding to a total of 50 sub-recipients at 178

service sites across the state.[15]  These include FQHCs, General Hospitals, and Local Health

Departments.

79.    In 2017, 305,464 patients were served through New York's Title X programs. Of

those patients, almost 90% were female, and approximately 24% were black and 34% were

Hispanic.  Approximately 72% of patients served by the program had an educational attainment

level of 12th grade or below and approximately 61% were at or below the FPL (with

approximately 83% of patients at or below 250% FPL).[16]

80.    Title X services are estimated to have prevented 59,200 unintended pregnancies in

New York State in 2015 alone.[17]

---

[13] For the grant year 2018-2019, OPA provided Title X funding to the latter two grantees. They
did not receive Title X funding in the preceding years.

[14] HHS, OPA, Recent Grant Awards, https://www.hhs.gov/opa/grants-and-funding/recentgrant-
awards/index.html (Jan. 31, 2018).

[15] HHS, OPA, *Title X Family Planning Directory* (May 2018), *available at*
https://www.hhs.gov/opa/sites/default/files/Title-X-Family-Planning-Directory-May2018.pdf.

[16] National Family Planning & Reproductive Health Association, *The Title X Family Planning
Program in New York*(November 2017), (*available at*)
https://www.nationalfamilyplanning.org/file/impact-maps-2017/NY.pdf.

[17] *Id.*

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

81.    In New York, funding from both DOH and PHS is used to provide family planning services and outreach to communities traditionally lacking access to such services. Title X providers in New York provide a range of services, including general health screenings, screenings for domestic violence and depression, testing for STIs, and Pap testing. Patients also receive comprehensive counseling on a broad range of effective and medically approved family planning methods. These methods do not include abortion. Patients with a positive pregnancy test are offered neutral, nondirective counseling on all pregnancy options, including adoption, continuation of the pregnancy, and termination of the pregnancy, and referrals are made upon request as necessary.

82.    DOH, PHS, and their sub-recipients are subject to stringent oversight to ensure compliance with Title X's program requirements. DOH requires its Title X sub-recipients to submit annual work plans and budgets for DOH's review, which includes providing documentation sufficient for DOH to ascertain that Title X funds are not used to provide abortion services. DOH further requires sub-recipients to submit an Assurance of Compliance, wherein the sub-recipient certifies that it complies with key Title X requirements, including that it will not provide abortion as a method of family planning and will provide services without subjecting patients to any coercion to accept services or use any particular methods of family planning.

83.    DOH also maintains its own cost allocation schedules to ensure that no Title X funds are used for impermissible purposes, including the provision of abortion services. After conducting extensive reviews of its sub-recipients, DOH has never found any indication that Title X funds in New York have been used for the provision of abortion services.

Page 28 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

84.    DOH was last monitored by HHS in September of 2017, and neither DOH nor any sub-grantee were informed by HHS that DOH or its sub-recipients inappropriately commingled Title X funds with those used to provide abortion services or otherwise misused Title X funds (nor have they ever been so informed).  Similarly, PHS has not found any indication that any Title X funds it distributed were used for the provision of abortion services. PHS was most recently inspected by HHS in fall 2017 and was given no indication that HHS believed PHS or its sub-recipients were inappropriately using Title X funds; on the contrary, PHS received a written assessment with no adverse findings.

## Colorado

85.    Title X is a critical source of family planning funds in Colorado. OPA provides Title X funding to one Colorado grantee: the Colorado Department of Public Health and Environment (CDPHE), a government organization dedicated to advancing the health of the people of Colorado and the quality of its environment.

86.     In 2017, Colorado's Title X programs served 55,266 patients. Of those patients, 45,177 were female and 10,089 were male.  Ninety-four percent of patients were at or below 250% of the FPL and received their clinical services on a sliding-fee-scale payment model. Using the Guttmacher Institute's Health Benefits and Cost Savings Calculator, Title X services are estimated to have prevented 9,710 unintended pregnancies in Colorado in 2017.

https://data.guttmacher.org/calculator.

87.    In Colorado, funding from Title X is combined with State general funds and is used to support family planning services and outreach to communities traditionally lacking

Page 29 -  COMPLAINT

TBW/j8b/9283940-v17

access to such services. Title X providers in Colorado provide a range of services including general health screenings, screenings for domestic violence and depression, testing for STIs and Pap testing.  Patients also receive comprehensive counseling on a broad range of effective and medically approved family planning methods. These family planning methods do not include abortion. Patients with a positive pregnancy test are offered neutral, nondirective counseling on all pregnancy options including adoption, continuation of the pregnancy, and termination of the pregnancy, and referrals are made upon request as necessary. The majority of CDPHE family planning clinics use highly trained health educators, registered nurses or medical assistants to provide contraceptive counseling and pregnancy options counseling, and to collect patient vitals, and process lab samples. By doing so, family planning staff such as advanced practice nurses, physician assistants, certified nurse midwives, and medical doctors can work at the top of their licensures and provide high-quality clinical care.

88.    CDPHE and its sub-recipients are subject to stringent oversight to ensure compliance with Title X's program requirements. CDPHE requires its Title X sub-recipients to sign an annual contract that features state and federal language prohibiting use of the funds for abortion services. CDPHE further requires sub-recipients to sign a monthly attestation on their fiscal invoices, certifying that no funds were used for abortion.

89.    For sub-recipients that provide abortion services outside of the Title X program, CDPHE performs an annual fiscal separation audit to ensure that no Title X funds are used for impermissible purposes, including the provision of abortion services. After years of conducting extensive fiscal compliance reviews of its sub-recipients, CDPHE has never found an indication

Page 30 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

that Title X funds have been used to provide abortion services.

90.     CDPHE was most recently inspected by the HHS OPA program in June 2017, and its fiscal monitoring was thoroughly reviewed. CDPHE received a written assessment with no adverse findings related to abortion or the manner in which it performs its fiscal separation audits.

91.     CDPHE is a considered a leader in the field of reproductive health. In recent years CDPHE expanded access to all contraceptive methods and improved the business systems of contracted sub-recipients. The results are noteworthy:

- Since the start of the expanded contraceptive project, the birth rate for young women ages 15 to 19 was reduced by more than half, falling 59% between 2009 and 2017. The rate dropped from 37.5 births per 1,000 teens in 2009 to 15.5 in 2017.

- A similar downward trend was seen among women ages 20 to 24, with their birth rates dropping 35% between 2009 and 2017. The number of repeat teen births (teens under 18 years giving birth for the second or third time, etc.) dropped by 85% between 2009 and 2017. The abortion rate among women ages 15 to 19 fell by 60% and among women ages 20 to 24 by 41% between 2009 and 2017.

- The average age of first birth increased by 1.7 years among all women between 2009 and 2017, from 25.9 years to 27.6 years.

- The reductions in teen and unintended pregnancies help the state avoid between $66,063,664 and $69,625,751 in entitlement program costs. (2010-2014). Medicaid costs associated with the averted births were estimated at between $52.3 and $53.7 million. Temporary Assistance to Needy Families (TANF) costs avoided were between $5.8 and $7 million, Colorado Food Assistance Program/Supplemental Nutrition Assistance Program (SNAP) avoided costs were $5.2 to $5.5 million and WIC avoided costs were $2.7 to $3.4 million.

92.     The Final Rule will reduce the effectiveness of CDPHE's Family Planning

Page 31 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Program, as it will prohibit recipients from providing abortion services with any other sources of funding, and will prohibit recipients from referring patients to abortion services. Providers will not compromise their professional responsibility to their patients by providing biased care, which will cause a dramatic statewide reduction of the number of high-quality providers who remain in the Title X program. Several sub-recipients may no longer qualify for Title X funding due to the confusing and burdensome financial and physical separation requirements between Title X and non-Title X services, resulting in a loss of services to thousands of patients per year. In addition, recent gains in reducing the unintended pregnancy rate and the abortion rate, made possible by expanded contraceptive access for patients, will diminish as patients may have fewer or no provider options available if providers lose or drop their Title X funding. If CDPHE loses some of its network of skilled and innovative providers, Colorado will see an increase in teen births, unintended pregnancy, and abortion.

### Connecticut

93.     The State of Connecticut and its Title X grantees, Planned Parenthood of Southern New England (PPSNE) and Cornell Scott-Hill Health Center, work in conjunction with one another to achieve improved health outcomes for low-income populations across the State, thereby improving the health and well-being of Connecticut residents and saving the State substantial taxpayer expenditures.

94.     If the over 45,000 patients currently served by Title X clinics in Connecticut each year are no longer able to access affordable and comprehensive health screenings and reproductive health care because one or both of Connecticut's Title X grantees decline to comply

Page 32 - COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

with the illegal conditions of the Final Rule and are therefore stripped of their Title X funds,

residents of Connecticut will be deprived of an important and valuable source of health care,

particularly family planning services.

95.    Title X clinics in Connecticut serve a population that is, in large part, underserved

and in need of access to comprehensive preventive care screenings and reproductive health care.

Approximately 85% of all those served by PPSNE, Connecticut's primary Title X grantee, had

incomes below 250% of the FPL in 2018. Specifically, 36% were below 100% of FPL, 30%

more were below 150%, 12% more were below 200%, and 7% more were below 250%.

96.    Other Connecticut health care providers will not be able to step in to readily

provide high-quality Title X services to Connecticut residents if PPSNE, the sole Title X

provider in all but one county in Connecticut, is no longer able to provide those services.

According to 2015 data compiled by the Guttmacher Institute, if Connecticut's Title X clinics

close, or are forced to withdraw from Title X, other health care providers in Connecticut would

need to at least triple their contraceptive client caseloads to meet the currently served medical

need.  That is not feasible within existing funding and staffing levels across the State because all,

or almost all, FQHCs in Connecticut, who serve similar populations as Title X grantees, are

already at or beyond capacity.  This is also true for most or all obstetrician-gynecologists in

private practice in Connecticut.

97.    In addition, if Connecticut is unable to fill the nearly $2.5 million funding gap

caused by the unlawful stripping of funds from PPSNE and other grantees, Connecticut will, for

people who could not timely access family planning services due to fewer or no available Title X

Page 33 -  COMPLAINT

TBW/j8b/9283940-v17

providers, incur increased Medicaid costs related to unintended pregnancies, poorer maternal and

infant health outcomes due to lack of pre-pregnancy counseling and care between pregnancies,

and poorer overall health from lack of access to other health care services currently provided

under Title X.  Currently, Medicaid covers four in 10 births in Connecticut.  Any increase in

unintended pregnancies among the population currently served by Title X will very likely

increase the State's Medicaid costs.

98.    If the Final Rule is allowed to be implemented, Connecticut will be forced to

either fund some or all services for the population currently served with Title X funds or to allow

its residents to go without vital health care services formerly funded with Title X funds.  Both

options will have negative public health consequences and significant fiscal impact in

Connecticut.

## Delaware

99.    The Division of Public Health ("DPH" or "the Division"), within the Delaware

Department of Health and Social Services, is Delaware's sole Title X grantee. Title X funds 55

sites throughout Delaware's three counties. These sites include FQHCs, community clinics, state

clinics, three Planned Parenthood health centers, university health centers and 21 school-based

health centers. School-based health centers comprise almost half of Delaware's Title X sub-

grantee sites.

100.    DPH ensures that its sub-grantees adhere to the Title X program requirements as

well as State, Department, and Division requirements. All sub-grantees enter into a contract with

the Division committing that they will comply with all funding requirements. Additionally, the

Page 34 -  COMPLAINT

TBW/j8b/9283940-v17

Division requires all sub-grantees to participate in an interdisciplinary, team approach-designed program to evaluate all aspects of clinic operations, both clinical and non-clinical, by site visits to all provider locations.

101.    Delaware's Title X clinics provide essential health care to thousands of low-income Delawareans.  In 2017 Delaware's Title X providers served 19,132 patients.  Almost two-thirds of these patients were at or below 100% of the FPL and 88% were at or below 250% of FPL.  In Delaware, Title X provides health care for both men and women. All Title X providers conduct physical assessments including height, weight, blood pressure, BMI, heart, lungs, extremities, assessment for signs of abuse, and other health screenings that are preventive and/or diagnostic to help clients achieve preconception health. Title X providers offer STI screening and treatment, rapid HIV testing and counseling, cervical and breast cancer screenings, and other services including preventive health, mental health assessment, and risk behavior screenings for promotion and disease prevention including smoking, substance misuse, domestic violence, human trafficking, STIs, and HIV.  Title X patients received family planning services that offer a broad range of acceptable and effective family planning methods and services (including natural family planning methods).  Other family planning methods include oral contraceptives, injectable medications, Long Acting Reversible Contraceptives (IUDs and implants), vaginal rings, diaphragms, spermicides, and male and female condoms. Patients received pregnancy testing and nondirective options counseling.

102.    Title X has never funded abortions in Delaware. Only two of Delaware's 55 Title X sub-grantee sites provide abortions, solely for non-Title X patients. However, these Planned

Page 35 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Parenthood affiliates provided Title X services to almost 7,000 patients in 2017. The Final Rule will result in the probable displacement of these patients into an already overburdened provider community. Currently in Delaware, all sub-grantee providers are already working at or over capacity and some have waiting lists for services.

103.    Delaware's Title X program is necessary and cost-effective.  In 2010 the 57% rate of unintended pregnancies in Delaware was the highest in the nation at 62 per 1,000 women aged 15 to 44.[18] In 2010, 3,300 or 71.3% of unplanned births in Delaware were publicly funded, compared with 68% nationally. That same year the federal and state governments spent $94.2 million on unintended pregnancies in Delaware alone; of this, the federal government paid $58.2 million and $36 million was paid by the state. In 2010 Title X funding prevented 2,900 unplanned pregnancies, saving the state and federal governments millions of dollars for the $1,135,000 allocated by HHS.

104.    Title X is instrumental in turning the tide on Delaware's unplanned pregnancy rates. In 2014 Delaware launched the CAN (Contraceptive Access Now) Initiative along with its non-profit partner, Upstream. The CAN Initiative's goal is to provide contraception to every woman who does not want to become pregnant by "providing training and technical assistance to all publicly funded healthcare providers and the largest private healthcare providers in the state to ensure their patients are offered the full range of contraceptive methods in a single

---

[18] *See* Kathryn Kost, *Unintended Pregnancy Rates at the State Level: Estimates for 2010 and Trends Since 2002*, Guttmacher Institute, *available at* https://www.guttmacher.org/report/unintended-pregnancy-rates-state-level-estimates-2010-and-trends-2002.

