ELLEN F. ROSENBLUM
Attorney General
CHRISTINA L. BEATTY-WALTERS #981634
SCOTT J. KAPLAN #913350
Senior Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Tina.BeattyWalters@doj.state.or.us
  scott.kaplan@doj.state.or.us

Attorneys for Plaintiff State of Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| STATE OF OREGON; STATE OF NEW YORK; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; and STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ALEX M. AZAR II, in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; DIANE FOLEY, in her official capacity as the Deputy Assistant Secretary, Office of Population Affairs; and the OFFICE OF POPULATION AFFAIRS,<br><br>Defendants. | Case No. 6:19-cv-00317-MC<br><br>DECLARATION OF MAGDA SCHALER-HAYNES IN SUPPORT OF STATES' MOTION FOR PRELIMINARY INJUNCTION |

## DECLARATION OF MAGDA SCHALER-HAYNES

I, Magda Schaler-Haynes, declare:

1. I serve as Director of the Office of Policy and Strategic Planning within the New Jersey Department of Health (NJDOH). NJDOH is charged with, among other things, eradicating health disparities and fostering women's equity and equality in health care and health outcomes. As Director of the Office of Policy and Strategic Planning, I lead policy development to advance and implement NJDOH mission and priorities. I make this declaration based on my personal knowledge and on information provided to me in my official capacity.

2. I hold joint appointments as Adjunct Associate Professor of Law at Columbia Law School and as Adjunct Associate Professor of Health Policy and Management at Columbia University's Mailman School of Public Health.

3. Prior to my current role, I served as Special Advisor for Health Care and Women's Rights to a United States Senator. I also served as Senior Health Policy Advisor at the New York State Insurance Department, prior to which I was an Associate in the Health Care Group at the Proskauer law firm in New York. I have provided health policy advisory and consulting services to varied clients over my career, often focused on reproductive health law and policy.

4. I earned my law degree in 2001 from Columbia Law School and an MPH in Health Policy and Management from Columbia in 1998. I earned my bachelor's degree *cum laude* from Brandeis University in 1996, where I majored in Sociology with a concentration in Law, Medicine and Health Policy.

5. NJDOH's priority is to strengthen New Jersey's health system by investing in population health, promoting equity, and achieving better health outcomes for all residents.

NJDOH is committed to providing access to high quality, affordable, culturally competent, and trauma-informed care, as well as reducing and eliminating disparities in health outcomes across all health care services. NJDOH's priorities align with evidence-based, national best practices, including the Institute of Medicine's six dimensions of quality health care: safety, timeliness, patient-centeredness, effectiveness, efficiency, and equitability.

6. NJDOH works closely with local, state, and federal government agencies, as well as private-sector partners, to oversee programs and services that, among other things, provide family planning and reproductive health care and provide science-backed sexual and reproductive health information and education. The Office of Policy and Strategic Planning works closely with NJDOH program staff to provide timely policy analysis, development, and implementation related to the Departmental mission and priorities.

7. Family planning services are an important tool to help women make intentional decisions about how and when to grow their families. Reproductive control enables equal participation by women in the labor market. Women's ability to achieve and maintain economic security has important health benefits, including lower risk of disease, better mental health, greater access to medical care, and longer life expectancy.

8. Improving access to reproductive health is one of NJDOH's key priorities and is essential to achieving health equity and to eliminating racial and ethnic disparities.

9. NJDOH works to ensure New Jerseyans have access to timely, quality reproductive and family planning care across the State. Consistent with its mission to promote health equity and reduce health disparities, NJDOH monitors and promotes access to such services for vulnerable populations, including lower-income residents.

