**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR 97204-3730
Tel: (503) 295-3085
Fax: (503) 323-9105

*Attorneys for Amici Curiae*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| STATE OF OREGON; STATE OF NEW YORK; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; COMMONWEALTH OF PENNSYLVANIA; STATE OF RHODE ISLAND; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; and STATE OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>ALEX M. AZAR II, in his official capacity as Secretary of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; DIANE FOLEY, in her official capacity as the Deputy Assistant Secretary, Office of Population Affairs; and the OFFICE OF POPULATION AFFAIRS,<br><br>Defendants. | Case No. 6:19-cv-00317-MC<br><br>**Amici curiae City of New York, the New York City Health and Hospitals Corporation, the City and County of San Francisco, the Cities of Baltimore, Chicago, Columbus, Los Angeles, and seven other municipalities' UNOPPOSED MOTION TO APPEAR AS AMICI CURIAE AND TO FILE MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**and**<br><br>**AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## LR 7-1(a) CERTIFICATION

Pursuant to the Joint Notice of Blanket Consent to the Filing of Amicus Briefs (Dkt. 56), the plaintiffs and defendants jointly consent to the filing of amicus briefs in support of either party, so long as the briefs supporting plaintiffs are filed by today, April 9, 2019.

## MOTION

The City of New York, the New York City Health and Hospitals Corporation, the City and County of San Francisco, the County of Santa Clara, and the Cities of Baltimore, Chicago, Columbus, Los Angeles, Bloomington, Flint, Houston, Oakland, Santa Cruz, and Seattle respectfully move to appear as amici curaie and file the below memorandum in support of plaintiffs' Motion for Preliminary Injunction (Dkt. 35).

## AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Amici curiae—the City of New York, the New York City Health and Hospitals Corporation, the City and County of San Francisco, the Cities of Baltimore, Chicago, Columbus, Los Angeles, and seven other municipalities throughout the country—submit this memorandum of law in support of plaintiffs' motion for a preliminary injunction. Amici are either recipients or indirect beneficiaries of federal Title X funding, which supports the provision of high-quality reproductive health care for amici's residents, in particular low-income women who otherwise would have minimal or no care.

The Compliance with Statutory Program Integrity Requirements Rule (the "Final Rule") adopted by the U.S. Department of Health and Human Services (HHS) would impose a "gag requirement" prohibiting Title X funding recipients from providing complete and unbiased information to pregnant patients about their legal options; require the unnecessary and arbitrary

**Page 1 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

physical and financial separation of Title X clinics from any services relating to abortion, including abortion referral and counseling; and revoke the requirement that family-planning information provided under the Title X program be evidence-based.

As plaintiffs show, the Final Rule is unlawful. The gag requirement conflicts with Title X's Nondirective Mandate by requiring directive counseling and forcing healthcare providers to conceal information from patients. The gag requirement and separation requirement conflict with the Affordable Care Act by interfering with communications between providers and patients and violating principles of informed consent. And the Final Rule is arbitrary and capricious and procedurally invalid under the Administrative Procedure Act.

Amici submit this memorandum of law to explain that if the Final Rule goes into effect, amici and their residents will experience significant and irreparable harm. Implementation of the Final Rule would create two distinct sets of harms for amici. First, amici would face financial and nonfinancial harms that cannot be remedied. Title X providers in our communities will face the choice of (a) complying with the Final Rule, which would impose massive costs for clinics to implement onerous physical and financial separation and would restrain what healthcare providers can and cannot say starting within a few months, or (b) forgoing participation in Title X, which will greatly reduce funding for much-needed family-planning programs. Some amici will confront this choice directly as Title X recipients, generally through subgrants from statewide grantees, and all may be affected financially by the choices of providers in our communities.

