DAVE YOST
  Attorney General of Ohio
BENJAMIN M. FLOWERS
  State Solicitor
STEPHEN P. CARNEY
JASON D. MANION
  Deputy Solicitors
Office of the Attorney General of Ohio
30 E. Broad St., 17th Floor
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@ohioattorneygeneral.gov

*Counsel for amici States*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **STATE OF OREGON, et al.,** | 6:19-cv-00317-MC (Lead case) |
| Plaintiffs, | 6:19-cv-00318-MC (Trailing case) |
| v. | |
| **ALEX AZAR, in official capacity as Secretary of Health and Human Services, et al.,** | ***AMICI CURIAE* BRIEF FILED BY THE STATES OF OHIO, ALABAMA, ARKANSAS, INDIANA, KANSAS, KENTUCKY (by and through its Governor), LOUISIANA, MISSOURI, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, and TEXAS SUPPORTING UNITED STATES IN OPPOSING A PRELIMINARY INJUNCTION** |
| Defendants. | |
| | Pursuant to Fed. R. Civ. P. 65 and 5 U.S.C. § 705 |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................... i

INTRODUCTION AND STATEMENT OF AMICI INTEREST .............................................1

ARGUMENT ....................................................................................................3

    I.    The new regulations better promote Title X's mission by separating the controversy over abortion from the consensus support for funding family-planning services. ...........3

        A.    The new regulations largely restore the regulatory scheme that the Supreme Court upheld as a valid implementation of Title X in *Rust v. Sullivan*. ................................. 4

        B.    Strictly segregating Title X funds and abortion is critical for preserving public support for the otherwise-popular program, and for reflecting the values and policy preferences of millions of Americans coast to coast. .................................................. 8

    II.    Any potential injunction should be limited to Oregon and the other plaintiff States—it should not be imposed on the *amici* States...................................................17

CONCLUSION ................................................................................................21

CERTIFICATE OF SERVICE ...............................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011) ......................................................................................... 21

*Doe v. Gillespie*,
    867 F.3d 1034 (8th Cir. 2017) ......................................................................... 11

*E. Bay Sanctuary Covenant v. Trump*,
    909 F.3d 1219 (9th Cir. 2018) ...................................................................... 2, 17

*F.C.C. v. Fox Television Stations*,
    556 U.S. 502 (2009) ......................................................................................... 1, 4

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ........................................................................................ 14

*Harris v. McRae*,
    448 U.S. 297 (1980) .................................................................................. 3, 9, 15

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ......................................................................................... 9, 10

*Locke v. Davey*,
    540 U.S. 712 (2004) ........................................................................................ 14

*Maher v. Roe*,
    432 U.S. 464 (1977) .................................................................................. 3, 9, 15

*Natl. Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ........................................................................................ 14

*Planned Parenthood Ariz., Inc. v. Betlach*,
    727 F.3d 960 (9th Cir. 2013) .......................................................................... 10

*Planned Parenthood Ass'n of Utah v. Herbert*,
    828 F.3d 1245 (10th Cir. 2016) ...................................................................... 11

*Planned Parenthood of Greater Ohio v. Hodges*,
    No. 16-4027, 2019 U.S. App. LEXIS 7200 (6th Cir. 2019) (en banc) ................... 1, 9, 10, 15

*Planned Parenthood of Gulf Coast, Inc. v. Gee*,
862 F.3d 445 (5th Cir. 2017) ........................................................................ 11

*Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*,
699 F.3d 962 (7th Cir. 2012) ........................................................................ 10

*Planned Parenthood of Kan. & Mid-Mo. v. Anderson*,
882 F.3d 1205 (10th Cir. 2018) .................................................................... 11

*Planned Parenthood v. Casey*,
505 U.S. 833 (1992) ...................................................................................... 14

*Rust v. Sullivan*,
500 U.S. 173 (1991) ............................................................................... *passim*

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ...................................................................................... 12

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018) ............................................................................ 2, 19

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................... 4

20 U.S.C. § 954(d)(1) ........................................................................................ 14

42 U.S.C. § 300a-6 ................................................................................. 1, 4, 7, 12

Ariz. Rev. Stat. Ann. § 35-196.02 ..................................................................... 16

Ark. Code Ann. § 20-16-1602 ........................................................................... 17

Colo. Rev. Stat. Ann. § 25.5-3-106 ................................................................... 16

Consolidated Appropriations Act,
2017 Pub. L. No. 115-31, §§ 613–14, 131 Stat. 135, 372 (2017) ................... 3

Family Planning Services and Population Research Act of 1970,
Pub. L. 91-572 § 6(c), 84 Stat. 1504, 1508 (1970) ......................................... 4

Ind. Code Ann. § 5-22-17-5.5 ........................................................................... 17

Iowa Code Ann. § 217.41B ................................................................................ 16

Kan. Stat. Ann. § 65-103b ................................................................................. 15

*Amici Curiae* Brief Supporting the United States in Opposing a Preliminary Injunction

Ky. Rev. Stat. Ann. § 311.715 ................................................................16

La. Rev. Stat. § 40:1061.6 ....................................................................16

La. Rev. Stat. § 49:200.51 ....................................................................17

Mich. Comp. Laws Ann. § 400.109a .....................................................16

Miss. Code. Ann. § 41-41-91 ...............................................................16