Page 36 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

appointment."[19] According to a report released by Child Trends, between 2014 - 2017 Long

Acting Reversible Contraceptive use increased from 13.7 to 31.5 percent among Delaware Title

X family planning clients ages 20-39.[20] Notably, this resulted in an estimated 24% decrease in

the unintended pregnancy rate among this population during 2014-2017.[21]  Title X is the

backbone of the sustainability plan for the CAN Initiative. The Final Rule jeopardizes the

progress Delaware has made in preventing thousands of unplanned pregnancies.

### District of Columbia

105.    In the District of Columbia, Title X-funded providers are a critical part of the

health care safety net. Title X funds 14% of public funding for family planning services in the

District, while 85% of public funding comes from Medicaid.

106.    Unity Health Care, Inc. ("Unity"), a 501(c)(3) not-for-profit organization, is

currently the sole statewide grantee for federal Title X family planning services in the District.

Unity serves one in seven District residents regardless of their ability to pay.

107.    Unity has participated in the Title X Program for more than 15 years,

demonstrating its administrative, management, and clinical capabilities to effectively direct the

District's Title X Program.  Unity continues to serve as a role model for other Title X projects

operating within the community health setting.

---

[19] *See* https://www.upstream.org/campaigns/delaware-can.

[20] Katie Welti and Jennifer Manlove,  *Estimated reductions in unintended pregnancy among Delaware Title X family planning clients after a contraceptive access intervention*, ChildTrends, *available at* https://www.childtrends.org/estimated-reductions-in-unintended-pregnancy-among-delaware-title-x-family-planning-clients-after-a-contraceptive-access-intervention.

[21] *Id.*

Page 37 -  COMPLAINT

TBW/j8b/9283940-v17

108.    Unity provides services funded by Title X at 26 sites across the District, including at 9 of its own community health centers that are FQHCs, and at non-traditional health sites, including school-based sites, shelters for individuals experiencing homelessness, and a homeless outreach van.  Unity is not an abortion provider.

109.    In 2018 Unity provided Title X funding to four sub-grantees that provide family planning and reproductive health services at five service sites throughout the District.  In 2019 Unity has five sub-grantees located throughout the District. None of the sub-grantees are abortion providers.

110.    Unity also contracts with local hospitals and other organizations to execute Title X services in order to meet the needs of their patients.  Hospitals that contract with Unity do provide abortions, although not with Title X funding.

111.    For fiscal year 2018 Unity's Title X grant award was $911,000.  OPA awarded Unity $1,335,000 in fiscal year 2017 for a three-year Title X grant.  Unity received a $1,264,000 Title X grant in fiscal year 2015.

112.    The District's Title X providers provide a full range of reproductive health services including counseling and education about achieving or preventing pregnancy, all FDA-approved contraceptive methods, fertility awareness-based methods of family planning, basic infertility services, pregnancy testing and options counseling (including appropriate referrals), preconception care, breast and cervical cancer screening, wellness screening (blood pressure, BMI and other factors), HPV vaccination, testing and treatment for STIs, physical exams,

Page 38 -  COMPLAINT

TBW/j8b/9283940-v17

screening for intimate partner violence and substance abuse, and referrals for social services, specialty care and/or primary care.

113.    The District's Title X providers served more than 58,000 individuals in the District in 2018, 60% of whom had incomes at or below 100% of FPL.  These patients included male, female, and transgender adolescents, adults, and families as well as persons with chronic conditions such as mental illness, diabetes, hypertension, and HIV/AIDS, and hard-to-reach populations such as the homeless, substance users, and the formerly incarcerated.  Of the patients served, 33% were Latino/Hispanic, 61% were black/African-American, 6% were other racial minorities, and 32% had limited English proficiency.

114.    District law serves the goals of reducing and preventing unintended teen pregnancy and reducing the spread of STIs among minors by expressly permitting individuals to consent to contraceptive services, STI and HIV services, prenatal services, adoption, and abortion, regardless of age. *See, e.g.*, D.C. Mun. Reg. tit. 22-B, §§ 22-B600 & 22-B603.

**Hawaiʻi**

115.    Title X funding is critical to the provision of family planning services in Hawaiʻi. Title X funding is provided directly to two Hawaiʻi grantees: the Hawaiʻi Department of Health ("HDOH"), the state's only public direct grantee, and Planned Parenthood of Hawaiʻi ("PPH"). In Fiscal Year 2017, OPA provided over $2,157,300 million in Title X funding to both HDOH and PPH.  HDOH's Title X grant helps to fund approximately 71%, an overwhelming majority, of Hawaiʻi's family planning services.  Combined with the services provided by PPH, it is clear that loss of these grants would significantly impact family planning services statewide.

Page 39 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

116.    As a recipient of Title X funds, Hawaiʻi commits to:

    a.    Providing family planning services and related preventive health services with priority to low-income population.

    b.    Implementing Title X rules and regulations, legislative mandates, Title X priorities, and key issues including encouraging family participation in the decision of minors to seek family planning services and providing counseling to minors on how to resist attempts to coerce minors into engaging in sexual activities.

    c.    Ensuring compliance with fiscal management according to federal and state regulations.

117.    Hawaiʻi's Title X program provides comprehensive family planning and related preventive health services, including contraceptive services and client-centered education, counseling, and referrals.  HDOH directly funds these family planning services.  These services are provided on six islands (Kauai, Oahu, Molokai, Maui, Lanai, and Hawaiʻi) through 12 contracts at 31 services sites.  Of the 12 contracts, nine receive state and federal funds and three receive state funds only.  These sites include, but are not limited to:

    a.    Eight FQHCs in medically underserved rural areas,

    b.    Three academic settings on Kauai, Maui, and Hawaiʻi Island, and

    c.    One hospital-based setting on Molokai Island.

118.    Hawaiʻi's Title X family planning clinics provide voluntary client-centered, nondirective, high-quality clinical family planning and related preventive health information, education, counseling, and referrals with priority given to low-income individuals.  These services include: (a) access to family planning services for all clients on all islands who desire to prevent and space their pregnancies and encourage parental involvement in adolescent decision-

Page 40 -  COMPLAINT

TBW/j8b/9283940-v17

making about engaging in sexual activity, to prevent adolescent unintended pregnancies and STIs; (b) access to family planning methods to those most in need, through outreach; (c) access to family planning and related preventive health services including immunizations for influenza and human papillomavirus; (d) access for male clients to prevent pregnancy and HIV and STIs; (e) an opportunity for clients to discuss and develop a reproductive life plan and preconception health services, as appropriate; and (f) testing for STIs, including HIV, chlamydia, gonorrhea, and syphilis, for all clients under 25 years of age, and timely medical follow-up and referral.

119.     In almost all of the rural and medically underserved areas throughout the state, Hawaiʻi's Title X-funded clinics are the only source for low-cost family planning services.  Hawaiʻi is comprised of six major islands.  Its geographic layout makes access to family planning services difficult for individuals who do not reside on the island of Oahu, where the majority of primary health care services and providers are located. The entire state's isolation in the middle of the Pacific Ocean compounds the inability of many to find or seek services elsewhere.  Thus, five of the six major islands comprising the State of Hawaiʻi are considered medically underserved areas and are heavily reliant on Title X funding.  Restriction on Title X funding would impact, for example, the University of Hawaiʻi health services clinics located on the islands of Hawaiʻi, Maui, and Kauai, as these clinics rely primarily on Title X family planning funding. Third-party reimbursement is largely insufficient to cover comprehensive family planning services.

120.     FQHCs in Hawaiʻi are also primarily reliant on Title X funding.  In the FQHC setting, a funding restriction would reduce the number of clients served by approximately 80%.

Page 41 -  COMPLAINT

TBW/j8b/9283940-v17

Other sources of funds such as third-party reimbursement are not sufficient to meet the needs of the FQHCs in serving patients, and patients often cannot afford the co-pay for these services.

121.    Currently, all of Hawaiʻi's 12 Title X grant sub-recipients provide nondirective pregnancy counseling by non-advanced practice providers such as registered nurses, health educators, case managers, and medical assistants.

122.    In fiscal year 2018 Hawaiʻi's 12 Title X grant sub-recipients in 31 service sites across the state served 16,002 unduplicated clients. Hawaiʻi estimates using the Guttmacher Institute's Health Benefits and Cost Service Calculator that publicly funded family planning in Hawaiʻi prevented the following: 3,440 unintended pregnancies, 1,620 unplanned births, 1,160 abortions, 660 miscarriages following unintended pregnancies,  420 unplanned births after short (<18 months) inter-pregnancy intervals, 250 unplanned preterm/low-birth-weight births, 160 chlamydia infections, 20 gonorrhea infections, 20 pelvic inflammatory diseases, and 10 HIV infections.

123.    Hawaiʻi's Title X family planning program had gross savings totaling $32,564,960, which included: $28,532,480 from maternal and birth-related gross cost savings from contraceptive services provided, $1,084,640 from miscarriage and ectopic pregnancies, $120,270 from averted abortions, and $2,812,200 from STI testing.  With the $3,507,630 investment in family planning, the net savings of $29,057,330 resulted in improved health outcomes and ultimately, the quality of life. In addition, Hawaiʻi's Title X family planning program made great strides in meeting project goals and objectives on time and on budget.

Page 42 -  COMPLAINT

TBW/j8b/9283940-v17

124.    The effect of Title X's funding shortfall would have a great impact on the following individuals who could potentially lose services: a) uninsured, under-insured, low-income and non-residents; b) adolescents; and c) individuals seeking "confidential services."

125.    Title X funds do not and never have funded abortion-related services in Hawaiʻi. The state program maintains strict accounting protocols and audit procedures to ensure appropriate separation of funds. The Final Rule will create extraordinary barriers in addressing the medical needs of Hawaiʻi's truly low income patients.

**Illinois**

126.    Title X is a critical source of family planning funds in Illinois. OPA provides Title X funding directly to three Illinois grantees: the Illinois Department of Public Health ("IDPH"), the state's only public direct grantee; Planned Parenthood of Illinois ("PPIL"); and Aunt Martha's Youth Service Center, Inc., the state's third-largest community health center network. In Fiscal Year 2017 OPA provided over $8 million in Title X funding to these three Illinois grantees, almost $4 million of which was awarded to IDPH.

127.    IDPH in turn provides Title X funding to a total of 28 sub-grantees ("delegate agencies") at 60 service sites across the state.[22] These include local health departments, health centers, school-based health centers, and hospitals.

128.    Title X clinics provide vitally important high-quality care to thousands of low-income Illinois residents. In 2017, Title X programs in Illiois served 112,426 patients Ninety

---

[22] HHS, Office of Population Affairs, *Title X Family Planning Directory* (November 2018), 100-104, *available at* https://www.hhs.gov/opa/sites/default/files/Title-X-Family-Planning-Directory-November2018.pdf.

Page 43 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

percent of those patients were female and 70% had incomes at or below the FPL.[23] Of the 46,103

patients served by IDPH's Title X Family Planning Program, 94% were female and 82% had

incomes at or below FPL.

129.    IDPH's Title X Family Planning Program services are estimated to have

prevented 8,764 unintended pregnancies in Illinois in 2017 and 7,370 unintended pregnancies in

2018.

130.    In Illinois, IDPH's Title X Family Planning Program grants are used to provide

voluntary comprehensive family planning services to low-income women and men who are

under-insured, uninsured, or otherwise lack access to health care. Through this effort, the

program seeks to improve the well-being of communities by lowering the incidence of

unintended pregnancy, improving maternal and infant health, and reducing the incidence of

abortion. The program also aims to reduce the health and social impact of unintended

pregnancies and the transmission of STIs. Delegate agencies provide a range of services,

including basic infertility services, pregnancy diagnosis, nondirective pregnancy counseling that

includes all options, STI diagnosis and treatment, HIV education, and screenings for breast,

cervical, and testicular cancer. Delegate agencies also offer a broad range of effective and

medically approved family planning methods and services, none of which include abortion.

131.    IDPH's delegate agencies are subject to stringent oversight to ensure compliance

with Title X's program requirements. Every two years each delegate agency submits to a formal

---

[23] HHS, Office of Population Affairs, *Title X Family Planning Annual Report 2017 National Summary* (Aug. 2018), Ex. B-1, available at: https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2017-national-summary.pdf.

Page 44 -  COMPLAINT

TBW/j8b/9283940-v17

on-site Program Review by IDPH officials, which involves an evaluation of policies and observation of the agency's facility and client counseling services. In the year that a delegate agency is not subject to a Program Review, IDPH conducts a remote audit, which involves the review of the delegate agency's statistical performance and screening of its fiscal spending. IDPH also requires its delegate agencies to submit annual certifications affirming that their Title X services do not include abortion services. Delegate agencies make the same certification upon acceptance of the Title X funds.

## Maryland

132.    The Maryland Department of Health is a Title X grantee.  For Fiscal Year 2019 Maryland received $3,951,000 in federal Title X funding.  The Department of Health in turn awards subgrants to local health departments, community health centers, Planned Parenthood health centers, and other providers.

133.    In 2018, 69,029 clients were served through Maryland's Title X providers at 65 family clinical sites. Of those clients, 86.5% were female.  Approximately 85% were at or below 100% of the FPL, and over 95% were at or below 250% of FPL.

134.    Maryland Title X providers offer a wide variety of health care services, including patient education and counseling; physical examinations and laboratory testing; breast and cervical cancer screening; STI and HIV prevention education, counseling, testing, and referral; and pregnancy diagnosis and counseling.

Page 45 - COMPLAINT

TBW/j8b/9283940-v17

135.    In 2014 Maryland's Title X program was estimated to have prevented 15,000 unintended pregnancies (including 3,200 teen pregnancies), 1,490 preterm or low birth-weight births, and 1,081 STIs.