10. NJDOH promotes access to health care provided in accordance with national, evidence-based standards. Comprehensive, patient-centered care requires non-directive counseling to advise patients of all available medical options. Such options specifically include, but are not limited to, contraception and abortion. The NJDOH takes note of the Opinion of the American College of Obstetrics and Gynecology Subcommittee on Health Care for Underserved Women, reaffirmed in 2017, which states:

> Safe, legal abortion is a necessary component of women's health care. The American College of Obstetricians and Gynecologists supports the availability of high-quality reproductive health services for all women and is committed to improving access to abortion. Access to abortion is threatened by state and federal government restrictions, limitations on public funding for abortion services and training, stigma, violence against abortion providers, and a dearth of abortion providers.[1]

11. It is the mission of NJDOH to design, fund, and evaluate programs to enable and ensure equitable access to reproductive health services—including abortion—across New Jersey. Myriad programs across multiple branches within NJDOH serve this mission.

12. New Jersey is a high-cost state and poverty persists at higher income levels here. Wealthy New Jerseyans enjoy, and will likely always enjoy, access to a full range of reproductive care, including abortion services, without limitation. For low- to moderate-income New Jerseyans, access to reproductive and family planning care is often more challenging. Affordability presents a disproportionate barrier to care for lower-income residents.

---

[1] The American College of Obstetricians and Gynecologists, Women's Health Care Physicians, Committee on Health Care for Underserved Women, Committee Opinion, *Increasing Access to Abortion* (Number 613, November 2014), *available at* https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Increasing-Access-to-Abortion.

13. Specialized, publicly-funded family planning providers often provide critical services to individuals who are otherwise uninsured or underinsured, underpinning the critical nature of state and federal funding.

14. Elimination or reduction of family planning providers in New Jersey has a regressive impact. Lower income New Jerseyans, especially women of color, bear disproportionate burdens of diminished access relative to their higher-income counterparts across New Jersey.

15. Limited, delayed, and denied access to reproductive and family planning services has far-reaching economic consequences. Long-term impacts include constrained participation in the workforce, limited intergenerational economic independence, and hindered participation in public life. Sub-optimal health outcomes are linked to these economic impacts.

16. NJDOH's mission and practice is directed, in part, by the New Jersey Supreme Court's decision in *Right to Choose v. Byrne*, 91 N.J. 287 (1982), which held that "the State may not jeopardize the health and privacy of poor women by excluding medically necessary abortions from a system providing all other medically necessary care for the indigent." New Jersey's Medicaid program is required to fund medically necessary abortion care using State dollars as a result of this decision.

17. NJDOH further recognizes that women's ability to control their reproductive lives enables them to participate equally in the economy and social fabric of our nation. The work of NJDOH focuses on modifying social determinants of health, taking a broad view of the many factors of "economic and social life" which relate to public health.

18. In addition, New Jersey women are more likely than women in other states to suffer injury and death related to pregnancy. Risks related to pregnancy are disproportionately

high in New Jersey relative to elsewhere in the United States, and women of color face exceptionally heightened risks. New Jersey is ranked 45th worst nationally in maternal mortality,[2] and the maternal mortality rate for African-American women is more than double the national average.[3] NJDOH is currently working on a strategic plan to eliminate preventable maternal death and injuries. In addition to preventable harm experienced by women, many costs associated with New Jersey's high rate of maternal mortality are paid for using public funding. Pregnancy planning and spacing through use of contraception and family planning are essential to the promotion of safe birth and to curbing the tide of maternal mortality and morbidity in the State.

I. **New Jersey's Title X Clinics**

19. New Jersey's family planning providers receive payments and funding from a mix of sources. Title X funds is one such source. Title X funds are federal family planning dollars distributed to states across the nation. NJDOH is not involved with the application for or administration of federal Title X funds.

20. In New Jersey, the non-profit New Jersey Family Planning League (NJFPL) is the sole recipient of federal Title X funds. NJFPL has sub-recipient agencies that provide family planning and reproductive health services ("Title X clinics").

21. NJDOH awards other, non-Title X family planning funds within New Jersey. NJDOH has awarded these funds to NJFPL. These non-Title X funds are aggregated from non-Title X federal grant funds and the State of New Jersey's budgeted family planning funds.