Second, the residents of all our communities would be harmed as clinics face the choice between complying with the Final Rule or declining Title X funding. Title X recipients provide critical health services to amici's low-income residents. Many current Title X recipients have stated that they will not abide by the Final Rule, and those that attempt to do so will incur costs

**Page 2 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
    PRELIMINARY INJUNCTION**

that would otherwise go to patient care. This reduction of and disruption in vital services would lead to negative public-health outcomes, even outside the reproductive-health context, because Title X recipients also provide other forms of preventive care to their patients. Even if amici attempt to make up the shortfall in funding out of their own budgets, they will necessarily divert vital public funds from other endeavors.

## INTERESTS OF THE AMICI CURIAE

All amici benefit from funds provided under Title X to clinics in their communities, and some receive Title X funding directly. The following briefly summarizes the uses and benefits of Title X funding in several of our municipalities.

**New York City.** Twenty-two New York City-based healthcare providers received Title X funding between 2012 and 2015.[1] Ten of the providers are run by amicus the New York City Health and Hospitals Corporation (NYC H+H) as a subgrantee of the New York State Department of Health. NYC H+H is a public-benefit corporation that provides health care for 1.4 million patients annually, including 500,000 uninsured patients.[2] It is the largest public healthcare system in the United States. Beyond NYC H+H, about a dozen organizations receive Title X funding to operate more than fifty health centers throughout New York City.[3] In total, New York City organizations have received $27.3 million dollars in Title X funding between 2012 and 2015 and used that money to provide services to about 150,000 people per year, mostly uninsured low-

---

[1] Scott M. Stringer, *Title X Funding in NYC: A Critical Resource that Must Be Protected* (Aug. 1, 2017), https://perma.cc/A8K2-9ZZT.

[2] NYC Health + Hospitals Corp., *2014 HHC Report to the Community,* https://perma.cc/QT2D-GCEZ.

[3] Hermina Palacio, *N.Y.C. Deputy Mayor for Health and Human Services, Comment to Proposed Rule HHS-OS*-2018-0008 (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-178635.

**Page 3 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
            PRELIMINARY INJUNCTION**

income young women.[4] Through these providers, residents of all backgrounds, income levels, and immigration status are able to access vital healthcare services such as breast- and cervical-cancer screenings, preventive care, contraceptive education, and HIV and sexually transmitted infection (STI) testing.

**San Francisco.** The San Francisco Department of Public Health (SFDPH) operates the majority of San Francisco-area health clinics that receive Title X funding. It uses Title X funding to fund family-planning projects for over 6,000 patients at 10 sites.[5] For example, SFDPH uses Title X funds to educate the public on important topics relating to family planning and reproductive health. SFDPH uses Title X funds to support its "Go Folic" project to increase community awareness of the importance of folic acid supplementation, which prevents birth defects. SFDPH also uses Title X funds to support a public education campaign to combat chlamydia, whose rates have increased in San Francisco and across California. In addition to family-planning services, these 10 sites also offer other types of care, including primary care.[6] Clinics operated by other organizations also rely on Title X funding to provide substantial numbers of patients with vital health and family-planning services.

**Los Angeles.** Los Angeles City and County has 23 health agencies that operate 117 clinics that receive Title X funding.[7] Collectively, they receive more than $5 million per year in Title X funding, which they use to serve about 260,000 people.[8]

---

[4] *Id.* at 5.

[5] *Essential Access Health, Inc. v. Azar*, No. 19-cv-1195 (N.D. Cal.), Decl. of Shivaun Nestor, ECF No. 36, at ¶ 3.

[6] *Id.*

[7] *Id.* ¶ 6.

[8] *Id.*

**Page 4 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
        PRELIMINARY INJUNCTION**

**Chicago.** There are 28 clinics operating in Chicago that receive Title X funding, including a number of clinics receiving subgrants from the Illinois Department of Public Health.[9] Through the efforts of public-health service providers in Chicago, including Title X grant recipients, Chicago achieved a historic low teen birthrate in 2016 and a 47% decline since 2011.[10] In part, the decline came about as a result of efforts by Chicago's Title X recipients to provide "education on birth control, [and] information to encourage making informed sexual choices and healthy relationships in select … high schools, in addition to testing and treatment for sexually transmitted infection."[11] These efforts go hand-in-hand with the services provided by Title X-funded organizations to improve the health and wellbeing of all Chicago residents.