Mo. Ann. Stat. § 188.205 .....................................................................16

N.C. Gen. Stat. Ann. § 143C-6-5.5 ......................................................16

Ohio Rev. Code § 5101.56 ....................................................................16

Tex. Health & Safety Code Ann. § 32.005 ............................................16

Wis. Stat. Ann. § 20.927 ......................................................................16

Wis. Stat. Ann. § 253.07(5) .................................................................17

Wis. Stat. § 253.07(5)(a) ......................................................................16

**Other Authorities**

42 C.F.R. § 59.5(a)(5)(i-ii) (July 3, 2000) ..............................................5

42 C.F.R. § 59.15.....................................................................................7

53 Fed. Reg. 2922 (Feb. 2, 1988) ............................................................5

58 Fed. Reg. 7462 (Feb. 5, 1993) ............................................................5

65 Fed. Reg. 41,270 (Jul. 3, 2000) ..........................................................6

83 Fed. Reg. 25,502 (June 1, 2018) ........................................................6

84 Fed. Reg. 7714 (Mar. 4, 2019) ................................................. passim

"Fungibility": The Argument at the Center of a 40-Year Campaign to
    Undermine Reproductive Health and Rights at www.guttmacher.org/gpr/
    2016/10/fungibility-argument-center-40-year-campaign-undermine-
    reproductive-health-and-rights ...................................................11

Title X Family Planning Directory at https://www.hhs.gov/opa/sites/default
/files/Title-X-Family-Planning-Directory-December2018.pdf (last visited
April 4, 2019) ................................................................................................... 15

Title X Family Planning Directory at https://www.hhs.gov/opa/sites/default
/files/Title-X-Family-Planning-Directory-December2018.pdf (last visited
April 4, 2019) ................................................................................................... 16

Title X Family Planning Service Grants Award by State at https://www.hhs.gov
/opa/grants-and-funding/recent-grant-awards/index.html (last visited April
4, 2019) ............................................................................................................ 15

Title X Family Planning Service Grants Award by State at https://www.hhs.gov
/opa/grants-and-funding/recent-grant-awards/index.html (last visited April
4, 2019) ............................................................................................................ 16

"Fungibility":  The Argument at the Center of a 40-Year Campaign to
Undermine Reproductive Health and Rights at www.guttmacher.org/gpr/
2016/10/fungibility-argument-center-40-year-campaign-undermine-
reproductive-health-and-rights .................................................................... 11

Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*,
131 Harv. L. Rev. 417 (2017) .............................................................. 2, 18

## INTRODUCTION AND STATEMENT OF AMICI INTEREST

Ohio and other *amici* States participate in Title X programs, partnering with the federal government to provide family-planning services and related healthcare to their residents. These States fully support Title X's mission. The States therefore support administrative regulations that fulfill that mission by following Congress's mandates.

At the same time, the *amici* States share many of their citizens' growing concerns about providing government support to entities with links to abortion. That is why Ohio law, for example, makes entities that provide abortions, or that are affiliated with entities that do, ineligible for funding under certain public-health programs—programs that are outside of, but similar to, Medicaid and Title X. *Planned Parenthood of Greater Ohio v. Hodges*, No. 16-4027, 2019 U.S. App. LEXIS 7200 (6th Cir. 2019) (en banc) (per Sutton, J.). Many other States have similar laws designed to ensure that public funds never make their way to abortion providers. These various laws are comparable to Title X itself, which likewise prohibits the use of its funds "in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.

The new Title X regulations support Title X's mission—including its express command not to use Title X funds in furtherance of abortion. And the new rules accomplish this while continuing to honor the desire of many citizens in the *amici* States (and, for that matter, in Oregon and other plaintiff States) to avoid any involvement with abortion. That is why the *amici* States are filing this brief in support of the United States. This brief will not address all the statutory arguments supporting the new regulations; the federal government will ably handle that. Instead, this brief focuses on two important-yet-underappreciated considerations supporting HHS's "reasoned explanation" for the rule change. *See F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

1

*First*, the new rules help preserve broad support for Title X by keeping a healthy distance between the consensus supporting family-planning services and the controversy over abortion. Without the new rules, public confusion regarding Title X's link to abortion will erode support for the law's uncontroversial and statutorily permissible applications. *Second*, because the new rules ensure that funds will be spent only on programs for which there is consensus support, they promote the intrinsic, democratic interest in governing in a manner that the largest number of people can get behind.

The *amici* States address one other point, too—the appropriate remedy if this Court holds that the new rules are invalid. Oregon and its co-plaintiff States ask for a national injunction. So do the private plaintiffs in the related case. *See Am. Med. Ass'n, et al. v. Azar, et al.*, No. 19-cv-318-MC. But neither the plaintiff States nor the private plaintiffs offer a sound reason to enjoin the new rules across the entire nation. Courts are beginning to express "uncertainty about the propriety of universal injunctions." *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1255 (9th Cir. 2018); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (2018) (Thomas, J., concurring); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 425 (2017). But even assuming national injunctions are ever appropriate, such relief is not appropriate here. Whether the challenged rules apply in the *amici* States or elsewhere is of no legitimate concern to Oregon or its co-plaintiff States. Surely they cannot show that *they* or their citizens will be irreparably harmed by the rules' application to *amici* States. And since Rule 65 requires injunctions to be tailored to address the situation at hand, the plaintiff States are not entitled to relief that extends beyond their borders—an injunction limited to those States will eliminate the risk of any supposed irreparable harm to those States' citizens.