136.    Title X funds are not and never have been used to fund abortion services in Maryland.

### Massachusetts

137.    Title X provides crucial funding to family planning programs in Massachusetts, particularly those that serve low-income individuals in high-need, underserved areas.  In Fiscal Year 2018 OPA awarded a total of $4,282,000 in Title X funds to three Massachusetts grantees: the Massachusetts Department of Public Health ("MDPH"); Action for Boston Community Development, Inc. ("ABCD"), a not-for-profit community development agency that provides, among other services, family planning care to low-income individuals and families in the metro-Boston area; and Health Imperatives, Inc., a not-for-profit agency that provides, among other services, family planning care to low-income individuals and families in Southeastern Massachusetts.  Of the over $4.2 million in Title X funds that flowed into Massachusetts in 2018, MDPH received $2,110,000, ABCD received $1,251,000, and Health Imperatives received $921,000.[24]

_____

[24] HHS, Office of Population Affairs, *Recent Grant Awards*, *available at* https://www.hhs.gov/opa/grants-and-funding/recentgrant-awards/index.html (last visited Jan. 30, 2019).

Page 46 -  COMPLAINT

TBW/j8b/9283940-v17

138.    Through their Title X grants, MDPH, ABCD, and Health Imperatives together fund 12 sub-grantees and 96 service sites.[25]  These service sites include community health centers, family planning health centers, FQHCs, School-Based Health Centers, hospitals, and Planned Parenthood health centers.

139.    Title X-funded providers in Massachusetts offer a wide range of important services and care, including pregnancy testing and nondirective counseling, contraceptive services and supplies, emergency contraception, routine gynecological care, screenings for cervical and breast cancer, general health screenings, testing and treatment for STIs, health education, infertility services, and referrals to primary care, specialists, and social services. Several Title X sites in Massachusetts rely on family counselors, health educators, and registered nurses to provide some of these services and care.

140.    In 2017 the Massachusetts Title X network serviced 75,275 patients. Of those patients, 86% were female, 50% were between 18- and 29-years-old, 62% were at or below the FPL (with 91% at or below 250% of FPL), and 19% were uninsured.[26]

141.    Title X has a profound effect on the lives of Massachusetts residents. Title X-funded services are estimated to have prevented 15,500 unintended pregnancies in Massachusetts

---

[25] HHS, Office of Population Affairs, *Title X Family Planning Directory* (May 2018), *available at* https://www.hhs.gov/opa/sites/default/files/Title-X-Family-Planning-Directory-May2018.pdf.

[26] HHS, Office of Population Affairs, *Title X Family Planning Annual Report, 2017 National Summary* (August 2018), *available at* https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2017-national-summary.pdf.

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

in 2015 alone through the provision of effective contraception methods and counseling services.[27]

142.    Title X is also cost-effective.  More than one-third of all births in Massachusetts are paid for by MassHealth (Massachusetts' Medicaid/CHIP Program).  By reducing the number of unintended pregnancies among communities that rely on MassHealth, Title X reduces the associated costs that would be reimbursed by the state and federal governments.  Researchers estimate that, by reducing the rate of unintended pregnancies in Massachusetts, Title X saves the federal government and Massachusetts nearly $150 million each year. [28]

143.    Title X funds are not, and never have been used to fund abortion services in Massachusetts.  The Title X grantees and their sub-grantees are subject to rigorous oversight and monitoring to ensure compliance with Title X's requirements. For example, Title X sub-grantees must apply to the direct Title X grantees in order to receive an award of Title X funds and must submit information about their compliance with state and federal laws including Title X.  Sub-grantees also submit budget proposals for approval and/or invoices for federally allowable family planning program expenses to Title X grantees, which include information about Title X

––––––––––––––––––––

[27] *The Title X Family Planning Program in Massachusetts*, National Family Planning & Reproductive Health Association, at 2 (Sept. 2018), *available at* https://www.nationalfamilyplanning.org/file/impact-maps-2017/MA.pdf.

[28] *Contraception, Cost Savings at Title X-Funded Centers: From Contraceptive Services*, Guttmacher Institute Data Center, https://data.guttmacher.org/states/table?state=MA&dataset=data&topics=96 (last visited January 10, 2019).

Page 48 -  COMPLAINT

compliance. Title X grantees also conduct site visits to ensure compliance with all federal and state requirements, including Title X.

## Michigan

144.    The Michigan Department of Health and Human Services is the Title X grantee in Michigan. Michigan's Title X program currently funds 31 sub-grantees and provides services at 93 clinic sites. Title X service sites are located in 72 of Michigan's 83 counties, and 89 of Michigan's Title X service sites are strategically situated to serve Medically Underserved Areas.

145.    Title X service sites provide vitally important high-quality health care to thousands of low-income Michigan residents. In 2018 Michigan's Title X service sites served approximately 62,707 clients, the majority of whom had incomes at or below the FPL. Approximately 3,700 of these clients were served in rural counties, and approximately 61,160 of these clients were served in medically underserved counties.

146.    Michigan's Title X service sites provide a variety of health care services including well-woman exams, breast and cervical screening, STI screenings and treatment, pregnancy testing, contraceptive management, and preconception health services, education and counseling. They also offer FDA-approved methods of contraception.

147.    To serve patients in its Title X service sites in 2017 and 2018, Michigan received over $7 million per year in Title X funds. Based on preliminary Family Planning Annual Report ("FPAR") data and the Guttmacher Health Cost Calculator, Michigan's Title X service sites averted approximately 11,810 unintended pregnancies in 2018. The average cost of a Medicaid-covered birth in Michigan is $16,608, which includes childbirth, related prenatal and postpartum

Page 49 -  COMPLAINT

TBW/j8b/9283940-v17

care, and expenses for the child for the first year of life.  If the Final Rule goes into effect, the number of unintended pregnancies resulting in Medicaid-covered births would increase.  As a result, the costs imposed on Michigan's taxpayers would also increase.

148.    Michigan's largest Title X sub-grantee, Planned Parenthood of Michigan (PPMI), provides Title X services in 15 counties in Michigan and is Michigan's only Title X provider in Detroit.  In 2017 alone, PPMI served approximately 67% of Michigan's Title X clients.  Title X providers such as PPMI would likely withdraw from Michigan's Title X program due to the gag rule's impact on ethical and medical standards and to the financial strain imposed by the Final Rule's physical separation requirement, thereby leaving a void of services or delaying services available to low-income patients.

149.    The loss of PPMI from Michigan's Title X program would also result in an increased number of low-income and uninsured women going without reproductive health and contraceptive services.  In 2018 approximately 40% of clients served in Michigan's Title X clinics had no insurance.  Without access to Title X service sites and without insurance, these clients would likely be unable to find another health care provider.

150.    In addition, the Final Rule's limitation on health care providers who may provide nondirective counseling on all legal options relating to pregnancy to "advanced practice providers" causes additional harm to Michigan.  The standard staffing model in Michigan's Title X service sites allows qualified health care providers such as registered nurses and other counselors without advanced degrees to provide nondirective counseling.  The Final Rule's

Page 50 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

prohibition will increase the cost to deliver Title X services and will cause delays in service to the detriment of Michigan clients and taxpayers.

**Minnesota**

151.    OPA provides Title X funding to two Minnesota grantees: Planned Parenthood Minnesota, North Dakota, South Dakota ("PPMNS"), and the Saint Paul – Ramsey County Public Health Department ("Ramsey County").  For fiscal year 2017 OPA awarded  $2,684,000 to PPMNS and $503,000 to Ramsey County.   For fiscal year 2018 OPA awarded  $1,865,000 to PPMNS and $394,000 to Ramsey County.

152.    Ramsey County is one of the largest local public health departments in Minnesota, serving the city of Saint Paul and all other cities in Ramsey County.  Ramsey County operates a public health clinic that offers pregnancy testing, women's health exams, breast and cervical cancer screening, STI testing and treatment, and medically accepted methods of birth control.

153.    PPMNS is a nonprofit corporation organized under the laws of the State of Minnesota.  In conjunction with its three sub-grantee agencies, PPMNS's Title X Project includes 17 PPMNS clinics and 14 sub-grantee clinics, which together serve more than 90% of Minnesota's Title X patients.  It has been the largest grantee of Title X-funded services in Minnesota for almost 50 years.  PPMNS provides comprehensive and confidential family planning and reproductive health care and education for people in Minnesota.

154.    In fiscal year 2017, 55,400 patients were served by Minnesota's Title X programs. Of those patients, 53% were at or below the FPL (with approximately 83% of patients at or

Page 51 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

below 250% FPL).  Both Minnesota grantees offer nondirective pregnancy counseling on all

pregnancy options including referrals on request.

155.    Title X funds are particularly important in rural areas of Minnesota outside the

Minneapolis/Saint Paul metropolitan area ("Greater Minnesota").  Women in Greater Minnesota

have a 30% higher risk of being diagnosed with invasive disease—such as cervical and breast

cancer—compared with those in metropolitan Minnesota and are disproportionately less likely to

receive preventive gynecological care, breast exams, Pap tests, and timely diagnosis of cervical

and breast cancers.  Furthermore, the 10 counties experiencing the highest rates of adolescent

pregnancy in Minnesota are all located in Greater Minnesota.   A significant number of

Minnesota's rural counties have been designated health care professional shortage areas due to

an inadequate number of primary care providers.   Ten PPMNS clinics and all PPMNS sub-

grantee clinics are located in Greater Minnesota.

156.    Title X services are estimated to have prevented 13,200 unintended pregnancies

and over 460 STIs in Minnesota in 2010 alone.

157.    As a direct result of the Final Rule, PPMNS will no longer participate in the Title

X program, which jeopardizes health care access for tens of thousands of low-income

Minnesotans across the state.  There is no known non-profit organization that could fill

PPMNS's role as the primary Title X grantee and provider in Minnesota.  Because alternative

providers in the state are already significantly overstretched, PPMNS's exclusion from the Title

X program could have serious adverse public health consequences for the State as a whole,

which could include a precipitous rise in unplanned pregnancies and STIs.

Page 52 -  COMPLAINT

TBW/j8b/9283940-v17

158.    Public health agencies in Minnesota do not have the capacity to cover the needs of clients served by PPMNS, especially in Greater Minnesota.  Additionally, according to data from the Guttmacher Institute, Minnesota FQHCs would need to triple their contraceptive client caseloads to absorb PPMNS' Title X contraceptive clients.

## Nevada

159.    Title X is administered in Nevada through the Division of Public and Behavioral Health ("DPBH"), various local government agencies and health districts, and non-profit organizations.  Through Community Health Services ("CHS"), DPBH provides services at 12 community-based clinics in eight rural and frontier counties, many of which are located in areas designated as Medically Underserved Areas by the U.S. Health Resources and Services Administration.  Additional past recipients of Title X grants in Nevada include Nevada Primary Care Association, Carson City Health and Human Services, the Southern Nevada Health District, the Washoe County Health District, and Nevada Health Centers.

160.    Title X providers served 10,787 patients in 2017.[29]  Of the patients served by Nevada's Title X providers, 88% had income levels below 250% of the FPL, and 56% had incomes at or below FPL.[30]  The range of services offered by Title X providers has included general health education, screening for cervical and breast cancer, infertility services, screening

---

[29] Title X in Nevada, Improving Public Health and Saving Taxpayer Dollars (October 2018), *available at* https://www.nationalfamilyplanning.org/file/state-snapshots-2018/Nevada.pdf.
[30] *Id.*

Page 53 -  COMPLAINT

TBW/j8b/9283940-v17

and treatment for STIs, pregnancy testing and options counseling, contraceptive services and supply, and referrals for other health and social services.[31]

161.    In 2017, through Senate Bill 122, Nevada created the Account for Family Planning, to be administered by DPBH for providing grants to local government agencies and nonprofit organizations that provide family planning services "to persons who would otherwise have difficulty obtaining such services because of poverty, lack of insurance or transportation or any other reason."  Nev. Rev. Stat. 442.725(2).  Grants awarded from the account "may only be used to fund" services listed within the statute.  *Id.*  In listing the services that may be provided by a grantee, the Legislature replaced the term "counseling" from the original draft of the bill with the term "education," to clarify that employees of the grantees providing services do not necessarily need to be licensed counselors.[32]

162.    Nev. Rev Stat. 442.735 requires that grantees "[i]nform a person to whom the entity or organization provides education concerning family planning which is funded by a grant of any methods or procedures that may be used to assist the person to achieve his or her goals concerning family planning." That information must including an explanation of "services, procedures, prescriptions and devices" available from the grantee and "those for which referral is

---

[31] *Id.*

[32] Minutes of the Meeting of the Assembly Committee on Health and Human Services, 79th Leg. Sess., at 4 (May 8, 2017), *available at* https://www.leg.state.nv.us/Session/79th2017/Minutes/Assembly/HHS/Final/1038.pdf; *see also* Assembly Amendment No. 649 to Senate Bill No. 122, First Reprint, 79th Leg. Sess., at 4-5 (May 9, 2017), *available at* https://www.leg.state.nv.us/Session/79th2017/Bills/Amendments/A_SB122_R1_649.pdf.

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

required"; risks of methods or procedures and possible negative outcomes; "likely outcome and benefits of using" a particular method or procedure; available alternatives "designed to accomplish the same goal"; and answer questions about particular methods or procedures. Nev. Rev. Stat.442.735(1)(a). And the grantee must "[n]otify a person whom the entity or organization provides education concerning family planning which is funded by a grant that the person is free to refuse any method or procedure" the grantee is required to discuss under the statute. Nev. Rev. Stat.442.735(1)(b).

163.    Title X grants are a critical source of funding for family planning services in Nevada.  If the Final Rule is allowed to go into effect, Nevada will face a conflict with respect to its existing state law and policy governing the provision of family planning services, particularly concerning who is qualified to provide information to persons seeking information on family planning services and what information those individuals are permitted to provide. The Final Rule will force Nevada to choose its existing framework for providing such services and education or limit its ability to offer vital health care services to a population of Nevada citizens that would not otherwise have access to such care.

## New Jersey

164.    In New Jersey, Title X-funded providers are a critical part of the health care safety net. The New Jersey Family Planning League (NJFPL), a 501(c)(3) not-for-profit organization, is currently the sole statewide grantee for federal Title X family planning services. For over 44 years, NJFPL has managed a system of sub-grantee agencies that provide high-quality family planning services to the residents of New Jersey.

Page 55 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

165.    NJFPL currently provides Title X funding to 10 sub-grantee agencies that provide family planning and reproductive health services at 47 service sites throughout the 21 counties in New Jersey.  Nine counties have only one Title X clinic, while 12 have multiple sites. The sub-grantee agencies include FQHCs, Planned Parenthood affiliates, a county health department, a hospital-based agency, and other community-based non-profit family planning service providers.