---

[2] United Health Foundation, America's Health Rankings, 2018 Health of Women and Children Report New Jersey, https://www.americashealthrankings.org/learn/reports/2018-health-of-women-and-children-report/state-summaries-new-jersey
[3] United Health Foundation, America's Health Rankings, *2018 Health of Women and Children Report, New Jersey in 2018*, https://www.americashealthrankings.org/explore/health-of-women-and-children/measure/overall_mch/state/NJ.

22. For NJDOH-awarded funds, NJDOH sets programmatic, data reporting, and budget priorities with the NJFPL through the annual grant application process and oversees those priorities through quarterly reporting requirements.

23. New Jersey's Title X clinics also receive patient service revenues (which include Medicaid, private insurance, and patient self-pay) in addition to the aforementioned NJDOH-awarded funds and the federal Title X grants.

24. New Jersey's Title X clinics provide a full range of reproductive health and family planning services, including contraceptive counseling and provision; education, testing, and treatment for sexually transmitted infections; screenings for breast and cervical cancers; and other sex education services.

25. Title X funds may not be used to pay for abortion care, but some Title X funded-providers provide abortion care using non-Title X funds. The Final Rule will dramatically change current rules related to the separation required between Title X and abortion services, making it effectively impossible for those providers to continue to remain in the Title X program.

26. In New Jersey, it is estimated that Title X saves nearly $160 million annually in health care spending by preventing unintended pregnancies that would otherwise result in additional expenditures for pregnancy- and delivery-related health care. In 2017, the Title X program in New Jersey prevented approximately 19,300 unplanned pregnancies, 9,100 unplanned births, and 6,500 abortions. In that same year alone, New Jersey's Title X program saved around $148 million in maternal and birth-related gross costs from contraceptive services provided.[4]

---

[4] Guttmacher Institute, *Health Benefits and Cost Savings of Publicly Funded Family Planning Calculator*, accessed at https://data.guttmacher.org/calculator. The numerical prevention and savings calculations were generated based upon the number of female family planning patients (89,945) who were served by New Jersey's Title X program in 2017.

## II. Impact of the Final Rule in New Jersey

27. Title X-funded providers are a critical part of the health care safety net in New Jersey. Patients who are unable to continue to receive family planning services at a Title X clinic will either forgo care or seek services elsewhere. Other family planning providers may not be accessible due to distance, cost, language barriers, confidentiality concerns, or the quality and comprehensiveness of services available. Federally Qualified Health Centers ("FQHCs") are publicly-funded health providers in all New Jersey counties. New Jersey's FQHCs do not appear equipped to absorb excess patient demand resulting from the loss of family planning service providers in their communities. Fewer providers means increased wait times leading to delayed and denied care and, consequently, increased rates of unintended pregnancy, HIV and STD mismanagement, and other adverse health outcomes. Each of these preventable, adverse outcomes has significant negative economic impacts on individual New Jerseyans and on the State.

28. State funding for family planning in New Jersey has been variable. For example, in 2010, there was a funding cut of approximately $7 million per year in state dollars for New Jersey's family planning centers. Over the next eight years, over $50 million in state family planning funding was withheld. Health care services affected by those state family planning funding cuts included birth control provision, sexually transmitted infection testing and treatment, and breast and cervical cancer screenings.

29. In that time period, six of New Jersey's 58 women's health and family planning centers closed altogether; others reduced staff and hours. New Jerseyans were immediately affected either because of care forgone due to closed facilities or care delayed due to longer travel times and time needed to gather resources for travel.

30. During the period of those cuts to state family planning funding, bacterial STI cases and, largely among women of color, certain cancers increased in New Jersey.[5] In addition to preventable pain and suffering, such an increase in preventable illnesses causes negative economic impacts.

31. Although state family planning funds were restored in January 2018, New Jersey's family planning providers are still recovering from eight years of State defunding. As a result, New Jersey is especially vulnerable to negative impacts associated with the Final Rule. If Title X clinics close or leave the Title X program due to the Final Rule, New Jersey will struggle to fill the gaps caused by those closures.