**Columbus.** Columbus is a subgrantee of the Ohio Health Department and, along with other Title X funding recipients, serves more than 10,000 Columbus residents each year.[12] Columbus provides services akin to those provided by other Title X recipients, such as family planning, breast-cancer screening, contraception, STI/HIV testing, and sexual-health clinics.[13]

**Baltimore.** The Baltimore City Health Department oversees the City's Title X funding, which is distributed to 23 sites run by the Health Department, Baltimore Medical System, Family Health Centers of Baltimore, Johns Hopkins Hospital, and University of Maryland Medical

---

[9] Office of Population Affairs, *Title X Family Planning Directory* (December 2018), https://perma.cc/7DWA-3N4U.

[10] City of Chicago, *Mayor Emanuel Announces Chicago Hits Historic Low Teen Birthrate* (January 15, 2018), https://perma.cc/28KB-EPP6.

[11] *Id.*

[12] Megan S. Kilgore & Elizabeth C. Brown, City of Columbus, *Investing in reproductive health isn't just good for women and their families—it's good for the economy,* https://perma.cc/4J67-ZZ4H.

[13] *See* City of Columbus, Sexual Health Programs, https://perma.cc/DS45-DN55; City of Columbus, Women's Health and Wellness Center, https://perma.cc/ZHB5-ZA7A.

Page 5 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
    PRELIMINARY INJUNCTION

System. Title X funding supports clinics in Baltimore that not only provide reproductive-health services, but also vital healthcare services such as cancer screenings, contraception, HIV testing and counseling, substance-use and mental-health screenings, and specialist referrals that many Baltimore residents would not otherwise be able to afford. One in three women in Baltimore are in need of publicly funded healthcare services to access contraception.[14]

For all cities and counties, Title X funds go to providers who serve low-income and historically underserved populations. As described by the Department of Health and Human Services, Title X providers serve "a vulnerable population, most of whom [are] female, low income, and young."[15] Sixty-seven percent of those served have incomes at or below the poverty level, 22% identify themselves as black or African-American and 33% identify as Latinx.[16] Six in ten of those patients who use a Title-X-funded provider identify it as their primary source of health care.[17]

## ARGUMENT

### THE AMICI MUNICIPALITIES WILL BE IRREPARABLY HARMED BY THE FINAL RULE

Amici municipalities face the prospect of irreparable harm if the preliminary injunction is not granted and the Final Rule goes into effect. Cities and counties that directly provide services and receive Title X grants will be forced either to decline Title X funds based on their opposition

---

[14] Catherine E. Pugh & Leana S. Wen, Baltimore City Health Department Comment to Proposed Rule HHS-OS-2018-0008 (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-161578.

[15] Office of Population Affairs, *Title X Family Planning Annual Report 2017 Summary* (August 2018), https://perma.cc/K686-X5BL.

[16] *Id.*

[17] Scott M. Stringer, *Title X Funding in NYC: A Critical Resource that Must Be Protected* (Aug. 1, 2017), https://perma.cc/A8K2-9ZZT.

to its requirements that interfere with the provision of quality medical care, or to attempt to comply with the Final Rule when it goes into effect in less than a month.[18] They face significant, unrecoverable fiscal harms no matter what course they choose—in compliance costs, or from loss of funding if they cannot or will not comply. And many amici, whether they provide Title X services directly or not, will face irreparable fiscal harms when they try to make up the shortfall in funding and services out of their own budgets as providers in their communities lose Title X funding that they depend on.

All amici also face the prospect of irreparable harm to their residents. Many providers in amici's communities have already indicated that they cannot or will not comply with the Final Rule. Patients' access to high-quality contraceptive care and abortion services at those providers will be impaired or delayed as former Title X recipients will be overstretched or unable to provide care entirely. Even if other Title X-compliant facilities continue to operate in our communities, there will be significant disruptions to or shortfalls in care as women seek new providers from among a much smaller pool. The result will be damage to women's physical, emotional, and economic well-being. The impact will be particularly severe on the low-income and young women that Title X is intended to serve.