2

Some of the private plaintiffs in the related case do have an interest in the new rules' applicability in other States. But as we illustrate below, the States manage their public-health programs in general and their Title X programs in particular in many diverse ways. Some States (Alabama, for example) even administer Title X programs themselves, without any reliance on private parties, thus eliminating any connection between Title X funding and abortion providers. Given this diversity of approaches to Title X, and given the equitable, fact-specific nature of injunctive relief, there is no way to properly tailor nationwide injunctive relief. Indeed, the private plaintiffs do not even try to claim that they will suffer harm in every jurisdiction nationwide without an injunction, meaning they lack standing to challenge the rules' application nationwide. Instead of trying to resolve this dispute for the entire nation, this Court should tailor any relief to be specific to the plaintiff States, leaving other courts to assess the rules' impact elsewhere.

## ARGUMENT

I. **The new regulations better promote Title X's mission by separating the controversy over abortion from the consensus support for funding family-planning services.**

Americans disagree passionately about abortion. But they can all agree that abortion has long been among the country's most divisive issues. These opposing views make public expenditure in support of abortion highly controversial. And as a result, the federal and most state governments avoid funding the practice. *See Rust v. Sullivan*, 500 U.S. 173, 201–02 (1991); *Harris v. McRae*, 448 U.S. 297, 315–17, (1980); *Maher v. Roe*, 432 U.S. 464, 474 (1977). To be sure, some States provide such funding. And many advocates would like to see more public funding. But the broader national consensus against funding elective abortion remains. *See* Pub. L. No. 115-31, §§ 613–14, 131 Stat. 135, 372 (2017) (barring certain federal funds from elective abortion).

Title X reflects this consensus.  Since its 1970 enactment, the law has funded *non-abortion* family planning.  All the while, it has banned the use of Title X funds "in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.  Needless to say, HHS's regulations must adhere to this congressional mandate.

Here, HHS explained that it updated the rules to better satisfy Congress's mandate—and concerned citizens' expectations.  84 Fed. Reg. 7714 (Mar. 4, 2019).  It thus offered "reasoned explanations" for the policy change, and the change is therefore not "arbitrary and capricious" in violation of the Administrative Procedure Act.  *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009).  Oregon is mistaken to insist otherwise.  *See* Oregon PI Mot. at 15–16; 5 U.S.C. § 706(2)(A).

Strict separation of Title X funding and abortion serves two important purposes that are of particular interest to the *amici* States, and thus a focus of this brief.  *First*, strict separation preserves public support for Title X by preventing it from becoming associated with abortion.  *Second*, strict separation advances the federal government's interest in adopting policies that large numbers can support.  The new rules better promote these two interests because they better promote Title X's mandate to segregate abortion services and Title X programs.  Part B elaborates on that point.  But first, Part A puts the new rules in historical context.  That context illustrates that the rules function in much the same way as earlier regulations that the Supreme Court already upheld.

## A. The new regulations largely restore the regulatory scheme that the Supreme Court upheld as a valid implementation of Title X in *Rust v. Sullivan*.

Title X bans recipients from using its funds "in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.  It always has.  *See* Family Planning Services and Population

4

Research Act of 1970, Pub. L. 91-572 § 6(c), 84 Stat. 1504, 1508 (1970). Over the years, HHS has repeatedly changed its regulatory approach to enforcing this congressional mandate.

Begin in 1988, when HHS issued regulations similar to those now at issue. It took this step because it determined that the pre-1988 regulations had failed to "preserve the distinction between Title X programs and abortion as a method of family planning." 53 Fed. Reg. 2922, 2923–24 (Feb. 2, 1988). To better promote that distinction, the agency adopted new rules that, among other things, barred recipients from making abortion referrals and *required* recipients to maintain a strict financial and physical separation between their non-abortion services and their abortion services (if indeed they provided any).

The Supreme Court, in *Rust v. Sullivan*, determined that these regulations properly enforced Title X, and thus upheld them against regulatory challenges. 500 U.S. 173, 191 (1991). It upheld them against constitutional challenges too, rejecting free-speech and Due Process Clause arguments. *Id.* at 192–200, 201–13.

The regulations did not last. In 1993, just two weeks into a new administration, the agency rescinded the just-upheld regulations after determining that they would "inappropriately restrict grantees." 58 Fed. Reg. 7462 (Feb. 5, 1993). The agency settled on a new tack, which it promulgated through interim rules. Once finalized in 2000, those rules required grantees to provide "information and counseling regarding" abortion, and required grantees to provide this information in "nondirective" terms. 42 C.F.R. § 59.5(a)(5)(i-ii) (July 3, 2000). In essence, the HHS replaced the ban on abortion referrals with its polar opposite. HHS justified this requirement by claiming that the *Rust*-approved rules had not been shown to work (even though they were in effect for just a short time), and that grantees preferred looser restrictions. Specifically, HHS said the looser rules

were "generally acceptable to the grantee community, in contrast to" the rules that *Rust* upheld. Those standards, HHS said, "were generally unacceptable to the grantee community." 65 Fed. Reg. 41270, 41,271 (Jul. 3, 2000).