166.    In fiscal year 2017-2018 the NJFPL's Title X grant award was $8.8 million.

167.    NJFPL's other sources of funding include non-Title X family planning funds awarded by the New Jersey Department of Health to NJFPL. These non-Title X funds are aggregated from the following sources:  Social Services Block Grant funds, Maternal and Child Health Block Grant funds, and the State of New Jersey's budgeted family planning funds.  NJFPL also receives funds from patient service revenues, which include Medicaid, private insurance, and patient self-pay.

168.    New Jersey's Title X clinics provide a full range of reproductive health services including counseling and education about achieving or preventing pregnancy, all FDA-approved contraceptive methods, fertility-awareness-based methods of family planning, basic infertility services, pregnancy testing and options counseling (including appropriate referrals), preconception care, breast and cervical cancer screening, wellness screening (for blood pressure, BMI and other factors), HPV vaccination, testing and treatment for STIs, physical exams, screening for intimate partner violence and substance abuse, and referrals for social services, specialty care and/or primary care if not provided on site.

Page 56 -  COMPLAINT

TBW/j8b/9283940-v17

169.    In 2017 approximately 99,800 patients received services at New Jersey's Title X clinics. It is one of the largest single existing systems for the provision of preventive health care in the state.

170.    An estimated 54% of patients served at New Jersey's Title X clinics were under 100% of the FPL, while 94% were below 200% of FPL.

171.    In 2017 the Title X program in New Jersey prevented approximately 19,300 unplanned pregnancies, 9,100 unplanned births, and 6,500 abortions. In that same year alone, New Jersey's Title X program saved about $148 million in maternal and birth-related gross costs from contraceptive services provided.[33]

172.    Title X funds do not fund abortion-related services in New Jersey. NJFPL has comprehensive oversight and monitoring procedures that ensure compliance with Title X abortion separation regulations and practice requirements as outlined in the Title X Statute and Program Regulations. Like all Title X grantees, NJFPL undergoes independent audits each year in compliance with federal grant audit requirements. HHS also conducts comprehensive grantee program reviews nationwide that review financial systems to ensure that the grantees and sub-grantees are not in violation of Title X requirements. In addition, NJFPL conducts annual sub-grantee program and fiscal reviews to ensure that Title X requirements are being met by each of its sub-grantees and service sites. NJFPL's current practices ensure compliance with all current

---

[33] Guttmacher Health Cost Calculator. The numerical prevention and savings calculations were generated based upon the number of female family planning patients (89,945) who were served by New Jersey's Title X program in 2017.

Page 57 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Title X Program requirements, including the separation of all non-Title X services and activities in the project.

173.    In New Jersey, patients who are unable to continue to receive family planning services at a Title X clinic will need to seek services elsewhere, which poses a barrier to care. Depending on the community, other family planning providers may not be accessible due to distance, cost, language barriers, confidentiality concerns, or quality and comprehensiveness of services available. Although publicly funded FQHCs exist in all New Jersey counties, they are not equipped to absorb the impact of the loss of family planning service providers in their communities. Fewer providers means increased wait times, leading to delayed care and increased opportunity for unintended pregnancy, HIV and STIs to go undetected and/or untreated, and other health issues (such as cancer detection, diabetes or other risk factors for a potential pregnancy) to go unaddressed and result in worsened outcomes.  Many FQHCs are already struggling to meet the demand for care in the New Jersey populations and communities they serve.

### New Mexico

174.    The New Mexico Department of Health ("DOH") is the sole Title X provider in New Mexico, providing services at 44 public health offices, 19 statewide contract sites and 13 school-based sites. [34]

---

[34] https://nmhealth.org/about/phd/fhb/fpp

Page 58 -  COMPLAINT

TBW/j8b/9283940-v17

175.     Title X pays primarily for salaries of clinicians, nurses, and clerks at public health offices; as well as state pharmacy, billing, and family planning staff.  Clinics provide a broad range of low-cost or no-cost services including family planning, well-woman exams, breast and cervical cancer screening, STI screening and treatment, pregnancy counseling including referrals upon request, contraception and contraception management, health and risk assessments, and laboratory tests.  The DOH Family Planning Program ("FPP") also supports community-based programming for teens, including service learning and positive youth development programs, and comprehensive sex education and adult-teen communication programs.

176.     Services are provided without regard to religion, race, color, national origin, immigration status, disability, age, gender, number of pregnancies, or marital status and are provided without imposing any residency requirements or physician referral requirements.  FPP makes services for uninsured, reproductive-aged women and men from low-income families its priority.[35] In 2018 FPP served a total of 17,190 women and 1,530 men.  Currently, more than 60% of its Title X clients are at or below 100% of FPL, and 20% fall between 101 and 250% of the federal poverty level.  Over 90% of clients are women; and 68% of clients are between 18 and 34 years of age.

177.     FPP does not estimate the number of unintended pregnancies avoided due to the provision of family planning services but instead monitors birth rates.  However, it is possible to estimate the number of unintended pregnancies prevented based on the Guttmacher Institute's

---

[35] https://nmhealth.org/publication/view/policy/2059/

Page 59 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

metric of 0.25 unintended pregnancies averted per user.[36] Based on this metric, the family

planning services provided to New Mexicans through Title X funding prevented 4,680

pregnancies in 2018.   Based on data from the Institute's interactive calculator, the cost for

family planning services in New Mexico was $3.7 million, but net savings (through births and

pregnancies averted, sexually transmitted infections prevented, and other birth and general health

factors) was $24.3 million.[37]

178.    New Mexico has not funded and does not fund abortions with Title X funds.

### North Carolina

179.    The State of North Carolina, through the North Carolina Department of Health

and Human Services (NC DHHS), has been an umbrella grantee for Title X funding in North

Carolina.  North Carolina uses its Title X funding to support services at county-level health

districts across the state.

180.    Planned Parenthood South Atlantic (Planned Parenthood S.A.) has served as the

other Title X umbrella grantee for North Carolina.  Planned Parenthood S.A. uses its Title X

funding to support to Planned Parenthood health centers across the state.

181.    In fiscal year 2017-2018 North Carolina was awarded Title X grant funds in the

amount of $7,375,000.  Out of this sum, approximately $5,338,000 is awarded to NC DHHS.

---

[36] (https://www.guttmacher.org/estimating-unintended-pregnancies-averted-couple-years-protection-cyp, retrieved 2/28/19).

[37] *See* Guttmacher Data Center's interactive calculator (https://data.guttmacher.org/calculator, retrieved 2/28/19).

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

182.    For the past four years, North Carolina's annual Title X grants have remained relatively stable, with small fluctuation from year to year.

183.    North Carolina's full Title X network currently includes 116 clinical locations—including 1112 sites administered by NC DHHS (through local health districts) and five Planned Parenthood locations.

184.    In many localities, Title X service sites are the only publicly funded providers of comprehensive family planning services.

185.    In calendar year 2017Title X funds provided services for 110,059 patients.  Of these patients, approximately

- 73,095 (66%) were living at or below 101% of the federal poverty level;

- 58,866 (53%) were uninsured; and

- 41,317 (37%) were females under 25 years of age;

186.    In calendar year 2014 approximately 110,167 patients were served by Title X-supported centers.  For these patients, Title X funding prevented approximately:

- 26,100 unintended pregnancies, of which 4,100 were teen pregnancies;

- 9,400 abortions; and

- 2,630 pre-term or low birth weights.

187.    In calendar year 2010, 139,982 patients were served by Title X-supported centers. For these patients, Title X funding prevented approximately:

- 56 cervical cancer cases;

- 22 precancer cases; and

Page 61 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- 1,120 chlamydia infections, the most commonly reported infectious disease in the United States.

188.   The Guttmacher Institute estimates that the services provided at publicly funded family planning centers helped save $232 million in public funds in 2010.

189.   If not enjoined, the Final Rule would have an adverse impact on patient care in North Carolina.  NC DHHS's local health districts would no longer be able to provide abortion referrals or unbiased nondirective counseling, even where the client requests such information. This limits the range of service that the state's local health districts can provide to patients, many of whom have limited financial resources available to seek care elsewhere in the state.

190.   In addition, the Final Rule's restrictive definition of "advanced practice provider" puts additional strain on NC DHHS's local health districts, which may rely on staff without a graduate degree to provide counseling services.

191.   If NC DHHS were to accept Title X funding under the Final Rule's new requirements, it would be required to:

- amend the existing program requirements, administrative policies, and clinical protocols related to the provision of pregnancy options counseling and abortion referrals;

- retrain staff across its Title X network in order to meet the new requirements;

- revise all materials (brochures and referral information) related to pregnancy options services, including abortion; and

Page 62 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- potentially obtain additional staff to meet the need for counseling services.

192.    In addition, under the Rule's amended Title X requirements, Planned Parenthood S.A., North Carolina's other Title X umbrella grantee, will likely be unable to receive Title X funding.  This change would restrict access to family planning services for Planned Parenthood S.A.'s existing patients and cause NC DHHS to absorb at least some of these patients, resulting in higher patient volumes and wait times.

193.    In addition, a reduction in the number of publicly funded family planning clinics will diminish the robust coverage network currently in place in the State, potentially leading to the contraceptive deserts that North Carolina's Title X grantees have worked to eliminate.

194.    Alternatively, if North Carolina were to decline Title X funding because of the Final Rule's new requirements, the State would lose access to more than $7 million in federal funding.  Hundreds of thousands of patients in North Carolina would therefore be faced with increased patient volumes, higher prices for services, and less access to health care providers, as Title X funds approximately 150 full-time employees.

### Pennsylvania

195.    Title X is a critical source of family planning funds in Pennsylvania. The Title X program provides grants to four non-profit organizations in Pennsylvania: AccessMatters, Adagio Health, Maternal and Family Health Services, Inc., and the Family Health Council of Central Pennsylvania. These four organizations distribute Title X funding to 75 sub-agencies, operating more than 200 clinics throughout the Commonwealth.

Page 63 - COMPLAINT

TBW/j8b/9283940-v17

196.    For Fiscal Year 2017, $13,502,000 in Title X funding provided services for more than 200,000 patients across the Commonwealth. Pennsylvania has the third-highest number of Title X patients in the nation.

197.    Title X clinics serve all 67 of Pennsylvania's counties.  Pennsylvania's Title X clinics are uniquely positioned to evaluate the needs of their local communities and ensure that Title X funds are utilized in the most effective and efficient way possible.

198.    Title X health care providers offer a range of essential preventive health services, including well-woman examinations, breast and cervical cancer detection, screening and treatment for STIs, HIV/AIDS testing, HPV and Hepatitis B vaccines, pregnancy testing and counseling, and contraception for thousands of low-income, uninsured, and underinsured individuals each year.

199.    Title X does not fund, and has never funded, abortions in Pennsylvania.  In fact, services provided through Title X funds are estimated to prevent thousands of abortions each year in the Commonwealth.

200.    Many areas served by Title X clinics in Pennsylvania are rural areas with a shortage of primary health care providers and facilities coupled with high levels of need.  Title X clinics are an essential provider of services for Medically Underserved Areas, which are found in the vast majority of Pennsylvania's counties. More than half of the patients who received services at Pennsylvania Title X clinics had incomes at or below the poverty level, and approximately 85 percent have incomes at or below 250 percent of the poverty level.

Page 64 -  COMPLAINT

TBW/j8b/9283940-v17

201.    Title X acts as the payer of last resort in the Commonwealth.  Clinics attempt to identify other sources of funding for patients, including other federal or state funding or private insurance, before relying on Title X grants.  As a result, Title X is truly a lifeline for the patients who rely on it.  Without services through Title X-funded providers, many of these patients would have nowhere else to turn.

202.    Title X is essential for reaching underserved communities, including black and Hispanic residents of the Commonwealth. For instance, of the clients who receive services at clinics funded by AccessMatters, which distributes Title X funding throughout Southeastern Pennsylvania, 44 percent are black and 15 percent are Hispanic.

203.    As a result of the Title X program, approximately 60,000 unintended pregnancies are avoided in Pennsylvania each year.  As a result, the Commonwealth and its citizens save tens of millions of dollars in maternal and birth-related costs.

204.    Planned Parenthood is the largest Title X provider in the Commonwealth.  In 2016, it operated 13 percent of Title-X funded centers but cared for 36 percent of all Title X patients.  In many parts of the Pennsylvania, Planned Parenthood is the only available Title X family planning provider.  For instance, in Bucks County—the fourth-largest county in the Commonwealth—all of the Title X clinics are operated by Planned Parenthood.

**Rhode Island**

205.    The State of Rhode Island, through its Department of Health, is a direct Title X grantee.

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

206.    The Rhode Island Department of Health ("RIDOH") is Rhode Island's sole Title X grantee.

207.    RIDOH was awarded $1,160,000 in Title X funds for family planning programs during HHS's Fiscal Year 2017, for project period April 1, 2016, to March 31, 2018.

208.    RIDOH was awarded an additional Title X Grant in the amount of $31,500 for Ensuring Access To Quality Family Planning Services during the fiscal year ending June 30, 2017 for funding outreach to low-income men and women.

209.    Rhode Island has seen an increase in Title X recipients. In 2018 there were 26 Title X service sites in the State, including the Providence Health Center operated by Planned Parenthood of Southern New England, Inc. The number of service sites increased from 23 sites in 2017.

210.    In 2018, 29,098 clients were served by Title X service sites, serving over 2,300 more clients than in 2017 (26,789). Of the clients served in 2018, 62% received Medicaid; 26% had private insurance, and 12% were uninsured.

211.    In 2018 RIDOH's Title X service sites provided 41,719 family planning visits; 7,952 pregnancy tests; 6,682 HIV tests; 12,674 chlamydia tests; 6,147 breast exams; and 3,260 Pap smears.

212.    In Rhode Island, 44% of pregnancies are unintended and 71,320 women are in need of publicly funded contraceptive services.  As of December 2018 the percentage of need met by Title X clinics and publicly supported providers in Rhode Island was only 35%.

Page 66 -  COMPLAINT

TBW/j8b/9283940-v17

213.    Rhode Island law and RIDOH regulations specifically exclude Title X providers from providing elective abortion services with the Title X funds. *See* Rhode Island General Laws §23-13-21(c); 216-RICR-20-05-2.4.2 ("Provider Requirements").

214.    RIDOH regulations require Title X providers to provide services in accordance with Title X Family Planning Guidelines, 42 C.F.R., part 59 subpart (A)(2014). *See* 216-RICR-20-05-2.2, 216-RICR-20-05-2.4.3(A)(1).