32. Women who never use or stop using contraception are more likely to have unplanned pregnancies and to require additional medical attention. If some of New Jersey's already vulnerable Title X clinics close as a result of the Final Rule, some New Jersey women will not be able to access reproductive health services and may stop using contraception or be unable to access contraceptive services altogether. New Jersey's low- to moderate-income populations will disproportionately bear the physical and economic burdens associated with the resulting increases in unintended pregnancy rates.

33. Further, if some of New Jersey's Title X clinics close as a result of the Final Rule, New Jersey's Medicaid public health insurance program and other state-funded social support programs will bear the fiscal impact of a rise in unintended pregnancy in the State.

34. According to the Guttmacher Institute, 68% of unplanned births are paid for by public insurance programs, including Medicaid, while 38% of planned births are paid for by

---

[5] Planned Parenthood Action Fund of New Jersey, *Access at Risk: Reproductive Health and Family Planning in New Jersey* (2017), http://ppactionnj.org/wp-content/uploads/2016/10/Planned-Parenthood-Action-Fund-of-NJ-Access-at-Risk-2017.pdf.

Page 9 - DECLARATION OF MAGDA SCHALER-HAYNES IN SUPPORT OF STATES' MOTION FOR PRELIMINARY INJUNCTION

these programs. In New Jersey in 2010, the federal and state governments spent a combined $477.1 million on unintended births; of this, $186.1 million was paid by the State.[6]

35. Because women experiencing unintended pregnancies are less likely to receive timely prenatal care (or any prenatal care at all), access to the full range of reproductive health care is vital to New Jersey's efforts to reduce both infant and maternal mortality.

36. Other negative outcomes associated with unintended pregnancy include reduced likelihood of breastfeeding, increased risk of maternal depression, and increased risk of physical violence during pregnancy, in addition to severe limitations on participation in the workforce.

37. In addition, children born from unplanned pregnancies are more likely to experience poor mental and physical health during childhood and, as teenagers, are more likely to experience lower rates of educational attainment. Many of these outcomes lead to conditions and circumstances for which social supports are publicly-funded.

### III. Physical Modifications of Health Care Facilities Required by the Final Rule

38. NJDOH's Health Systems branch oversees health facility licensure, regulation, and inspection in New Jersey. The Health Facility Survey and Field Operations program promotes quality health service delivery through enforcement of state licensing regulations and Medicare certification standards. The Final Rule's new physical separation requirements will directly impact New Jersey's existing health facility regulatory landscape adding significant costs without any corresponding benefit.

39. The Final Rule will impact current Title X-funded providers who offer abortion care outside the Title X program by requiring the erection of physical barriers within the health

---

[6] Guttmacher Institute, *Public Costs from Unintended Pregnancies and the Role of Public Insurance Programs in Paying for Pregnancy-Related Care: National and State Estimates for 2010* (Feb. 2015), https://www.guttmacher.org/sites/default/files/report_pdf/public-costs-of-up-2010.pdf.

care facility or even new facilities altogether. Such barriers serve no medical purpose, offer no public health benefit, and do not improve the quality of patient care. Costs associated with compliance with this new physical barrier requirement will, however, negatively impact New Jersey's already vulnerable family planning providers.

40. In the face of the Final Rule, New Jersey's Title X clinics will have to make hard choices. In order to comply with the Final Rule, such choices include options to: (1) close the clinic as a result of the Final Rule; (2) leave the Title X network in order to maintain comprehensive, patient-centered care based on national evidence-based standards; or (3) stay in the Title X network, but make drastic service program changes that curtail available services and depart from widely-accepted standards of care. These options all risk abandoning patients who rely on services provided at New Jersey's family planning providers, leaving them without options for care. The impact of such abandonments will disproportionately affect lower-income New Jerseyans of color.