**A.      Amici face the irreparable loss of direct funding and an increase in indirect costs.**

Amici and their constituents rely on the funds dedicated by Congress under Title X for critical healthcare services. While not all amici receive direct funding from Title X and provide services, all benefit from the provision of care in their communities, and all will face substantial costs if the Final Rule goes into effect. While economic harms are not ordinarily irreparable, they

---

[18] *See*, *e.g.*, Decl. of Lauren Tobias, Dkt. 66, ¶ 43 (explaining effect of Final Rule on funding recipients in New York).

**Page 7 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
             PRELIMINARY INJUNCTION**

may be where, as here, it will be impossible "to recover monetary damages." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). Even a successful challenge to the Final Rule will not allow the plaintiffs, or other grantees, to seek money damages against the government for any lost grant amounts. *See id.* (explaining that APA challengers may seek only relief "'other than money damages'" (quoting 5 U.S.C. § 702)).

For example, New York, San Francisco, Columbus, and Baltimore have city public-health providers that are direct recipients of Title X funding and would be subject to the Final Rule's new requirements, with only a month to either comply or lose funding for which they applied months ago. Complying with the Final Rule will be expensive, as clinics must construct physical separation between differing portions of their facilities or secure a separate location and implement financial and administrative separation.[19] The separation is not only costly on its own but sacrifices economies of scale for large providers. The providers, if they choose to abide by the Final Rule, will also have to devote significant time and attention to training their health care professionals on what they can and cannot say in accordance with the gag requirement.

Moreover, some direct recipients of Title X funds may not have the option of complying even if they wish to. For example, Baltimore receives funds as a subgrantee of the Maryland Department of Health, and Maryland is currently considering a bill that would preclude the Department of Health from taking any Title X funding subject to the Final Rule.[20] These harms are irreparable because direct providers will be unable to recover either lost grant money or the

---

[19] *See Essential Access Health, Inc. v. Azar*, No. 19-cv-1195 (N.D. Cal.), Decl. of Shivaun Nestor, ECF No. 36, at ¶ 13 (stating that San Francisco's "clinics cannot bear the cost of setting up separate facilities, so SFDPH will have to forego Title X funds.").

[20] Baltimore Sun, *Maryland could become first state to stop participating in Trump administration family planning program* (March 15, 2019), *available at* https://perma.cc/278K-N4PF?type=image.

Page 8 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
              PRELIMINARY INJUNCTION

costs of compliance, even if the plaintiffs are successful in vacating the Final Rule. *See California*, 911 F.3d at 581.

Direct recipients of Title X funds also face another irreparable harm, in the form of the forced choice to comply with an unlawful regulation, on penalty of loss of funding. The Final Rule, as explained in detail by the plaintiffs, is arbitrary and capricious under the APA, violates the Nondirective Mandate and the Affordable Care Act, and infringes on the First Amendment rights of healthcare providers. Being forced to choose between compliance with an unlawful condition and losing significant funds is itself an irreparable harm. *See Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009). Complying with the Final Rule while awaiting a final order, if the preliminary injunction is not granted, will require not only significant fiscal outlays, but also alter the very nature of Title X providers' reproductive-health programs in ways that cannot be remedied for patients treated while the case is ongoing.

Cities and counties that do not directly receive funds will face substantial fiscal burdens as a result of the loss of funding to Title X providers in their communities. In total, public and private Title X funding recipients serve more than 150,000 people per year in New York City, 16,000 people in Baltimore, 10,000 in Columbus, and tens of thousands more in other amici municipalities. Many clinics in our communities have already indicated that they cannot or will not comply with the Final Rule and will be forced to close or limit the volume of patients that they will be able to serve.[21] The funds provided to nongovernmental Title X providers within amici's communities will either need to be replaced from municipal coffers or some other source, or their

---

[21] *See, e.g.* Decl. of Lauren Tobias, Dkt. 66, at ¶ 43 (NY); Decl. of Lisa M. David, Dkt. 46, at ¶¶ 39–40 (NY); Decl. of Karen Nelson, Dkt. 57, at ¶¶ 16–17 (MD); Decl. of Shannon Lightner, Dkt. 54, at ¶¶ 32–33 (IL).