The regulations HHS promulgated in 2000 remain in effect. The agency's new rules will soon displace them, however. These new rules—which largely mirror the 1988 rules that *Rust* upheld—differ from the current rules both in the procedure by which they were adopted and their substance. Begin with the procedural difference. In 1993, just days after the new administration entered office, HHS rescinded the rules that *Rust* had upheld. Here, in contrast, HHS worked on the issue for significantly longer, announcing its proposed rules only on June 1, 2018. 83 Fed. Reg. 25502 (June 1, 2018). HHS followed notice and comment procedures before any immediate action, and has now issued the updated regulations, explaining its reasons for the changes. 84 Fed. Reg. 7714 (Mar. 4, 2019).

The substantive differences between the current rules and the new ones are more relevant to this case. HHS sought to better comply with Title X's text, and with the expectation of citizen taxpayers, by clearly segregating abortion services and Title X funds. *Id.* at 7714–15. In its own words, the new rules "will ensure compliance with, and enhance implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning and related statutory requirements." *Id.* at 7714. How? For one thing, by eliminating the requirement that Title X recipients make abortion referrals, and replacing it with a rule that permits (but does not require) non-directive consulting about the availability of abortion. *Id.* at 7716–17. For another, by requiring Title X recipients to maintain stricter physical and financial separation between abortion services and programs that spend Title X mon-

ey. *Id.* at 7763–77; 42 C.F.R. § 59.15.  The new rule says that "to be physically and financially separate, a Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient."  42 C.F.R. § 59.15.

HHS will review programs for "objective integrity" based on factors listed in the rule:

(a)  The existence of separate, accurate accounting records;

(b)  The degree of separation from facilities (*e.g.*, treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites) in which prohibited activities occur and the extent of such prohibited activities;

(c)  The existence of separate personnel, electronic or paper-based health care records, and workstations; and

(d)  The extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent.

42 C.F.R. § 59.15.

Together, these requirements "protect against the unintentional commingling of Title X resources with non-Title X resources of programs."  84 Fed. Reg. at 7715.  Preventing such comingling is necessary to give effect to Congress's prohibition on using Title X funds "in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.  And by addressing "the potential for ambiguity between approved Title X activities and non-Title X activities and services," the new rules eliminate what would otherwise be the "significant risk" of "public con-

7

fusion over the scope of Title X services, including whether Title X funds are allocated for, or spent on, non-Title X services, including abortion." 84 Fed. Reg. at 7715.

The agency additionally supported its financial-and-physical-separation rule by citing numerous sources illustrating the failure of the current rule to support Congress's mandate. Those sources showed that, "under the current arrangement, it is often difficult for patients, or the public, to know when or where Title X services end and non-Title X services involving abortion begin." 84 Fed. Reg. at 7764. "Even with the strictest accounting . . . , a shared facility greatly increases the risk of confusion." *Id.* The agency noted that this concern sharpened over the years because abortion was increasingly being performed in "nonspecialized clinics"—in other words, clinics that focus on non-abortion services (such as Title X contraception services) but that also provide abortions. *Id.* at 7765. HHS noted that "[a]ccording to the Guttmacher Institute, nonspecialized clinics accounted for 24% of all abortions in 2008, 31% in 2011, and 36% in 2014." *Id.* (citations omitted). That increased the likelihood of confusion about whether Title X supported abortion services.

**B.  Strictly segregating Title X funds and abortion is critical for preserving public support for the otherwise-popular program, and for reflecting the values and policy preferences of millions of Americans coast to coast.**

The new rules strictly segregate Title X funding and abortion services. These rules are valuable both instrumentally and intrinsically. Their instrumental value lies in preventing "public confusion" regarding Title X's connection to abortion. If people begin to suspect that Title X is funding abortion even indirectly, the program will lose public support. The new rules stop that loss of support. The rules' intrinsic value is that they can gain broad support in a pluralistic country made up of millions of individuals with radically different views. In a representative democracy

8

like ours, a law that can gain wide support is, all else equal, better than one that cannot. Since nearly everyone can get behind Title X so long as it has no connection to abortion, the revised rules promote this democratic ideal.

Oregon's brief fails to appreciate either point—perhaps because it fails to appreciate the concerns of citizens who do not share its views of the issue. This brief aims to fill the gap.

**1.** Because many citizens oppose abortion, federal and state laws have long banned the public funding of abortion facilities and services. *See Harris*, 448 U.S. at 315-17; *Maher*, 432 U.S. at 474. For millions of Americans, these laws do not go far enough. For one thing, money is fungible. Thus, giving money to abortion providers for purposes unrelated to abortion is often no different from funding abortion itself; if the government doles out $100 to spend on STD tests, an abortion provider can accept the money, buy the tests, and use $100 that it would have spent on the same tests to support its abortion services. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010). In addition to their concern with fungibility, many Americans believe that prohibitions on direct funding do too little to express a legitimate policy preference against government-endorsed elective abortion. These citizens believe that permitting abortion providers or advocates to participate in providing a government-funded service implies a public imprimatur on abortion—an imprimatur that citizens legitimately seek to withhold. *See Planned Parenthood,* 2019 U.S. App. LEXIS 7200 at *4.