### Vermont

215.    Title X is a critical source of family planning funds in Vermont. The Vermont Department of Health (VDH) is the sole direct grantee for Title X funds in the state. In 2017-2018 VDH received $781,000 in Title X grant funding. This is consistent with the level of funding Vermont has received over the past 10 years. The majority of this funding is passed on from VDH to the sole Title X sub-grantee and service provider in Vermont, Planned Parenthood of Northern New England (PPNNE).

216.    VDH has overseen administration of Vermont's Title X funds since Congress passed Title X in 1970. At the beginning of every three-year project period VDH broadly releases a Request for Proposals to potential Title X sub-grantees. Since the program's inception, PPNNE has been the sole bidder. Vermont, similar to much of the United States, has a shortage of qualified medical providers to meet current patient care needs. PPNNE is currently the only provider in Vermont willing and able to implement the Title X program statewide. Ten of the 12 health centers that PPNNE operates in Vermont are funded in part through Title X.

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

217.    Title X Health Centers serve largely rural and vulnerable populations. Vermont's Title X provider network has spent the past several years improving existing facilities and opening new facilities to better reach underserved areas of the state. Title X centers are geographically spread out across the state, with centers in 10 of Vermont's 14 counties. Those centers are located in medically underserved areas or serve patients who live in medically underserved areas.

218.    At Title X health centers, approximately 60% of patients receive Title X services. Approximately 10,000 Vermonters access Title X services annually. Of those, 46% are under the age of 25 and 47% are between the ages of 25 and 44. Twelve percent of individuals accessing Title X services are male. In addition, 77% of individuals accessing Title X services are at or below 250% of FPL, with 41% at or below 100% of FPL.

219.    Title X funds provide a range of family planning and reproductive health services in Vermont. These services include patient education and counseling; breast and pelvic examinations; breast and cervical cancer screening; STI and HIV prevention education, counseling, testing, and referral; and pregnancy diagnosis and counseling.

220.    In 2017 Title X funding provided 1,449 Pap tests and 1,907 clinical breast exams. In addition, 4,908 females and 1,067 males received chlamydia testing.

221.    One estimate shows that approximately 1,900 unintended pregnancies were averted by Title-X funded clinics in Vermont in 2014. Of those, 400 would have been teen pregnancies.

Page 68 -  COMPLAINT

TBW/j8b/9283940-v17

222.    VDH has worked with partners like the Blueprint Women's Health Initiative to ensure that medical providers are trained in best-practice approaches to contraceptive counseling, which is grounded in medical accuracy and a comprehensive understanding of the full range of contraceptive methods. Patients at Title X clinics receive comprehensive counseling on a broad range of effective and medically approved family planning methods. These methods do not include abortion.

223.    All pregnancy counseling at Title X centers in Vermont is nondirective. Patients with a positive pregnancy test are offered neutral, nondirective counseling on all pregnancy options, including adoption, continuation of the pregnancy, and termination of the pregnancy, and referrals are made upon request as necessary.

224.    Title X does not fund, and never has funded, abortion-related services in Vermont.

225.    Since the inception of the Title X program, VDH has a demonstrated history of full compliance with the prohibition against using Title X funding for abortion. PPNNE is monitored by VDH to ensure compliance with all Title X program policies, statutes and regulations, legislative mandates and program priorities. VDH enforces strict accounting protocols and audit procedures to ensure that Title X funds are used for Title X services only and are never used for abortion services. OPA monitors VDH through a comprehensive Program Review approximately every three years.

Page 69 -  COMPLAINT

TBW/j8b/9283940-v17

226.    VDH and OPA's oversight have shown that, in any of PPNNE's health centers that also provide abortion, services and finances are kept separate and apart from the Title X program.

227.    Vermont does not have any sustainable source of funding readily available to replace the amount of Title X funds that could be lost if the state becomes ineligible for Title X funding. While Vermont currently makes a limited amount of funding available for reproductive health services for patients who do not qualify for Title X funds, and some similar funding for STI prevention and outreach, both supported by Section 1114 Medicaid waivers, neither is a sufficient source of funding to replace the Title X funds that Vermont stands to lose under the new rules.

## Virginia

228.    Since 1972, the Commonwealth of Virginia, through the Virginia Department of Health (the Department), has been an umbrella grantee for Title X funding in Virginia. Virginia uses its Title X funding to support services at local state-run health districts across the state, in addition to one FQHC in Rockbridge, Virginia (the Rockbridge center).

229.    Since 2013 Planned Parenthood South Atlantic (Planned Parenthood S.A.) has served as the other Title X umbrella grantee for the Commonwealth. Planned Parenthood S.A. uses its Title X funding to support Planned Parenthood health centers in the western region of the Commonwealth.

Page 70 -  COMPLAINT

TBW/j8b/9283940-v17

230.    In fiscal year 2017-2018, Virginia's Title X grant award was $4,450,000—with $3.665 million granted to Virginia's Department of Health and $785,000 granted to Planned Parenthood S.A.

231.    For the past four years, Virginia's annual Title X grant award has remained relatively stable with minimal fluctuation from year to year.

232.    In addition to Title X grants, the Department allocates $16 million in general funds to its 35 local health districts for family planning. These services do not fall within the purview of the Title X program.

233.    In addition to Title X services, the Department's local health districts offer screenings for STIs, the provision of treatment as appropriate, primary care referrals, and HIV and tuberculosis testing. Some local health districts also provide physical exams and prenatal and post-partum care. Neither the Department's health districts nor the center in Rockbridge provide abortion services, though they do offer referral services to patients who express a need for such services.

234.    Virginia's full Title X network currently includes 135 clinical locations— including 132 sites administered by the Department (known as local health districts), one FQHC (the Rockbridge center), and two Planned Parenthood locations.

235.    In the majority of localities, Title X service sites are the only publicly funded providers of comprehensive family planning services. Due to the Department's and Planned Parenthood's robust Title X network, Virginia currently has relatively few areas with less than one family planning clinic per 1,000 women in need of publicly funded family planning services.

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

236.    In 2017, 50,575 patients received Title X services in Virginia, and the program prevented 10,870 unintended pregnancies. Of these patients,

- 40,334 (80%) were living at or below 200% of the FPL;

- 32,959 (65%) were uninsured;

- 7,442 (15%) were teens;

- 12,699 received cervical cancer screenings (pap tests);

- 17,255 received breast cancer screenings (clinical breast exams); and

- 16,059 were tested for chlamydia, the most commonly reported infectious disease in the United States.

237.    In 2017 the Department served 46,349 unduplicated Title X clients. Of these clients,

- 43,677 were female and 2,672 were male.

- Of the female clients, 30.3% were Hispanic or Latino; 68.6% were Not Hispanic or Latino;

- Of the male clients, 9.2% were Hispanic or Latino; 87.5% were Not Hispanic or Latino.

This information does not include clients served by Planned Parenthood S.A. and its sub-grantees.

238.    Of the Department's Title X clients:

Page 72 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- 56.5% were at 100% or below FPL; 17.9% were 101-150% of FPL; 6.3% were 151-200% of FPL; 2.2% were 201-250 of FPL; and 2.2% were over 250% of FPL;

- 17% have public health insurance covering primary medical care; 13.5% have private health insurance covering primary medical care; and 66.4% are uninsured (no public or private health insurance); 3.1% are unknown/not reported insurance status; and

- 23% of these patients have Limited English Proficiency. Virginia does not assess immigration status as part of determining eligibility for Title X services.

This data does not include clients served by Planned Parenthood S.A. or its sub-grantees.

239.    Given the role of contraception in preventing unintended pregnancies, the Guttmacher Institute estimates that every public dollar spent on family planning services saves $7.09. Virginia's 2017-2018 Title X funding thus amounted to over $32 million in cost savings.

240.    For the upcoming Title X project period (April 1, 2019-March 31, 2022), the Department proposes to serve no less than 43,495 patients annually, with at least 24,792 being below 100% of the FPL.

241.    Title X clinics are required to regularly administer patient satisfaction surveys to ensure they are providing culturally competent care. These surveys indicate that patients are satisfied with the services they receive at Title X clinics across the state.

Page 73 -  COMPLAINT

TBW/j8b/9283940-v17

242.    The Department primarily allocates Title X funding to its local health districts according to caseload. Districts with high teen pregnancy rates, chlamydia rates, and low-birth weight rates typically receive a larger portion of the Title X grant funding. Because the Department believes that services are most effectively planned at the local level, the Central Office works with local health districts to develop appropriate work plans and goals based on their specific communities and caseload capacities. The Central Office also works with local health districts to identify appropriate community partners, such as the Rockbridge center, that can deliver Title X services.

243.    Administration of the Title X program includes the provision of technical assistance to ensure adherence to the requirements of the Title X statute. As part of that effort, the Department's Reproductive Health Unit Supervisor, Quality Assurance FP Nurse Supervisor, and Fiscal Auditor conduct site visits of all participating local health districts at least once every project period. The Department uses the program review tool developed by the Office of Population Affairs to assess the site's compliance with all elements of the Title X statute, including established standards of clinical care. If a site is found to be out of compliance with any program requirement, they are required to submit a Corrective Action Plan within 30 days of the final report, and the Department's Central Office staff follows up to ensure that the deficiency is corrected.

244.    Because neither the Department nor its partnering center in Rockbridge provide abortion services, there is no risk that Title X funding granted to the Department will be used to support abortion services.

Page 74 -  COMPLAINT

TBW/j8b/9283940-v17

245.    If not enjoined, the Final Rule would have an adverse impact on patient care in Virginia. The Department would no longer be able to provide abortion referrals, even where the client requests such information. This limits the range of service that Virginia's local health districts can provide to patients, many of whom have limited financial resources available to seek care elsewhere in the State.

246.    In addition, the Final Rule's restrictive definition of "advanced practice provider" puts additional strain on the Department's local health districts, many of which rely on staff without a graduate degree to provide counseling services.

247.    If the Department were to accept Title X funding under the Final Rule's new requirements, the Department would be required to, without limitation:

- amend the existing program requirements, administrative policies, and clinical protocols related to the provision of pregnancy options counseling and abortion referrals;

- retrain staff across the Department's Title X network in order to meet the new requirements at an estimated cost of $72,000, not including staff time among Central Office and local staff;

- revise all materials (brochures and referral information) related to pregnancy options services, including abortion; and

- potentially obtain additional staff to meet the need for counseling services.

Page 75 -  COMPLAINT

TBW/j8b/9283940-v17

248.    In addition, under the Rule's amended Title X requirements, Planned Parenthood S.A., Virginia's other Title X umbrella grantee, will likely be unable to receive Title X funding. This change would restrict access to family planning services for Planned Parenthood S.A.'s existing patients and cause the Department to absorb at least some of these patients, resulting in higher patient volumes and wait times.

249.    In addition, a reduction in the number of publicly funded family planning clinics will diminish the robust coverage network currently in place in the Commonwealth, potentially leading to the contraceptive deserts that Virginia's Title X grantees have worked to eliminate.

250.    Alternatively, if Virginia were to decline Title X funding because of the Final Rule's new requirements, the Commonwealth would:

- lose access to $4.52 million in federal funding;

- require new general funds to offset funding losses or incur layoffs at the Department's Central Office and potentially also at local clinic sites, as many staff are funded in varying percentages with Title X program funding.

251.    In addition, if Virginia were to decline Title X funding, patients under the age of 18 would also lose access to Title X's minor confidentiality protections, which protect a minor's medical records from parental oversight without consent.

252.    Likewise, if Virginia were to decline Title X funding, patients would incur higher prices for services and increased patient volumes.

Page 76 -  COMPLAINT

TBW/j8b/9283940-v17

**Wisconsin**

253.     The State of Wisconsin Department of Health Services ("WDHS") has been an umbrella grantee for Title X services in Wisconsin since 2018. The Women's Health–Family Planning Program is the Title X coordinating body within WDHS. Planned Parenthood of Wisconsin ("PPWI") has been a Title X grantee since 1971. In 2018 WDHS was awarded $1 million in Title X funds and PPWI was awarded $2.1 million. The current funding will expire on March 31, 2019. WDHS and PPWI submitted applications for the next round of funding in January 2019.

254.     The Women's Health–Family Planning Program provides funding and direct support to 21 agencies in the state, which operate 35 clinic sites. PPWI funds and supports 21 additional clinic sites. The sites consist of local public health facilities, FQHCs, community-based health centers, tribal health agencies, and Planned Parenthood clinics. These clinics offer core family planning services including counseling and education, a broad range of contraceptive methods, STI screening and treatment, and preconception health assessment and screening for obesity, smoking, substance abuse, violence, and mental health. If a clinic does not or is unable to offer certain comprehensive services, it will make a referral to a local health system.

255.     Wisconsin consists of 72 counties, of which 55 (76%) have one or more Title X clinic. An additional six counties are served by dual-protection sites under the DHS Women's Health Family Planning Program, bringing the total number of counties served by Title X and the Women's Health–Family Planning Program to 61 (85%). In 2017 the total number of

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Wisconsinites living in counties served by a Title X clinic was 4.6 million, including approximately 900,000 women and 1.5 million men of reproductive age.

256.    In Wisconsin, 9 percent of women and 7 percent of men are black, and 8 percent of women and 7 percent of men are Hispanic. Additionally, Wisconsin is home to 11 federally recognized tribes and approximately 50,000 individuals who identify as American Indian/Alaska Native. Wisconsin has an Amish/Mennonite population of between 15,000 and 20,000 individuals. Certain counties are more racially diverse than others. Twenty-six percent of Milwaukee County residents are black. Milwaukee County is home to four Title X clinics: three Planned Parenthood locations and one local health department. Approximately 232,770 women in Wisconsin who live below 250% of the FPL are between the ages of 20 and 44 need contraceptive services.

257.    In 2018 Title X sites funded and supported by WDHS provided family planning services to 11,911 individuals; 20,249 clinic visits; 3,520 pregnancy tests; future-pregnancy screening for 60% of their female patients; 500 cervical cancer screenings; and 4,035 STI screenings. Sixty percent of female patients in Title X clinics reported using a moderately to highly effective method of birth control in 2018.