### IV. Informed Consent Thwarted by Final Rule

41. The State of New Jersey has affirmed its commitment to the principle of informed consent in medical care, which includes a patient's right to advice and information from their provider about available, alternative treatments and options.

42. NJDOH promotes communication of clear, timely, unbiased medical information designed to inform and empower New Jersey's health consumers. The American Medical Association's Code of Medical Ethics (Opinion 2.1.1) makes clear: "Informed consent to medical treatment is fundamental in both ethics and law. Patients have the right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care. Successful communication in the patient-physician relationship

fosters trust and supports shared decision making."[7] Quality health care delivery in New Jersey requires implementation of such principles. Provision of non-directive, timely, and complete information about pregnancy and all related options enables patients to make decisions without undue influence.

43. "Gagging" or prohibiting providers from supplying patients with full information, including referrals for abortion, undermines the physician-patient relationship; erodes trust in the medical profession; and contradicts longstanding principles of informed consent as noted above. Because the Final Rule places such prohibitions on providers who serve New Jersey's most vulnerable populations, the sub-standard quality of care prompted by the Final Rule will be disproportionately experienced by New Jersey's most vulnerable, lowest-income populations of color.

44. The Final Rule compels providers to respond to a patient's explicit request for a referral to an abortion provider with a non-responsive list that includes providers unwilling to provide abortion care. This essentially mandates deceptive communication that will undermine the doctor-patient relationship and undermine timely access to care. For New Jerseyans seeking abortion care, delays in access to services increase costs and risks as pregnancy progresses.

45. The Final Rule's apparent intention to direct funds to entities that promote natural family planning will presumably divert funds from providers that provide evidence-based care, which necessarily includes all contraceptive options. The Final Rule promotes distribution of public funds to providers with personal and often religious objections to most contraceptive methods and favors less-effective "fertility awareness" and unpopular abstinence "methods" without a requirement that a center offer any other options. Diversion of funds from all-options

---

[7] American Medical Association, *Code of Medical Ethics Opinion 2.1.1*, https://www.ama-assn.org/delivering-care/ethics/informed-consent.

providers will disproportionately impact low-income populations who rely upon publicly-funded providers.

46. The Department takes note of additional concerns raised by abortion providers in the State. Delays in referrals to medically-appropriate care increase the costs and the medical risks of abortion procedures, especially for women with pre-existing or pregnancy-related medical conditions. In the absence of Title X clinics with full capacity to refer to abortion services, two of New Jersey's four high-risk abortion providers expressed, "We are afraid for our patients who have medical, obstetrical and gynecological illnesses where continuing a pregnancy will increase their chance of dying while pregnant."[8] For example, as maternal ages rise, there are increased risks of adverse outcomes and complications like fetal anomalies and genetic disorders. Patient safety is a priority for NJDOH.

47. Increased rates of unintended pregnancy, in turn, cause increased incidence of maternal mortality and morbidity. Given New Jersey's existing and grave concern about maternal mortality and morbidity in the State, NJDOH has a compelling interest in ensuring pregnancies among New Jersey women are planned and that New Jersey women receive high quality maternity care.

---

[8] Lauren Barlog and Natalie Roche, *We provide abortions in N.J. New rules could harm state's most at-risk patients*, https://www.nj.com/opinion/2018/12/we-provide-abortions-in-nj-new-rules-could-harm-states-most-at-risk-patients.html.

48. Maternal morbidity (injuries associated with pregnancy and delivery) also create significant limitations on labor market participation. The New Jersey economy is negatively impacted by New Jersey's alarmingly high rate of maternal death and injury. Publicly-funded social supports are used to support New Jerseyans unable to maintain economic independence as a result of maternal death and injury.

**I declare under penalty of perjury that the foregoing is true and correct.**

DATED March 19, 2019.

_____
MAGDA SCHALER-HAYNES
Director
Office of Policy and Strategic Planning
New Jersey Department of Health