**Page 9 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
           PRELIMINARY INJUNCTION**

constituents will not be served. Given the effectiveness of Title X funding in achieving a variety of critical public-health goals, many municipalities will scramble to fill the gap in funding, drawing funds from other vital public programs.

Beyond the health impacts that amici's residents would face, discussed further below, they will also face the heightened financial costs of unintended pregnancies and health complications, some of which will be borne by amici through their provision of public healthcare funding. Pregnancy, delivery, and early childhood-related care are expensive, especially compared to many other family-planning services offered by Title X providers.[22] Pregnancies can impose a significant financial burden, particularly on low-income and uninsured individuals and families. Some of these costs will be borne by amici through their provision of public healthcare and governmental services for low-income mothers. Indeed, it is precisely the low-income women served by Title X providers who will be most likely to require government assistance if they become pregnant. For those that become pregnant, effective prenatal care provided by Title X recipients reduces complications to both mother and child, preventing potentially costly and harmful complications. Thus, decreasing access to a full range of family-planning services not only would perpetuate a cycle of poverty that amici have adopted policies to break, but also strain amici's public-health finances as they deal with an increase in both unintended pregnancies and health problems.

Moreover, as of 2016, over a third of Title X patients were Medicaid recipients. Recent analyses have shown that every $1 invested in Title X saves more than $7 in Medicaid-related costs, thereby saving taxpayer contributions towards Medicaid, which, in many cases, are

---

[22] Palacios, *supra* note 3, at 5.

**Page 10 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

administered at least in part by municipalities such as amici.[23] As a result, the Final Rule could impose additional financial strain both on those who lose access to services and on the Medicaid system by tipping the ratio of services towards more pregnancy-related care rather than cost-effective family-planning services.

**B.      Amici's residents face irreparable harms to their health, finances, and overall wellbeing.**

Beyond the fiscal costs to amici, tens of thousands of amici's constituents face the prospect of losing access to the public health care and family-planning services on which they rely if the Final Rule goes into effect. The loss of critical services and the concomitant risk of unplanned pregnancies, undetected cancers, and other serious health issues all constitute irreparable harms. *See*, *e.g.*, *Diaz v. Brewer*, 656 F.3d 1008, 1012 (9th Cir. 2011) (upholding finding that the "health problems of [individuals] facing loss of healthcare" was an irreparable harm); *M.R. v. Dreyfus*, 663 F.3d 1100, 1114 (9th Cir. 2011) (holding that "beneficiaries of public assistance may demonstrate a risk of irreparable injury by showing that enforcement of a proposed rule may deny them needed medical care" (quotation marks omitted)); *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (holding that "medical complications … due to delayed treatment" are irreparable harms).

The consequences of that loss of access will be severe. Those members of our communities face the loss of what is, in many cases, their primary source of health care.[24] Even for those who may find another provider that is in compliance with the regulation and available to provide Title

---

[23] *Id.* at 5.

[24] *See* Scott M. Stringer, *Title X Funding in NYC: A Critical Resource that Must Be Protected* (Aug. 1, 2017), https://perma.cc/A8K2-9ZZT (explaining that "six in ten women who obtain care from a publicly funded family planning clinic consider that clinic to be their primary source of health care").

**Page 11 –   AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

X services, continuity of care will be disrupted.[25] If patients are unable to find quality family-planning services, they will face an increased risk of unintended pregnancies and health complications.[26] These are not only risks to our residents' health, but also a potentially large and unplanned expense. The high costs of unintended pregnancies fall most sharply on low-income and uninsured women. The Final Rule threatens not only our residents' health, but also their financial well-being.