The fungibility and public-imprimatur concerns led many citizens to call for laws putting a greater distance between public funding and abortion-performing entities. Their representatives listened, and passed laws doing just that. Ohio, for example, enacted a law barring public funds under several non-Title X programs from going to entities affiliated with abortion providers. This

*Amici Curiae* Brief Supporting the United States in Opposing a Preliminary Injunction

law is designed to "promote childbirth over abortion, to avoid 'muddl[ing]' that message by using abortion providers as the face of state healthcare programs, and to avoid entangling program funding and abortion funding." *Id.* at *4 (citing Ohio's brief at 39–41). In upholding the law, the en banc Sixth Circuit, in an opinion by Judge Sutton, recognized the validity of Ohio's interest: "Governments generally may do what they wish with public funds," so they may "subsidize some organizations but not others and [] condition receipt of public funds on compliance with certain obligations." *Id.* at *6 (citing *Rust*, 500 U.S. at 192–94). So when a State's citizens do not wish to promote abortion, that State may choose not to spend its citizens' money doing so. *See id.* The Sixth Circuit's en banc ruling thus establishes the legitimacy of, and confirms the desire for, laws putting a greater distance between public funds and abortion.

Ohio is not alone. In 2011, Indiana enacted a law providing that state agencies "may not[] enter into a contract with, or make a grant to, any entity that performs abortions or maintains or operates a facility where abortions are performed," other than hospitals and ambulatory surgical centers. The same law cancelled existing contracts with covered abortion providers. *Planned Parenthood of Ind., Inc. v. Comm'r of the Ind. State Dep't of Health*, 699 F.3d 962, 969–70 (7th Cir. 2012). Arizona passed a similar law in 2012, barring state agencies and subdivisions from entering family-planning services contracts with, or awarding family-planning services grants to, any person performing "nonfederally qualified abortions" or maintaining or operating a facility in which those abortions were performed. *Planned Parenthood Ariz., Inc. v. Betlach*, 727 F.3d 960, 964 (9th Cir. 2013). The pace of such laws is increasing: the Guttmacher Institute reports that, while State have sought for decades to bar family-planning funds from going to those who perform abortions or even referrals or counseling, at least eighteen States adopted new fungibility-based restrictions between

10

2011 and 2016.  *See* "Fungibility":  The Argument at the Center of a 40-Year Campaign to Undermine Reproductive Health and Rights at www.guttmacher.org/gpr/2016/10/fungibility-argument-center-40-year-campaign-undermine-reproductive-health-and-rights.

These laws do not even count the executive actions terminating funding.  Between 2015 and 2016, officials in Arkansas, Kansas, and Utah all sought to terminate funding for non-abortion services to Planned Parenthood affiliates.  *See Doe v. Gillespie*, 867 F.3d 1034, 1037–38 (8th Cir. 2017) (Arkansas); *Planned Parenthood of Kan. & Mid-Mo. v. Anderson*, 882 F.3d 1205, 1212–14 (10th Cir. 2018) (Kansas); *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245 (10th Cir. 2016) (Utah).  And in 2015, the Louisiana Department of Health and Hospitals terminated Planned Parenthood of Gulf Coast's Medicaid provider agreements, apparently in response to concerns related to particular aspects of Planned Parenthood's abortion practices.  It canceled these agreements even though Planned Parenthood claimed also to be providing various public-health services, including pregnancy testing and counseling, contraception and contraceptive counseling, testing and treating specified sexually transmitted diseases, and more.  *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 450–52 (5th Cir. 2017), *cert. denied*, 139 S. Ct. 408 (2018).

These laws and executive acts have no direct bearing on Title X; each involves a change to a program receiving no Title X funds.  They are nonetheless significant because they reflect a common, concrete reality:  many Americans are concerned that public family-planning funding or other public-health funding is linked to abortion.  Even the *impression* that a law steers money to abortions can stir intense voter passion.  In 2010, an advocacy group in Ohio "issued a press release announcing its plan to 'educat[e] voters that their representative voted for a health care bill that includes taxpayer-funded abortion.'"  The same group "sought to display a billboard in [a repre-

sentative's] district condemning that vote." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 153–54 & n.2 (2014). The public's concerns may be based on the fungibility of funds. They may rest on a desire to withhold the government's "stamp of approval" for organizations connected to abortion. But whatever motivates these concerns, there is no doubt they are deeply held and here to stay. The many laws and executive actions discussed above leave no doubt about that.

**2.** All of this matters to Title X. Many Americans—perhaps a hundred million or more—do not want their money going to fund abortions, directly or indirectly. If Title X provides such funding, or *appears to* provide such funding, support for the program will erode. HHS properly accounted for that.

The updated rules, once implemented, will assure concerned citizens that their tax money is following Title X's mandate and not being "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. They will also address distinct citizen concerns. The enhanced financial-separation requirement addresses concerns about fungibility of funds. Higher figurative walls between any entity's Title X funds and abortion-related funds ensure that no indirect subsidy occurs. The physical-separation requirement addresses the "imprimatur" or approval concern, as it assures citizens that their Title X dollars are not indirectly supporting abortions by attracting patients to a facility that performs abortions on the other side of a literal wall. These assurances ultimately help to preserve and promote public support for Title X itself. That support might be threatened if the strong, continued sentiment against abortion combines with a growing concern that Title X funds abortion indirectly. Keeping Title X funds far away from abortion ensures that the consensus support for Title X is not eroded by any connection to the controversial practice of abortion.