258.    All Title X clinics must serve anyone regardless of their ability to pay for services and must have a sliding scale fee schedule for clients with a limited ability to pay. The Women's Health–Family Planning clinic sites are certified through Wisconsin Medicaid. Certified clinics may bill Medicaid for services to clients with incomes above 100% of FPL. State law requires clinics to maintain accurate and complete medical and financial records. The Wisconsin Family

Page 78 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Planning Only Services ("FPOS") and private insurance are used as the first source for reimbursement of services. FPOS provides family planning services to low-income men and women of reproductive age to prevent unplanned pregnancies. The average monthly enrollment for FPOS is around 46,000. Title X clinics seek reimbursement for services from FPOS before Title X, which is the payer of last resort.

259.    Title X is not and has never been used to fund abortions in Wisconsin.

260.    If the Final Rule goes into effect, the majority of clinic sites supported and funded by WDHS and PPWI would become ineligible for Title X funds unless they are willing and able to timely comply with the new requirements. Without Title X funds, Wisconsin estimates that more than half of its existing Title X clinics will no longer provide women's health care. As a result, the residents of at least 27 Wisconsin counties will no longer have access to independent women's health services and comprehensive reproductive health care. The loss of funding will also directly impact the Women's Health–Family Planning Program. Title X funds support 5.5 full-time Program positions, including three advanced practice nurse prescribers, one nurse consultant, one epidemiologist, and one health educator. These professionals are essential to Wisconsin's commitment to ensuring high-quality, evidence-based, equitable care through measurement and monitoring of local public agencies.

## VIII.   THE PROPOSED RULE

261.    On June 1, 2018, HHS published a Notice of Proposed Rulemaking in the Federal Register ("Proposed Rule"), intending to restrict reproductive freedom and suppress the freedom of speech of advocates for reproductive choice.  83 Fed. Reg. 25,502 (June 1, 2018).

Page 79 -  COMPLAINT

TBW/j8b/9283940-v17

262.    The Proposed Rule contained a number of problematic provisions.  The Proposed

Rule contained a "gag rule" provision that prohibited any and all nondirective counseling by any

health care providers, including both counseling and referral for abortion. 83 Fed. Reg. 25,518.

At the same time, the Proposed Rule would have required Title X providers to provide

information and referrals for prenatal care, regardless of the desires or needs of the patient for

such information and care. *Id.*

263.    The Proposed Rule also included provisions requiring extensive financial and

physical separation of every Title X project from any of the Proposed Rule's prohibited activities

– including the provision of abortion and nondirective counseling, and abortion referrals. *Id.* at

25,519.

264.    HHS included in the Proposed Rule a number of additional provisions designed to

shift Title X funding away from the provision of high-quality and effective reproductive health

care and toward less-effective care by less-experienced providers, some of whom may not be

medical providers at all. *Id.* at 25,516.  The Proposed Rule included a definition of family

planning that emphasized "natural family planning" and abstinence, removed the requirement

that family planning methods be medically approved, and added numerous provisions designed

to weaken the quality of the Title X provider network. *Id.* at 25,515.

265.    HHS added a definition of "low-income" in the Proposed Rule that would have

diverted funds away from the population of people Title X was intended to assist.  The definition

would have made all women eligible for Title X-funded contraception, regardless of their

income, if their employer-provided insurance did not cover contraceptive care. *Id.* at 25,514.

Page 80 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

266.    In the Proposed Rule, HHS included a Regulatory Impact Statement estimating that the proposal was not "economically significant" as measured by whether it would have an annual effect on the economy of $100 million or more.  83 Fed. Reg. at 25,521.  HHS also prepared a regulatory impact analysis purporting to quantify the costs and benefits of the proposed rulemaking.  *Id.*

267.    The projected costs of the rulemaking as identified in the Proposed Rule's regulatory impact analysis included *no* estimate or analysis whatsoever of the costs for patients, including the health-related costs that would accompany the increase in the number of unintended pregnancies and STIs the implementation of the Proposed Rule is predicted to cause. *Id.* at 25,524-25.

268.    The Final Rule similarly includes no economic analysis or quantification of the costs the Final Rule will impose on patients.  84 Fed. Reg. at 7,779-82.  The Department specifically declined to quantify the costs of an increase in the number of unintended pregnancies on the grounds that the Department believes there will be no such increase, and that the costs of any such increase would not be calculable in any event.  *Id.* at 7,775.

269.    The regulatory impact analysis in the Proposed Rule identified some expected costs for providers, but failed entirely to analyze certain predictable costs, and offered unsubstantiated estimates for others.  For example, despite proposing significant changes to the definition of "low income family" that would include women who, regardless of income, are unable to receive contraceptive coverage because of HHS's separate regulations restricting insurance coverage for contraception, the regulatory impact analysis did not account for the

Page 81 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

predictable increased costs to providers tasked with providing low-cost or cost-free contraception.  83 Fed. Reg. at 25,524-25.

270.    The regulatory impact analysis in the Final Rule likewise fails to include any economic analysis of the Final Rule's revised definition of "low income family."  84 Fed. Reg. at 7,779-82.

271.    The regulatory impact analysis in the Proposed Rule also included an unsubstantiated and unrealistically low estimate of the costs of complying with the physical separation provisions in the Final Rule. The proposal estimates that for each affected service site, "an average of between $10,000 and $30,000, with a central estimate of $20,000, would be incurred to come into compliance with the physical separation requirements in the first year." *Id.* at 25,525.  HHS provided no support or quantitative basis for this estimate.

272.    Having failed to provide any analysis of or basis for the Proposed Rule's estimate of the physical separation costs, the Final Rule critiques the many public comments contending that the Department underestimated those costs on the ground that commenters "themselves did not provide sufficient data to estimate these effects across the Title X program." 84 Fed. Reg. at 7,781.  The Department nonetheless revised its estimated costs for the physical separation requirement to a "central estimate of $30,000" per affected service site. *Id.* at 7,781-82.

273.    HHS received extensive comments in opposition to the Proposed Rule.  Many of the States commented in opposition.  Prominent professional health care organizations and health care providers also submitted comments strongly opposing the Proposed Rule, including the American Medical Association, the Planned Parenthood Federation of America, the American

Page 82 -  COMPLAINT

College of Obstetricians and Gynecologists, the American Academy of Pediatrics, the Society

for Adolescent Health and Medicine, the American Academy of Family Physicians, the

American Academy of Physician Assistants, and the American Academy of Nursing. These

commenters, among many others, explained that the Proposed Rule would erode the high quality

of care provided under Title X, reduce access to health care services, interfere in the provider-

patient relationship, and conflict with ethical standards that apply to health care providers.

## IX.    THE FINAL RULE

274.    On March 4, 2019, HHS published the Final Rule in the Federal Register.  Rather

than respond meaningfully to the extensive opposition to the Proposed Rule and abandon the

misguided and harmful proposed changes to the Title X regulations, HHS made few changes to

the Proposed Rule.  The Final Rule is contrary to law and arbitrary and capricious because it

departs from law, decades of history, prior practice, and recognized standards of care for health

care practitioners.  The Final Rule fails to provide reasoned (or in some cases, any) support for

the changes.

### The Gag Rule

275.    The Final Rule both gags health care practitioners and forces their speech,

regardless of the professional judgment of the practitioner.  Specifically, the Final Rule gags

health care providers by unequivocally prohibiting referrals for abortion.  The Final Rule states:

"A Title X project may not perform, promote, refer for, or support abortion as a method of

family planning, nor take any other affirmative action to assist a patient to secure such an

abortion."  .  84 Fed. Reg. at 7,788-89 (to be codified at 42 C.F.R. § 59.14(a)).

Page 83 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

276.     The Final Rule forces health care practitioners to provide referrals for prenatal care to pregnant patients, however, regardless of patient request or the professional judgment of the health care practitioner.  The Final Rule provides, "Because Title X funds are intended only for family planning, once a client served by a Title X project is medically verified as pregnant, she shall be referred to a health care provider for medically necessary prenatal health care."  84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. § 59.14(b)(1)).

277.     The Final Rule also permits, and in some cases requires, providers to provide misleading information to patients.  Even if a pregnant patient states that she has decided to have an abortion and seeks only a referral to an abortion provider, a health care provider could— consistent with the Final Rule—provide a list of health care providers that does not include any abortion providers at all.  84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. § 59.14(e)(5)).   A provider may include abortion providers on the list but the providers on the list must all be "comprehensive primary health care providers" and the list must not include a majority of providers that also provide abortions.  Moreover, neither the list nor the provider may in any way identify the provider(s) on the list that provide(s) abortions.  84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. § 59.14 (c)(2)).

278.     The Final Rule permits Title X providers to provide incomplete pregnancy counseling to patients, regardless of the needs or requests of the patient.  The Final Rule allows Title X providers to furnish "referral to social services or adoption agencies" and "information about maintaining the health of the mother and unborn child during pregnancy" without

Page 84 -  COMPLAINT

TBW/j8b/9283940-v17

providing any other information about pregnancy options, including abortion.   84 Fed. Reg. at

7,789 (to be codified at 42 C.F.R. § 59.14 (b)(1)(iii),(iv)).

279.    Moreover, the Final Rule arbitrarily prohibits qualified Title X providers from

providing nondirective pregnancy counseling.  The Final Rule permits, but does not require,

providers to provide nondirective pregnancy counseling when requested, but limits nondirective

pregnancy counseling to "physicians or advanced practice providers."  84 Fed. Reg. at 7,789 (to

be codified at 42 C.F.R. § 59.14 (b)(1)(i)).   Advanced practice providers are defined to include

only those providers with "at least a graduate level degree in the relevant medical field and

maintains a license to diagnose, treat, and counsel patients."  84 Fed. Reg. at 7,787 (to be

codified at 42 C.F.R. § 59.2).  The Final Rule unreasonably exlcudesproviders who currently

provide nondirective pregnancy counseling, such as registered nurses. The Final Rule fails to

provide any explanation for this exclusion. Even those who are permitted to provide nondirective

pregnancy counseling must not present abortion as "the only option," regardless of patient

request, and "should discuss the possible risks and side effects to both mother and unborn child

of any pregnancy option presented." 84 Fed. Reg. at 7,747; *see also* 84 Fed. Reg. 7,739 (to be

codified at 42 C.F.R. § 59.14(c)(1)) (prohibiting the provision of "counseling… as an indirect

means of encouraging or promoting abortion as a method of family planning").

### The Separation Requirements

280.    The Final Rule contains irrational and arbitrary provisions requiring extensive

physical and financial separation of Title X projects from activities that are prohibited under the

Final Rule.  Specifically, the Final Rule states, "A Title X project must be organized so that it is

Page 85 -  COMPLAINT

TBW/j8b/9283940-v17

physically and financially separate, as determined in accordance with the review established in this section, from activities which are prohibited under section 1008 of the Act and § 59.13, §59.14, and §59.16 of these regulations from inclusion in the Title X program." 84 Fed. Reg. at 7,789 (to be codified at 42 C.F.R. § 59.15). HHS identified "relevant factors" that it would review in order to determine whether "objective integrity and independence from prohibited activities" exists. The factors include "(a) The existence of separate, accurate accounting records; (b) The degree of separation from facilities. . . in which prohibited activities occur and the extent of such prohibited activities; (c) The existence of separate personnel, electronic or paper-based health care records, and workstations; and (d) The extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent." *Id.*

281.    These separation requirements require separation of Title X projects from not only the provision of abortion but any activities related to abortion, including referral for abortion. The Final Rule imposes these restrictions even where the "prohibited activities" occur outside the Title X project.

**Other Requirements of the Final Rule**

282.    The Final Rule also contains other problematic provisions that would weaken the quality of care provided under Title X and shift Title X money toward less-effective methods and services. The Final Rule  removes the requirement that family planning methods and services be "medically approved," encourages less-effective contraceptive care such as fertility-awareness based methods, and allows projects not to include "every acceptable and effective family

Page 86 - COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

planning method or service." 84 Fed. Reg. at 7,787 (to be codified at 42 C.F.R. § 59. 5(a)(1)). The Final Rule also allows Title X projects to provide contraception to women who are not low-income and are insured by an employer but whose employer's insurance plan does not cover contraceptive care. 84 Fed. Reg. at 7,787 (to be codified at 42 C.F.R. § 59.2).

283.    The Final Rule requires Title X projects to "encourage family participation" in the decision of minors to seek family planning services, by requiring specific recordkeeping regarding such "encouragement' in the minors' medical records, regardless of state laws that protect the rights of minors to consent to confidential services for STIs, abortion, and family planning. 84 Fed. Reg. at 7,788 (to be codified at 42 C.F.R. § 59.5(a)(14)).

284.    The impact of the Final Rule on the States and their residents will be substantial.

## X.    THE FINAL RULE HARMS THE STATES.

285.    As described in detail above, the Final Rule harms the States' economic, proprietary, and quasi-sovereign interests.  The Final Rule will damage the integrity of the Title X program and in turn harm the States and their residents in a number of significant ways.

286.    First, the States risk losing millions of dollars in federal funding for family planning because of providers' inability or unwillingness to conform to the Final Rule's unreasonable and burdensome strictures.

287.    Second, even if providers are able to abide by the Final Rule, quality of care for patients will decrease, as providers will no longer be required (or in some cases, even permitted) to provide a full array of contraceptive services or to engage in nondirective counseling and will be unable to make necessary referrals for appropriate patient care.  The Final Rule would also

Page 87 -  COMPLAINT

TBW/j8b/9283940-v17

irrationally limit those able to provide nondirective counseling to health care professionals with advanced degrees. For example, registered nurses, who have traditionally provided a significant portion of Title X counseling, could not continue their important family planning work, which will reduce the number of patients who can recieve Title X services.

288.    Third, as a consequence of fewer providers providing Title X services, as well as a decrease in the quality of the program, State programs (whether or not States are direct Title X grantees) will be required to shoulder the resulting costs of increases in unintended pregnancies, pregnancy complications, and worse birth outcomes including maternal and infant mortality. In addition, loss of preventative care will increase costs from STIs and cervical cancers, to name just a few of the likely economic and public health impacts that will fall to the States.

289.    Finally, some Plaintiff States are also injured because the Final Rule attaches unconstitutional conditions to the use of Title X funds.  Specifically, the Final Rule forces States such as Oregon and New York – direct grantees of Title X funds – to choose whether to forego Title X funding for essential reproductive health care, expending scarce state funds instead, or violate the constitutional rights of the providers who provide Title X services, as well as the rights of patients who receive those services.