Moreover, all amici have focused in recent years on reducing the incidence of teen pregnancy and STIs. Especially in the last two decades, many amici have made substantial progress on this front, and the disruption and reduction in services that the Final Rule will occasion has the potential to undo the progress that amici have made. For example, in New York City, the pregnancy rate among adolescents ages 15–19 decreased by 60% from 2000 to 2015. These results have been achieved in large part due to access to affordable contraception, including through programs like Title X.[27] Likewise, in 2016, Chicago achieved a historic low teen birthrate and a 47% decline since 2011.[28] And San Francisco cut the teen birth rate in half between 2009 and 2015.[29] These gains are at risk not only because the Final Rule would limit access to services, but also because the rule requires providers to "encourage family participation," in health services

---

[25] *See* Decl. of Lauren Tobias, Dkt. 66, ¶ 45.

[26] *See* Declaration of Kathryn Kost, Dkt. 54, ¶¶ 119–22 (describing case studies of states that did not accept Medicaid funding for family planning).

[27] Palacio, *supra* note 3, at 4.

[28] City of Chicago, *Mayor Emanuel Announces Chicago Hits Historic Low Teen Birthrate* (January 15, 2018), https://perma.cc/28KB-EPP6.

[29] Lizzie Johnson, *Doctors fear Trump change could lead to more teen pregnancies*, S.F. Chronicle (July 17, 2017), *available at* https://perma.cc/253H-SUWY.

Page 12 –  AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
         PRELIMINARY INJUNCTION

provided to minors, 84 Fed. Reg. 7717–18; 7787, which has the probable effect of delaying or discouraging minors from accessing care.[30]

The harm extends beyond the provision of contraception and family-planning services because Title X recipients provide a broad range of other services. The critical services provided by Title X recipients include screening for a wide range of conditions, including STIs, HIV, breast and cervical cancer, high blood pressure, and diabetes.[31] HHS itself touts Title X's role in funding these screenings, explaining that "Title X-funded STD and HIV screenings prevent transmission and adverse health consequences" and that "Title X-funded cervical and breast cancer screenings contribute to early detection and treatment."[32] The Final Rule would substantially disrupt Title X recipients' ability to provide these critical healthcare services, which would not only have the direct effect of harming patients' health now, but also could lead to serious secondary effects in the future. For example, STI/HIV cases that go undetected risk the further spread of those diseases, and the longer the diseases are untreated, the higher the risk of individuals developing long-term health complications.[33] The incidence of cervical cancer in the United States has markedly declined due to widespread screening; the Final Rule risks limiting access to cervical-cancer screening for the poor and uninsured.[34] The Final Rule would also increase the risks to maternal health from associated complications and co-morbidities, such as high blood pressure and

---

[30] Decl. of Melisa Byrd, Dkt. 40, ¶ 8; Decl. of Dr. Cheryl Zoll, Dkt. 69, ¶ 14.

[31] Palacio, *supra* note 3, at 5.

[32] Office of Population Affairs, *Title X Family Planning Annual Report 2017 Summary*, (August 2018), https://perma.cc/K686-X5BL.

[33] *See, e.g.*, Decl. of Dr. Blair Darney, Dkt. 45, ¶ 17, 21 (noting gaps in care for sexually transmitted infections and cancer screening as a result of the lack of Title X funding).

[34] *Id.* ¶ 22.

**Page 13 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

diabetes.[35] The harm from these health problems will be irreparable absent an injunction. *See Diaz*, 656 F.3d at 1012.

The loss of funding would exacerbate existing inequities because the harm would fall disproportionately on low-income and minority women. In New York, 60% of those served by Title X-providers have incomes below the federal poverty line, and 32% lack health insurance. For individuals served by Planned Parenthood in New York City, 60% are either Black or Latinx, and 66% of patients have incomes at or below the federal poverty level (FPL).[36] In Baltimore in 2017, 86% had incomes at or below the FPL, 50% were using Medicaid, and nearly 25% were uninsured.[37] In San Francisco, 60% of the patients served by the San Francisco Department of Public Health's Title X-funded clinics are Black or Latinx, and only 1% have private health insurance.[38] The numbers are similar for Title X funding nationwide.[39] Imposition of the Final Rule will strike another blow at these populations who have historically been denied equitable health care and depend on Title X-funded services for access to high-quality and unbiased care.