The agency recognized all this.  As explained above, *see above* 6–7, HHS explained how the previous administrative regime did not adequately reassure citizens of the separation they expect, and that Congress's mandate requires.  The new rules do.

**3.**  The agency's new rules are important for another reason:  they reflect the virtues of government of the People, by the People, for the People.  Oregon speaks as though the federal government could please everyone by simply giving the States block grants through Title X and allowing them to send that money to whomever they wish.  But as the above shows, that is wrong.  Many American do not want to fund abortion, and the block-grant model would force them to do so.

Most people, whether they are pro-life or pro-choice or neither, support funding family-planning services *unrelated to* abortion.  The new rules assure the public that Title X will continue providing that support, but that it will do so without indirectly supporting abortion.  For example, the new rules bar recipients from making abortion referrals, in contrast to the old rules which *required* referral.  The rules will no longer require "nondirective pregnancy counseling" (though they will permit it).  The rules will also encourage family participation in family-planning decisionmaking, and will require training regarding compliance with State and local sexual-abuse reporting requirements.  84 Fed. Reg. at 7715–18.  These and other changes reflect (in addition to Congress's mandate) the consensus position that public funding for services unrelated to abortion is appropriate, while keeping the government from funding abortion even indirectly.

The new rules are hardly unique in funding priorities that can achieve greater consensus.  Indeed, funding limits of this sort are quite common.  Voters may, through their representatives, sometimes fund "all comers" in a certain category.  But they may do the opposite too, even in areas that touch on constitutional rights.  Thus, for example, the federal government may issue grants

to promote art projects that are consistent with the "general standards of decency and respect for the diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1); *see also Natl. Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998). In a pluralistic society, it is fully appropriate for a government to spend its taxpayers' money on art that many will deem worthy of funding—and not, for example, a photograph of a crucifix submerged in urine. *See Finley*, 524 U.S. at 574. Supreme Court precedent further establishes that when a government elects to fund education, it may elect not to fund religious studies if many of its citizens object to the public funding of religious training. *Locke v. Davey*, 540 U.S. 712, 720–22 (2004). The fact of the matter is that funding decisions require policy choices. In a constitutional democracy, one reasonable way to make such choices is to fund the projects that can gain broad support.

Oregon's brief seems to rest on an assumption that pro-life views, despite being shared by millions in and outside of its borders, are illegitimate—and that the federal government may not accommodate or advance such views. The Supreme Court disagrees. The very same case that created the modern abortion-rights framework acknowledged that States may pass legislation to "express profound respect for the life of the unborn." *Planned Parenthood v. Casey,* 505 U.S. 833, 877 (1992) (plurality op.). The federal government may likewise "use its voice and its regulatory authority to show its profound respect for the life within the woman." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007). The federal ban on partial-birth abortion serves precisely that purpose: it bans a gruesome procedure, "'disturbing'" in its "'similarity to the killing of a newborn infant,'" because the procedure is "laden with the power to devalue human life" and "implicates additional ethical and moral concerns that justify a special prohibition." *Id*. at 158 (citation omitted). If the federal government can pass laws to prevent the devaluation of human life, so can the States. They

14

can do so by declining to fund elective abortions, *Harris*, 448 U.S. at 315-17 and *Maher*, 432 U.S. at 474, or by ensuring that non-abortion funding is insulated from abortion activities, *Rust*, 500 U.S. at 201–02.  Or they may do so by cutting abortion providers off from state funds altogether.  *See Planned Parenthood,* 2019 U.S. App. LEXIS 7200 at *3, 20–21.

If the People can ban entire procedures in order to express their preference for life, surely they can also take the much smaller step of ensuring that abortions do not happen on their dime, or with seeming public approval.

**4.**  Critically, the new rules will serve these instrumental and intrinsic purposes without posing any threat to the vitality of Title X programs.  We know this because many States administer their own public-health programs without funding abortion providers.  *See above* 9–11.  And we also know this because many States administer Title X programs themselves, they do so effectively, and they do so without providing abortions.  This confirms that there is no necessary connection between the success of Title X's family-planning mission and the comingling of abortion and Title X funds.

To understand this, start with the fact that it is unusual for a State to rely heavily on private parties to provide Title X-funded services.  Most Title X funds go to fund services at state agencies and county health departments.  *See* Title X Family Planning Directory at https://www.hhs.gov/opa/sites/default/files/Title-X-Family-Planning-Directory-December2018.pdf (last visited April 4, 2019); *see also* Title X Family Planning Service Grants Award by State at https://www.hhs.gov/opa/grants-and-funding/recent-grant-awards/index.html (last visited April 4, 2019).   Several States have laws that express a preference that Title X funds be prioritized for public entities, even if it is possible for leftover funds to be subgranted to private organizations. *See, e.g.*, Kan. Stat. Ann.

15

§ 65-103b; Ky. Rev. Stat. Ann. § 311.715; Wis. Stat. § 253.07(5)(a).  These public programs of course provide no abortion services.  They are nonetheless able to serve the public by providing precisely the services that Title X is designed to fund.