290.    Under the Final Rule, Title X providers, many of whom have been Title X grantees or sub-grantees for significant periods of time, either will have to agree to provide care that conflicts with their medical standards if they want to continue to provide care for their low-income patients, or will exit the program because they cannot or are unwilling to conform their practices to the Final Rule.

Page 88 -  COMPLAINT

291.    The Final Rule will force providers unable or unwilling to abide by the Final
Rule's requirements, including depriving patients of nondirective counseling and necessary
referrals, together with the significant costs of physical separation, to drop out of the Title X
program.  States may be unable to find other high-quality providers with appropriate experience
to take their place.  This is particularly true in rural areas and Medically Underserved Areas
where a Title X site is the only safety-net family planning center.  Even if new sub-grantee
providers are willing and able to meet the Final Rule's requirements, patient services and
continuity of care will be disrupted, with resulting challenges in accessing care.

292.    For example, without Title X funding in Oregon, individuals may be subject to
out-of-pocket costs that would be a barrier to seeking care.  Moreover, in Oregon in 2017,
approximately 33% of Title X pregnancy counseling was performed by registered nurses, who
would be arbitrarily prohibited from providing such counseling because they lack advanced
degrees, reducing access to the Title X program and increasing its costs.

293.    Similarly, in parts of New York served by only one Title X provider for hundreds
of miles, the possible loss of such a provider with no replacement will result in fewer, if any
options for family planning for New Yorkers, leaving potentially hundreds of thousands of low-
income women and men with dramatically decreased access to free or low-cost health care
services.  Residents of the States will lose access to an array of care including contraception,
reproductive health counseling, and related medical services, as well as pregnancy testing and
nondirective counseling on and referral for all pregnancy options including prenatal care,
adoption and abortion.  Patients will also lose access to other services delivered by trusted

Page 89 -  COMPLAINT

TBW/j8b/9283940-v17

providers funded by Title X, including STI testing, counseling and treatment, cervical and breast cancer screening and prevention, and screening for high blood pressure diabetes, depression, or other health conditions diagnosed or treated in the course of basic gynecologic and reproductive health care.

294.    By way of other examples, in almost all of the rural and medically underserved areas throughout the state of Hawaiʻi, Title X-funded clinics are the only source for low-cost family planning services. Hawaiʻi is comprised of six major islands, and the geographic layout of Hawaiʻi makes access to family planning services difficult for individuals who do not reside on the island of Oahu, where the majority of primary health care services and providers are located.  In Minnesota, the clinics that serve rural areas in the state will have to decline Title X funds under the Final Rule, which would jeopardize access to health care for tens of thousands of low-income Minnesota residents.  In Connecticut, existing providers are already at or beyond capacity and could not feasibly make up for the loss of Title X providers.  As alleged above, these sorts of harm would occur in all of the Plaintiff States if the Final Rule goes into effect.

295.    The loss of funding will force Plaintiff States to replace the Title X funds with other dollars that many States simply do not have. In some cases, loss of Title X funds will force States to move funding from other safety net programs to the detriment of other state residents. Ultimately, without the funding for the array of services supported by Title X funds, the States will risk increase in unintended pregnancies as well as undetected and untreated STIs and cervical cancer, among other public health impacts.

Page 90 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

296.    These public health consequences flowing from the Final Rule will require the Plaintiff States to shoulder the related costs through an array of state-funded programs including Medicaid and State hospital systems. Title X-supported services – including contraceptive care, STI testing, and cervical cancer testing and prevention – save approximately $7 for every public dollar invested.  This amounted to an estimated $8.1 billion in gross federal and state government savings in 2010 (the most recent year for which these data are available), by avoiding public expenditures that would have otherwise been made for medical care associated with unintended pregnancies, STIs, and cervical cancer.  Frost JJ et al., *Return on investment: a fuller assessment of the benefits and cost savings of the US publicly funded family planning program,* Milbank Quarterly, 92(4):667-720 (2014), https://onlinelibrary.wiley.com/doi/epdf/10.111/1468-0009.12080.

297.    Those of the plaintiff States that are direct grantees will be harmed because the Final Rule attaches unconstitutional conditions to the use of federal Title X funds, and will force States to choose whether to forego Title X funding for essential health care, or violate the constitutional rights of Title X providers as well as the patients who receive those services. Accepting Title X funding under the Final Rule would require the States to restrict the speech of Title X providers by prohibiting them from discussing medically appropriate and legally available pregnancy options, including abortion. The Final Rule would bar referrals to legally available abortions, potentially endangering the health of patients, while at the same time requiring compulsory, government-mandated speech about prenatal care.

Page 91 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

298.     The Final Rule will also injure the States because many established Title X providers will no longer be able to participate in the program due to the Final Rule's onerous and punitive financial and physical separation requirements, designed to be difficult or impossible to comply with.  This will cause some State residents to lose reproductive health care access that either (1) the States will be forced to restore at their significant cost; or (2) will cause States to incur substantial increased health care costs, such as those for unintended pregnancies, increased pregnancy and delivery complications (including maternal and infant death), treatment of preventable cancers and STIs and complications, among many other harmful effects, that would not have occurred if Title X funds had been available.

299.     The Final Rule also directly conflicts with state laws that guarantee minors the right to consent to confidential health services that help reduce teen pregnancy rates and prevent the spread of STIs among minors.

## FIRST CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Not In Accordance With Law – Appropriations Act)

300.     The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

301.     The Administrative Procedure Act requires the court to "hold unlawful and set aside agency action" that it finds to be "not in accordance with law." 5 U.S.C. § 706(2)(A).

302.     The Final Rule is not in accordance with law because, without limitation, the Consolidated Appropriations Act of 2018, like each preceding appropriations act since 1996,

Page 92 -  COMPLAINT

requires "that all pregnancy counseling shall be nondirective."   2019 Health and Human Servs. Act, 132 Stat. 2981, 3070-71.

303.    Nondirective pregnancy counseling requires the presentation of neutral, factual, and nondirective information about all legal and medically indicated options for pregnancy, including abortion.  Nondirective pregnancy counseling also requires nondirective referrals for particular pregnancy services on request of the patient.

304.    The Final Rule violates this statutory requirement in multiple ways.  For example, the Final Rule requires referral for prenatal care, regardless of patients' need or desire for such referral.  The Final Rule prohibits nondirective counseling, including counseling for abortion, by any medical professionals such as registered nurses who do not both have graduate degrees and a license to diagnose, treat, and counsel patients.  What the Final Rule designates as "nondirective counseling" is not in reality nondirective because it requires prenatal counseling regardless of a patient's request for information only about abortion. 84 Fed. Reg. 7, 747.  Finally, the Final Rule prohibits referrals for abortion even if such referrals are nondirective.  The Final Rule thus requires directive counseling toward prenatal care and away from abortion in violation of law.

305.    Pursuant to 5 U.S.C. § 706(2)(A), the States are entitled to an order vacating the Final Rule and declaratory and injunctive relief against the Department taking any action to implement the Final Rule.

Page 93 -  COMPLAINT

TBW/j8b/9283940-v17

## SECOND CLAIM FOR RELIEF

## (Violation of the Administrative Procedure Act, U.S.C. §§ 706(2)(A), (C) – Not In Accordance With Law – Affordable Care Act)

306.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

307.    The Administrative Procedure Act requires the court to hold unlawful and set aside agency action that is "not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

308.    The Affordable Care Act, 42 U.S.C. § 18114, provides that HHS shall not promulgate any regulation that:

(1)    creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;
(2)    impedes timely access to health care services;
(3)    interferes with communications regarding a full range of treatment options between the patient and the provider;
(4)    restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions;
(5)    violates the principles of informed consent and the ethical standards of health care professionals; or
(6)    limits the availability of health care treatment for the full duration of a patient's medical needs.

309.    The Final Rule violates each subsection of the statute by: (1) creating unreasonable barriers to patients seeking medically appropriate family planning, pregnancy care, and abortion services; (2) impeding timely access to patients seeking these services; (3) interfering with communications between patients and providers regarding medically appropriate family planning, pregnancy care, and abortion service; (4) restricting the ability of health care

Page 94 -  COMPLAINT

TBW/j8b/9283940-v17

providers to fully disclose to their patients all relevant information regarding medically appropriate family planning, pregnancy care, and abortion services; (5) requiring health care professionals to violate the principles of informed consent and the ethical standards of health care professions; and (6) limiting the availability of health care treatment for the full duration of the patient's needs due to the Final Rule's onerous and irrational separation requirements.

310.    The Final Rule is therefore not in accordance with law or is in excess of statutory authority.  Pursuant to 5 U.S.C. §§ 706(2)(A) and (C), the States are entitled to an order vacating the Final Rule and declaratory and injunctive relief against HHS taking any action to implement the Final Rule.

## THIRD CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, U.S.C. § 706(2)(A) – Arbitrary and Capricious)

311.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

312.    The Administrative Procedure Act requires the court to "hold unlawful and set aside agency action, findings and conclusions" that it finds to be arbitrary, capricious, or an abuse of discretion."  5 U.S.C. § 706(2)(A).

313.    The Final Rule reverses a prior agency decision without providing a reasoned explanation for the change while simultaneously disregarding material facts and evidence, including nationally recognized standards of care for medical professionals, which supported the agency's prior rules.  The Final Rule is not evidence-based.

Page 95 -  COMPLAINT

TBW/j8b/9283940-v17

314.    Defendants' explanation for issuing the Final Order contravenes and ignores the evidence submitted during the comment period.  The justification provided by the Department is neither material nor rational, is wholly speculative, and ignores the recognized and applicable medical standards of care for the services at issue.  The Final Rule is thus arbitrary and capricious in ways that include but are not limited to the following:

- The Final Rule imposes a gag rule;

- The Final Rule changes Title X from a nondirective program to a directive one;

- The Final Rule imposes onerous and irrational separation requirements on Title X providers that engage in abortion-related activities outside the Title X program;

- The Final Rule purports to allow only medical professionals who are "advanced practice providers" to provide nondirective pregnancy counseling without providing any justification for this limitation and despite the fact that many medical professionals who are not "advanced practice providers" currently provide effective nondirective pregnancy counseling.

- The Final Rule eliminates the requirement that family planning methods be medically approved and emphasizes non-medically approved contraceptive methods in its new definition of family planning.  As a result, HHS encourages greater participation by and the diversion of Title X funds to non-medical providers of less-effective non-medically approved contraceptive

Page 96 -  COMPLAINT

TBW/j8b/9283940-v17

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

services such as natural family planning and abstinence-only education, which will decrease contraceptive choice and lower the quality of care available to Title X patients.

315.    HHS's issuance of the Final Rule is therefore arbitrary or capricious.  Pursuant to 5 U.S.C. § 706(2)(A), the States are entitled to an order vacating the Final Rule and declaratory and injunctive relief against HHS taking any action to implement the Final Rule.

## FOURTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B); Unconstitutionally Vague)

316.    The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

317.    The Administrative Procedure Act provides that courts must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

318.    The Final Rule's prohibition on promotion, referral, or support for abortion "as a method of family planning" and its physical and financial separation requirements are impermissibly vague in violation of the Fifth Amendment because they do not provide Title X grantees with fair warning about what conduct the new regulations prohibit.

319.    HHS does not define the term "abortion as a method of family planning," nor does the Title X statute.  To the contrary, the Final Rule defines "family planning" to specifically exclude abortion in the Title X context.

Page 97 -  COMPLAINT

TBW/j8b/9283940-v17

320.    Although plaintiffs understand that any services provided within the Title X program must be for "family planning," except to the limited extent of providing transitional information to direct patients out of the Title X project, the Final Rule does not make clear what "abortion as a method of family planning" means and whether this term encompasses abortion-related services occurring entirely outside of the Title X program.

321.    Accordingly, the Final Rule is unclear under what circumstances HHS prohibits referrals for abortion-related services provided outside the Title X project.  If HHS intended to prohibit all abortion referrals (as opposed to those for "family planning" purposes), it could have stated so unambiguously, particularly since comments submitted to HHS highlighted this concern.  These strictures make no sense in light of the process for treating, counseling and referring pregnant patients. Any patient being referred out of a Title X program is being referred for a service or medical need other than "family planning," whether that is prenatal care or abortion, and no referral for abortion will be "for family planning purposes."

322.    The physical and financial separation requirements are similarly problematic. These provisions require separation between the Title X project and activities "prohibited under section 1008 of the Act and §§ 59.13, 59.14, and 59.16 from inclusion in the Title X program," which refers to the prohibitions on a Title X project including abortion "as a method of family planning" (§ 59.13), promoting, referring, or supporting "abortion as a method of family planning," (§ 59.14), and encouraging, promoting, or advocating 'abortion as a method of family planning" (§ 59.16).  In other words, it requires separation between the Title X project and activities that would be prohibited under the new regulations – i.e., services related to abortion

Page 98 -  COMPLAINT

TBW/j8b/9283940-v17

"as a method of family planning." Therefore, when plaintiffs' sub-grantees provide referrals for abortion and other abortion-related services outside of Title X that are not for "family planning," and thus are not prohibited by the regulations, it is entirely unclear what activity Title X projects must keep physically and financially separate from their Title X projects.

323. The Final Rule's key provisions seek to regulate and prohibit activity related to "abortion as a method of family planning" when that term is undefined. HHS has failed to provide sufficient guidance to Title X grantees, sub-grantees, and future applicants that provide abortion-related services outside of Title X. Such entities face an unacceptable risk of losing their Title X funding for running afoul of these vague and unclear regulations. The regulations as drafted must be set aside as in violation of 5 U.S.C. § 706(2)(B).

## FIFTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(D) – Without Observance of Procedure Required by Law)

324. The States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

325. The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

326. The APA requires agencies to publish notice of all proposed rulemakings in a manner that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." 5 U.S.C. § 553(c); *see also id.* § 553(b).

327. In addition, Executive Order 12866, Executive Order 13563, and guidance from the White House Office of Management and Budget require that agencies quantify the costs and

Page 99 - COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

benefits of their proposed regulations wherever possible.  *See* Exec. Order 12,866 at §§ 1(a),

1(b)(6), 6(a)(3)(C), *Regulatory Planning and Review*, 58 Fed. Reg. 51,735 (Oct. 4, 1993); White

House Office of Mgmt. & Budget, Circular A-4 at 18-27 (Sept. 17, 2003); Exec. Order 13,563 at

§ 1, *Improving Regulation and Regulatory Review*, 76 Fed. Reg. 3,821 (Jan. 21, 2011) ("[E]ach

agency is directed to use the best available techniques to quantify anticipated present and future

benefits and costs as accurately as possible.").