---

[35] *Id.* ¶ 23.

[36] *Id.*

[37] Catherine E. Pugh & Leana S. Wen, Baltimore City Health Department Comment to Proposed Rule HHS-OS-2018-0008 (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-161578.

[38] *Essential Access Health, Inc. v. Azar*, No. 19-cv-1195 (N.D. Cal.), Decl. of Shivaun Nestor, ECF No. 36, at ¶ 4.

[39] Sixty-seven percent of those served by Title X providers had incomes at or below the poverty level, 22% identified themselves as black or African-American and 33% identified as Latinx. *See Office of Population Affairs, Title X Family Planning Annual Report 2017 Summary* (August 2018), https://perma.cc/K686-X5BL.

**Page 14 –   AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
                    PRELIMINARY INJUNCTION**

# CONCLUSION

The plaintiffs' motion for a preliminary injunction should be granted.

DATED this 9th day of April, 2019.

                MARKOWITZ HERBOLD PC

By:    *s/ Harry B. Wilson*
        Harry B. Wilson, OSB #077214
        (503) 295-3085
        *Attorneys for Amici Curiae*

        Zachary W. Carter
        Corporation Counsel of the
        City of New York
        Richard Dearing
        Claude S. Platton
        Jamison Davies
        Melanie C.T. Ash
        100 Church Street
        New York, NY 10007
        *Attorneys for the City of New York and the New York City Health and Hospitals Corporation*

(*additional counsel listed below*)

**Page 15 – AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
       PRELIMINARY INJUNCTION**

Andre M. Davis
City Solicitor, City of Baltimore
100 N. Holliday Street, Suite 101
Baltimore, MD 21202
*Attorney for the Mayor and City Council of Baltimore*

Edward N. Siskel
Corporation Counsel for the
City of Chicago
Jane Elinor Notz, Deputy
Rebecca Hirsch, Assistant Corporation Counsel
Affirmative Litigation Division
City of Chicago Department of Law
121 N. LaSalle Street, Room 600
Chicago, IL 60602
*Attorneys for the City of Chicago*

Zach Klein
Columbus City Attorney
77 N. Front St – 4th Floor
Columbus, OH 43215
*Attorney for the City of Columbus*

Michael N. Feuer
City Attorney of the City of Los Angeles
200 N. Main Street, 800 CHE
Los Angeles, CA 90012
*Attorney for the City of Los Angeles*

Dennis J. Herrera
San Francisco City Attorney
City Attorney's Office
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102
*Attorney for the City and County of San Francisco*

Mary C. Wickham
County Counsel, County of Los Angeles
Matthew C. Marlowe
648 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA 90012-2713
*Attorneys for the County of Los Angeles*

James R. Williams
County Counsel, County of Santa Clara
70 W. Hedding Street, East Wing, 9th Floor
San Jose, CA 95110
*Attorney for the County of Santa Clara*

Philippa M. Guthrie
Corporation Counsel, Legal Department
City of Bloomington
401 N. Morton Street, Suite 200
Bloomington, IN 47402
*Attorney for the City of Bloomington*

Angela Wheeler
City Attorney
City of Flint, Department of Law
1101 S. Saginaw Street, 3rd Floor
Flint, MI 48502
*Attorney for the City of Flint*

Ronald C. Lewis
City Attorney
Judith L. Ramsey
Chief, General Litigation Section
Collyn Peddie
Sr. Assistant City Attorney
900 Bagby, 4th Floor
Houston, Texas 77002
*Attorneys for the City of Houston*

| | |
|---|---|
| Barbara J. Parker<br>City Attorney<br>City of Oakland<br>One Frank H. Ogawa Plaza, 6th Floor<br>Oakland, California 94612<br>*Attorney for the City of Oakland* | Anthony P. Condotti<br>City Attorney<br>City of Santa Cruz<br>333 Church Street<br>Santa Cruz, California 95060<br>*Attorney for the City of Santa Cruz* |

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200
*Attorney for the City of Seattle*

NEWYUS\855408