Other States do not subgrant federal Title X funds to private parties *at all*.  Consider, for example, the State of Alabama.  The State Department of Public Health is the sole Title X grantee in Alabama.  See Title X Family Planning Directory at https://www.hhs.gov/opa/sites/default /files/Title-X-Family-Planning-Directory-December2018.pdf (last visited April 4, 2019).  It uses Title X funds to support more than 80 health centers across the State, all of which are operated by state and local county health departments.  *See id.*  These local health centers provide contraceptive services, pelvic exams, screening for STDs, infertility services, and health education. The Department's 2019 grant award is over $5,000,000, which it will use to provide services to roughly one hundred thousand people.  *See* Title X Family Planning Service Grants Award by State at https://www.hhs.gov/opa/grants-and-funding/recent-grant-awards/index.html (last visited April 4, 2019).

Finally, some States that subgrant Title X funding to private organizations already do so subject to state laws that mirror the challenged regulations.  At least thirteen States—Arizona, Arkansas, Colorado, Indiana, Iowa, Louisiana, Michigan, Mississippi, Missouri, North Carolina, Ohio, Texas, and Wisconsin—have laws that also prevent federal pass-through family planning funds from being used to pay for abortions. See Ariz. Rev. Stat. Ann. § 35-196.02; Colo. Rev. Stat. Ann. § 25.5-3-106; La. Rev. Stat. § 40:1061.6; Iowa Code Ann. § 217.41B; Miss. Code. Ann. § 41-41-91; Mich. Comp. Laws Ann. § 400.109a; Mo. Ann. Stat. § 188.205; N.C. Gen. Stat. Ann. § 143C-6-5.5; Ohio Rev. Code § 5101.56; Tex. Health & Safety Code Ann. § 32.005; Wis. Stat.

*Amici Curiae* Brief Supporting the United States in Opposing a Preliminary Injunction

Ann. § 20.927.  Several of these States have further restricted family-planning funds from any organizations that provide abortion, that contract with abortion providers, or that refer patients to get abortions. See Ark. Code Ann. § 20-16-1602; La. Rev. Stat. § 49:200.51; Ind. Code Ann. § 5-22-17-5.5; Wis. Stat. Ann. § 253.07(5).  The upshot is that the challenged regulations will help—not hinder—these States administer Title X programs.

*    *    *

In a country of more than 300 million people, no one gets his way all the time.  Everyone has to compromise a bit.  Title X reflects that compromise, by funding the services that large number of Americans support while withholding that funding from services that large numbers oppose.  The new federal rules promote that compromise, by helping to ensure that Title X provides no direct or indirect funding to abortion services.  In so doing, the rules merely respect Congress's promise from 1970, which perhaps will finally be met.

## II.   Any potential injunction should be limited to Oregon and the other plaintiff States—it should not be imposed on the *amici* States.

If the Court does enjoin HHS's new rules, it should limit its injunction to Oregon and the other plaintiff States.  Those States seeks a nationwide injunction, but they offer no good reason to award one here.

The first problem with Oregon's request is that it is doubtful district courts have any authority to award such relief.  The Ninth Circuit recently recognized the "uncertainty" surrounding the propriety of nationwide injunctions.  *E. Bay Sanctuary Covenant*, 909 F.3d at 1255.  The uncertainty is well founded.  For one thing, such injunctions are a relatively recent development unrelated to traditional understandings of jurisdiction and equity.  *Trump*, 138 S. Ct. at 2424–29 (Thomas, J., concurring); *see also* Bray, *Multiple Chancellors*, 131 Harv. L. Rev. at 425.  More fundamentally,

17

they exceed the proper bounds of the judicial power. Article III limits courts to addressing cases or controversies. That empowers the judiciary to "provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). National injunctions ignore this limit, awarding relief to *non-parties*, and thus resolving more than is at issue in any one "case" or "controversy." Any injunction that awards relief to non-parties exceeds the bounds of Article III. *Trump*, 138 S. Ct. at 2427–28 (Thomas, J., concurring).

But assume that national injunctions can be appropriate in some cases. Even then, there is no reason to award such relief here. The plaintiff States want relief for *their* citizens. Indeed, they allege harms to their "sovereign and quasi-sovereign interests," saying that they speak for *their citizens'* health interests. *See* Plaintiff States' Mot. at 35–41. They also claim harm to the States' own interests in preserving their current networks of Title X providers. *Id.* They support their request for an injunction with evidence of alleged harms to the *plaintiff States and their citizens* and to *their* particular Title X provider networks. *Id.* Neither of those interests extend far enough to justify an injunction against applying the new regulations in Ohio or any other non-plaintiff State, especially as to the *amici* States.

That is all the more true because the *amici* States *support* the updated regulations; they do not want to assist in the funding of entities linked to abortion. What interest does Oregon have in forcing its values upon Ohio? What interest does Vermont or any plaintiff State have in imposing its values upon Texas or any *amicus* State here? To be sure, people and entities *in Ohio* may have an interest in enjoining the new regulations' operation in Ohio. But if they do, they can sue in Ohio to achieve that result. The same goes for the other *amici* States. For proof, look no further than

18

California, Maine, and Washington, where suits identical to this one are pending already. Indeed, to the extent that universal injunctions might be urged to avoid "multiplicity of suits," *Trump,* 138 S. Ct. at 2427 (Thomas, J., concurring) (citing Bray, *Multiple Chancellors*, 131 Harv. L. Rev.at 426), that rationale cuts against that practice here. Multiple cases already exist, so a nationwide injunction here risks conflict with the outcomes in those cases.