328.    The regulatory impact analysis in the Proposed Rule did not sufficiently identify

and quantify the costs and benefits of the rulemaking, evading the APA's critical procedural

protections that ensure agency regulations are tested through exposure to public comment, and

denying the States and other affected parties an opportunity to present comment and evidence to

support their positions, in violation of 5 U.S.C. § 706(2)(D).

329.    In addition, under the Final Rule, nondirective pregnancy counseling is restricted

to that provided only by "physicians or advanced practice providers."   84 Fed. Reg. at 7,789 (to

be codified at 42 C.F.R. § 59.14(b)(1)(i)).  The Proposed Rule did not disclose that the

Department was considering this restrictive ban on nondirective pregnancy counseling, depriving

the States and other affected parties an opportunity to present comment and evidence opposing

this ban.  Because this restriction is not a logical outgrowth of the HHS's Proposed Rule, it was

adopted without conforming to procedure required by law, in violation of 5 U.S.C. § 706(2)(D).

330.    The regulations as drafted must be set aside as in violation of 5 U.S.C.

§ 706(2)(D).


Page 100 -COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## SIXTH CLAIM FOR RELIEF

### (Unconstitutional Condition – First Amendment)

331.    The plaintiff states that are direct grantees ("Grantee States[38]") reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

332.    The Final Rule exceeds HHS's power under the U.S. Constitution because it induces States to violate the First Amendment in order to secure Title X funding.

333.    The Final Rule compels Grantee States and other Title X grantees to infringe upon the free speech rights of health care providers as a condition of securing Title X funds by prohibiting them from referring pregnant patients for abortion and by requiring them to refer pregnant patients for prenatal care, regardless of the needs or requests of their patients.  The Final Rule intrudes upon the relationship between medical providers (including but not limited to doctors), and their patients who receive care in Title X funded clinics. The Final Rule dictates the medical advice and referrals for follow-up medical care that providers will deliver and prohibits providers from being able to deliver unencumbered medical advice, including referrals, on crucial matters of a deeply personal nature, such as the options available to an individual patient who is pregnant.

334.    The Final Rule also compels Grantee States and other Title X grantees to infringe upon the free speech rights of health care providers who are not advanced practice providers, such as registered nurses, by prohibiting them from providing nondirective options counseling to

---

[38] Grantee States are Oregon, New York, Colorado, Connecticut, Delaware, Hawaiʻi, Illinois, Maryland, Massachusetts, Michigan, Nevada, New Mexico, North Carolina, Rhode Island, Vermont, and Virginia.

Page 101 -COMPLAINT

TBW/j8b/9283940-v17

pregnant patients that they are fully qualified to provide under the applicable professional practice standards.

335.    The Final Rule imposes these speech restrictions on patients and providers not only when the providers are providing services funded by Title X but also when they are providing services not funded by Title X.  The Final Rule thus compels and controls speech by the recipients of Title X funds and their patients inside and outside the contours of the Title X program.  The speech restrictions are content and viewpoint-based.

336.    The Grantee States are entitled to an order vacating the Final Rule and declaratory and injunctive relief against HHS taking any action to implement the Final Rule as contrary to the United States Constitution.

## XI.    PRAYER FOR RELIEF

WHEREFORE, the States pray for judgment against each of the Defendants as follows:

1.    Declare that the Final Rule is unauthorized by and contrary to the Constitution and laws of the United States;

2.    Declare that the Final Rule is not in accordance with law, is beyond statutory authority, and is arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706;

3.    Vacate and set aside the Final Rule;

4.    Enter a preliminary and permanent injunction that enjoins the Defendants from implementing and enforcing the Final Rule;

5.    Stay the effective date of the Final Rule pursuant to 5 U.S.C. § 705;

Page 102 -COMPLAINT

TBW/j8b/9283940-v17

6.      Award Plaintiffs their reasonable costs, fees, and expenses, including attorneys'

fees, pursuant to 28 U.S.C. § 2412; and

7.      Award such other and further relief as the Court deems just and proper.


DATED:  March 5, 2019                          Respectfully submitted,

                                               ELLEN F. ROSENBLUM
                                               Attorney General

                                                 *s/Christina L. Beatty-Walters*
                                               CHRISTINA L. BEATTY-WALTERS #981634
                                               SCOTT J. KAPLAN #913350
                                               Senior Assistant Attorney General
                                               Trial Attorneys
                                               100 SW Market St
                                               Portland, OR 97201
                                               Tel (971) 673-1880
                                               Fax (971) 673-5000
                                               Tina.BeattyWalters@doj.state.or.us
                                               Scott.Kaplan@doj.state.or.us
                                               *Attorneys for State of Oregon*


Page 103 - COMPLAINT

TBW/j8b/9283940-v17

LETITIA JAMES
Attorney General
State of New York


*s/ Matthew Colangelo*
MATTHEW COLANGELO,
Chief Counsel for Federal Initiatives
(Special Admission: January 17, 2019)
LISA LANDAU
Bureau Chief, Health Care
(Special Admission Pending)
ELIZABETH CHESLER
Assistant Attorney General
JUDITH VALE
Assistant Solicitor General
Office of the New York State Attorney
General
28 Liberty St., 19th Floor
New York, NY 10005
Phone: (212) 416-6305
Matthew.Colangelo@ag.ny.gov
Lisa.Landau@ag.ny.gov
Elizabeth.Chesler@ag.ny.gov
Judith.Vale@ag.ny.gov
*Attorneys for State of New York*

PHILIP J. WEISER
Attorney General
State of Colorado


*s/Eric R. Olson*
ERIC R. OLSON
Solicitor General
(Special Admission: February 28, 2019)
JENNIFER L. WEAVER
First Assistant Attorney General
(Special Admission: February 28, 2019)
W. ERIC KUHN
Senior Assistant Attorney General
(Special Admission: February 28, 2019)
Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
Tel (720) 508-6548/6145/6143
eric.olson@coag.gov
jennifer.weaver@coag.gov
eric.kuhn@coag.gov
Colorado Bar Numbers: 36414, 28882,
38083
*Attorneys for State of Colorado*


WILLIAM TONG
Attorney General
State of Connecticut


*s/Maura Murphy Osborne*
MAURA MURPHY OSBORNE
Assistant Attorney General
(Special Admission: January 31, 2019)
55 Elm St.
Hartford, CT 06106
Tel (860) 808-5020
Fax (860) 808-5347
Maura.MurphyOsborne@ct.gov
*Attorneys for State of Connecticut*


Page 104 -COMPLAINT

TBW/j8b/9283940-v17

KATHLEEN JENNINGS
Attorney General
State of Delaware

___s/Ilona Kirshon_____
ILONA KIRSHON (#3705)
Deputy State Solicitor
(Specially Admitted: February 28, 2019)
JOANNA SUDER (#5808)
Deputy Attorney General
(Specially Admitted: February 28, 2019)
Department of Justice
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801
Tel (302) 577-8323
Fax (302) 577-6630
Kathleen.jennings@delaware.gov
ilona.kirshon@delaware.gov
joanna.suder@delaware.gov
*Attorneys for State of Delaware*


KARL A. RACINE
Attorney General
District of Columbia

___s/Robyn R. Bender_____
ROBYN R. BENDER
Deputy Attorney General
(Special Admission Pending)
VALERIE M. NANNERY
Assistant Attorney General
(Special Admission Pending)
441 4th Street, N.W., Suite 630 South
Washington, DC 20001
Tel (202) 442-9596
Fax (202) 730-1465
robyn.bender@dc.gov
valerie.nannery@dc.gov
*Attorneys for District of Columbia*

CLARE E. CONNORS
Attorney General
State of Hawai'i

___s/Diane K. Taira_____
DIANE K. TAIRA
ANGELA A. TOKUDA
JILL T. NAGAMINE
Deputy Attorneys General
(Special Admission Pending)
Department of the Attorney General
State of Hawai'i
425 Queen Street
Honolulu, Hawai'i 96813
Tel (808) 587-3050
Fax (808) 587-3077
Diane.K.Taira@Hawaii.gov
Angela.A.Tokuda@Hawaii.gov
Jill.T.Nagamine@Hawaii.gov
*Attorneys for State of Hawai'i*


KWAME RAOUL
Attorney General
State of Illinois

___s/Elizabeth Morris_____
ELIZABETH MORRIS
Assistant Attorney General
(Special Admission Pending)
LEIGH J. RICHIE
(Special Admission Pending)
Assistant Attorney General
ELIZABETH ROBERSON-YOUNG
Public Interest Counsel
100 West Randolph Street, 11th Floor
Chicago, IL 60601
(312) 814-3000
EMorris@atg.state.il.us
LRichie@atg.state.il.us
ERobersonYoung@atg.state.il.us
*Attorneys for State of Illinois*

Page 105 -COMPLAINT

TBW/j8b/9283940-v17

BRIAN E. FROSH
Attorney General
State of Maryland


   *s/Carolyn A. Quattrocki*
STEVE M. SULLIVAN
Solicitor General
CAROLYN A. QUATTROCKI
Deputy Attorney General
(Special Admission Pending)
JEFFREY P. DUNLAP
Assistant Attorney General
(Special Admission Pending)
200 St. Paul Place
Baltimore, MD 21202
jdunlap@oag.state.md.us
*Attorneys for State of Maryland*



MAURA HEALEY
Attorney General
Commonwealth of Massachusetts


   *s/Amanda Hainsworth*
AMANDA HAINSWORTH
Assistant Attorney General
(Specially Admitted)
One Ashburton Place
Boston, MA 02108
Amanda.hainsworth@state.ma.us
*Attorneys for Commonwealth of
Massachusetts*

DANA NESSEL
Attorney General
State of Michigan


   *s/Fadwa A. Hammoud*
FADWA A. HAMMOUD (P74185)
Solicitor General
(Special Admission Pending)
TONI L. HARRIS (P63111)
Assistant Attorney General
(Special Admission Pending)
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI  48909
Telephone:  (517) 335-7603
HammoudF1@michigan.gov
Harrist19@michigan.gov
*Attorneys for State of Michigan*



KEITH ELLISON
Attorney General
State of Minnesota


   *s/Megan McKenzie*
MEGAN MCKENZIE
Assistant Attorney General
(Special Admission: February 26, 2019)
445 Minnesota Street, Suite 900
St. Paul, Minnesota 55101-2127
Telephone: (651) 757-1405
Email: megan.mckenzie@ag.state.mn.us
*Attorneys for State of Minnesota*


Page 106 -COMPLAINT

TBW/j8b/9283940-v17

AARON D. FORD
Attorney General
State of Nevada

*s/Heidi Parry Stern*
HEIDI PARRY STERN
Solicitor General
(Special Admission Pending)
Office of the Nevada Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717
(775) 684-1100
hstern@ag.nv.gov
*Attorneys for State of Nevada*


GURBIR S. GREWAL
Attorney General
State of New Jersey

*s/Glenn Moramarco*
GLENN MORAMARCO
Assistant Attorney General
KIMBERLY CAHALL
(Specially Admitted)
ELSPETH HANS
(Specially Admitted: January 17, 2019)
Deputy Attorneys General
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ  08625
(609) 984-3900
Glenn.Moramarco@law.njoag.gov
Kimberly.Cahall@njoag.gov
Elspeth.Hans@law.njoag.gov
*Attorneys for State of New Jersey*

HECTOR BALDERAS
Attorney General
State of New Mexico

*s/ Jennie Lusk*
JENNIE LUSK
(Special Admission Pending)
Assistant Attorney General, Director New
Mexico Office of Attorney General
201 Third NW, Suite 300
Albuquerque, NM 87102
JLusk@nmag.gov
(505) 717-3500
*Attorneys for State of New Mexico*


JOSHUA H. STEIN
Attorney General
State of North Carolina

*s/Sripriya Narasimhan*
SRIPRIYA NARASIMHAN
Deputy General Counsel
(Special Admission Pending)
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
SNarasimhan@ncdoj.gov
*Attorneys for State of North Carolina*

Page 107 -COMPLAINT

TBW/j8b/9283940-v17

JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania


   *s/Michael J. Fischer*
MICHAEL J. FISCHER
Chief Deputy Attorney General
(Special Admission Pending)
AMBER J. SIZEMORE
Deputy Attorney General
Office of Attorney General
Strawberry Square
Harrisburg, PA 17120
(215) 560-2171
mfischer@attorneygeneral.gov
asizemore@attorneygeneral.gov
*Attorneys for Commonwealth of Pennsyvlania*


PETER F. NERONHA
Attorney General
State of Rhode Island


   *s/Maria R. Lenz*
MARIA R. LENZ
Assistant Attorney General
(Special Admission Pending)
Office of the Attorney General
150 South Main Street
Providence, Rhode Island 02903
1-401-274-4400, ext. 2225
marialenz@riag.ri.gov
*Attorneys for the State of Rhode Island*


THOMAS J. DONOVAN, JR.
Attorney General
State of Vermont


   *s/Eleanor Spottswood*
ELEANOR SPOTTSWOOD
Assistant Attorney General
(Special Admission Pending)
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-3178
eleanor.spottswood@vermont.gov
*Attorneys for State of Vermont*


MARK R. HERRING
Attorney General
State of Virginia


   *s/Toby J. Heytens*
TOBY J. HEYTENS
Solicitor General
(Special Admission Pending)
MATTHEW R. MCGUIRE
Principal Deputy Solicitor General
(Special Admission Pending)
MICHELLE S. KALLEN
Deputy Solicitor General
(Special Admission Pending)
BRITTANY M. JONES
John Marshall Fellow
(Special Admission Pending)
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240
solicitorgeneral@oag.state.va.us
*Attorneys for State of Virginia*


Page 108 - COMPLAINT

TBW/j8b/9283940-v17

JOSHUA L. KAUL
Attorney General
State of Wisconsin


    *s/Maura FJ Whelan*
MAURA FJ WHELAN
Assistant Attorney General
(Special Admission Pending)
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Tel (608) 266-3859
whelanmf@doj.state.wi.us
*Attorneys for State of Wisconsin*


Page 109 - COMPLAINT

    TBW/j8b/9283940-v17