The private plaintiffs have an admittedly better case for a broader injunction, but their request for a nationwide injunction fails nonetheless. For one thing, the *most* they would be entitled to is an injunction forbidding application of the new rules *to themselves*. Neither Article III nor traditional equity principles permit the Court to enjoin applying the new rules to non-parties. *See above* 17–18.

But they are not entitled even to that. If this Court finds the rules invalid, it should enjoin their enforcement only within the plaintiff States' borders. This follows from the principle that injunctive relief "must be tailored to remedy the specific harm alleged," *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991), and "no more burdensome to the defendant[s] than necessary to provide complete relief *to the plaintiffs*." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added). The private plaintiffs have not shown, and almost certainly could not show, that a nationwide injunction is "necessary" to protect their interests. True, at least some of the private plaintiffs operate outside of Oregon and the other plaintiff States, and thus have an interest in seeing the rules' application enjoined, as to them, nationwide. The trouble is, the patchwork of approaches to public-health programs generally and Title X programs in particular makes a nationwide injunction decidedly *un*necessary. The plaintiffs suffer no harm *at all* from the rules' application to States (like Alabama) that administer Title X programs themselves, or

19

States (like Indiana) that take no Title X funding at all.  Even for those States that accept funds and subgrant them to private parties, the sheer diversity of approaches to public-health funding makes it impossible to properly tailor injunctive relief for the entire nation.  The Court should focus on the one issue for which it can feasibly craft injunctive relief:  whether the plaintiffs are entitled to injunctive relief in Oregon and the plaintiff States.  Other courts in other parts of the country can assess the rules' application there.

The availability of nationwide injunctions in cases like this one, where there is no pressing need for national uniformity, creates the potential for forum shopping.  *See City of Chicago v. Sessions*, 888 F.3d 272, 288 (7th Cir. 2018), *vacated by* 2018 U.S. App. LEXIS 21801 (7th Cir. 2018).  If courts set a precedent of awarding nationwide injunctions, they will give advocates great incentive to structure their litigation strategies to pick out what they perceive to be the most favorable fora to obtain invalidation of whatever federal law they dislike.  "The opportunity for forum shopping is extended by the asymmetric effect of decisions upholding and invalidating a statute, regulation, or order."  Bray, *Multiple Chancellors*, 131 Harv. L. Rev. at 460.  When a court "*upholds* the challenged law, that decision has no effect on other potential plaintiffs.  But if one district judge *invalidates* it and issues a national injunction, the injunction controls the defendant's actions with respect to everyone."  *Id.*  The result?  "Shop 'til the statute drops."  *Id.*  Declining to award a nationwide injunction allows for a multiplicity of suits throughout the nation.  And *that* permits courts and parties to continue developing arguments, perspectives, and data, all of which will prove useful when this dispute eventually makes its way to One First Street.

But the biggest problem with forum shopping is neither unfairness nor the risk of preventing percolation in lower courts.  The biggest problem is the risk it poses to the federal courts' repu-

tation.  "Few exercises of the judicial power are more likely to undermine public confidence in the neutrality and integrity of the Judiciary than one which casts the Court in the role of a Council of Revision, conferring on itself the power to invalidate laws at the behest of anyone who disagrees with them."  *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 145–46 (2011).  That is precisely the role that courts assume when they issue national injunctions in case where narrower relief will suffice.

## CONCLUSION

For the above reasons, the *amici* States urge the Court to deny Oregon's and the plaintiff States' request for a preliminary injunction, or alternatively, to limit any injunction to Oregon and the plaintiff States.

*Amici Curiae* Brief Supporting the United States in Opposing a Preliminary Injunction

**RESPECTFULLY SUBMITTED** this 11th day of April, 2019 by:

/s/ *Benjamin M. Flowers*

STEVE MARSHALL
  Attorney General of Alabama

DAVE YOST
  Attorney General of Ohio
BENJAMIN M. FLOWERS
  State Solicitor
STEPHEN P. CARNEY
JASON D. MANION
  Deputy Solicitors
Office of the Attorney General of OHIO
30 E. Broad St., 17th Floor
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@ohioattorneygeneral.gov

LESLIE RUTLEDGE
  Attorney General of Arkansas

CURTIS T. HILL, JR.
  Attorney General of Indiana

DEREK SCHMIDT
  Attorney General of Kansas

JEFF LANDRY
  Attorney General of Louisiana

ERIC S. SCHMITT
  Attorney General of Missouri

MIKE HUNTER
  Attorney General of Oklahoma

ALAN WILSON
  Attorney General of South Carolina

JASON RAVNSBORG
  Attorney General of South Dakota

HERBERT H. SLATERY III
  Attorney General and Reporter of Tennessee

KEN PAXTON
  Attorney General of Texas

*Attorneys for Amici States*

22

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2019, I filed the foregoing document with the Clerk of the

Court by CM/ECF, which automatically sends notice of the filing to all counsel of record.

/s/ *Benjamin M. Flowers*

BENJAMIN M. FLOWERS

*Amici Curiae* Brief Supporting the United States in Opposing a Preliminary Injunction